# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Civil Action No. <u>1:21-cv-628</u>

SARAH LIEBERENZ, Individually and as Personal
Representative of THE ESTATE OF JACKSON MAES,
deceased,

**ATTORNEY LIEN CLAIMED**
**JURY TRIAL DEMANDED**

       Plaintiff,

v.

BOARD OF COUNTY COMMISSIONERS OF THE COUNTY OF SAGUACHE,
COLORADO, in its official capacity;
SAGUACHE COUNTY SHERIFF'S OFFICE, a governmental entity;
DAN WARWICK, SHERIFF OF SAGUACHE COUNTY, in his official capacity;
KENNETH WILSON, in his individual capacity;
ELKE WELLS, in her individual capacity;
MIGUEL MACIAS, in his individual capacity; and
SHELBY SHIELDS, in her individual capacity,

       Defendants.

---

## COMPLAINT AND JURY DEMAND

---

Sarah Lieberenz, Individually and as Personal Representative of the Estate of Jackson Maes, deceased (Jackson), pleads the following allegations against these Defendants:

## I.

### PRELIMINARY STATEMENT

1.      On November 16, 2019, a 27-year-old African American man named Jackson Maes died alone in a cell at the Saguache County Jail (SCJ). Jackson made multiple cries for help that night, telling the Defendants repeatedly that he was suicidal. But the Defendants never gave

Jackson the medical care or supervision he needed to survive despite knowledge that Jackson was not free to leave to help himself.

2. While jail staff socialized in the dispatch room, Jackson succumbed to his illness and perished around 10:30 p.m. He would not be found for more than eight-and-a-half hours. And one of the Defendants would go on to record a cell check for Jackson's cell that never happened.

3. The unlawful conditions at the SCJ were caused by years of chronic underfunding, inadequate training, and mismanagement of the SCJ by the county's elected officials. For years prior to Jackson's death, the elected officials had a choice: "[t]he County could pay on the front end to protect the constitutional rights of inmates by building a new jail, or the County could pay on the back end by satisfying judgments in meritorious civil rights actions based on unconstitutional conditions at the Jail." *Winton v. Bd. of Comm'rs*, 88 F. Supp. 2d 1247, 1268 (N.D. Okla. 2000). The elected officials in Saguache County chose the latter.

4. This is an action under Title 42, Section 1983 of the United States Code for violations of the Fourteenth Amendment to the United States Constitution alleging inadequate conditions of confinement, inadequate funding and supervision, and deliberate indifference exhibited by Saguache County, its elected officials, and employees, towards the substantial risk of serious harm confronting pretrial detainees who are highly intoxicated and expressing acute suicidal ideations during the intake process at the SCJ. Jackson also brings supplemental state law claims as allowed by the Colorado Governmental Immunity Act (CGIA) for the negligent operation of the SCJ.

5. Sarah Lieberenz is Jackson's mother and Personal Representative of the Estate, and now appears before this Honorable Court to seek justice for Jackson's death.

## II.

### PARTIES, JURISDICTION, VENUE

6.      Sarah Lieberenz is a resident and citizen of Colorado. She is the biological mother of Jackson Maes who died at the SCJ between November 16 and 17, 2019. Upon information and belief, Jackson was not married at the time of death and had no issue.

7.      Board of County Commissioners of the County of Saguache County (Board) is a political subdivision of the State of Colorado. The term "The Board of County Commissioners of the County of Saguache" is the designation used to sue Saguache County pursuant to C.R.S. § 30-11-105. The Board is the governing body for Saguache County, and has overall responsibility for the operation of Saguache County, including the responsibility to provide an adequate physical plant for the SCJ along with adequate funding for its operation. *See* C.R.S. § 17-26-101. Board is deemed an individual within the meaning of 42 U.S.C. § 1983.

8.      Saguache County Sheriff's Office (SCSO) is the law enforcement department of Saguache County.

9.      Dan Warwick (Warwick) is the elected sheriff of Saguache County, Colorado. Warwick is a final policymaker for Saguache County responsible for the operational aspects of the SCJ, including the adoption, maintenance, and enforcement of written policies and unwritten practices governing training, supervision, and the provision of adequate medical care at the SCJ. He is sued in his official capacity.

10.      Kenneth Wilson (Wilson), Elke Wells (Wells), Miguel Macias (Macias), and Shelby Shields (Shields), are or were employees of County, SCSO, and/or Warwick working at the SCJ in November 2019. They are sued in their individual capacities.

11.    All Defendants were acting under color and authority of state law at the times referenced in this pleading.

12.    The events complained of occurred in the State of Colorado, making venue proper.

13.    Pursuant to 28 U.S.C. § 1331, this Court has federal question jurisdiction over the claims arising under 42 U.S.C. § 1983. This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

### III.

#### STATEMENT OF THE CLAIM

**A.    GENERAL KNOWLEDGE OF SUICIDE RISK IN PRETRIAL DETENTION**

14.    According to the United States Department of Justice, suicide is the leading cause of death in jails, accounting for 31.1% of jail deaths in 2016. *See* U.S. Dept. of Justice, Office of Justice Programs, Bureau of Justice Statistics, MORTALITY IN LOCAL JAILS AND STATE PRISONS, 2000 AND 2006-2016 – STATISTICAL TABLES, Feb. 2020.[1]

15.    Suicide has been the leading cause of death in local jails each year since 2000, the first year the Department of Justice began collecting data. From 2008 to 2016, the suicide rate in jail facilities increased by more than 30%.

16.    From 2000 to 2016, suicide has been a more prevalent cause of death in local jail facilities than heart disease, AIDS-related illness, cancer, liver disease, and respiratory disease.

17.    The vast majority of suicides occur in a jail cell, usually when the person is alone and unsupervised. Suicides often involve fabric like a sheet or curtain that are easily used as a ligature.

---

[1] *See* https://www.bjs.gov/content/pub/pdf/mlj0016st.pdf (last visited Oct. 22, 2020)

18.    On or about February 5, 2008, Felix Granados, a pretrial detainee at the SCJ, committed suicide at the facility by tearing down a shower curtain, tying it around the bars of the cell, and fashioning the curtain into a ligature. Mr. Granados' suicide was preceded by another suicide at the SCJ several years prior.

19.    Upon information and belief, Warwick was employed by the SCSO at the time of the Granados' suicide and had actual knowledge of Granados' suicide and mechanism of death.

20.    Upon information and belief, Board, Warwick, and Wilson had actual knowledge regarding the risk of suicide in local jail facilities, including the SCJ, based on their familiarity with the facility; their education, training, and experience; and their participation in a risk pool providing coverage for the specific risk of in-custody suicide at the SCJ.

21.    Upon information and belief, Wells, Macias, and Shields either had actual knowledge regarding the risk of suicide in local jail facilities, including the SCJ, or they would have known about the risk with adequate training.

**B.    KNOWLEDGE OF DEFICIENCIES AT THE SCJ**

22.    Agendas maintained by the Board indicate that from 2008 through 2018, the Board routinely listed a "Jail Tour" among its agenda items.

23.    Based on the history of jail tours reflected in the Board's minutes and agendas, Board had actual knowledge of the conditions of confinement at the SCJ in November 2019, including the condition and layout of its physical plant.

24.    Minutes maintained by the Board from 2016 though 2019 memorialize knowledge of the conditions and risks existing at the SCJ by the Board and Warwick, including the following:

      a.    <u>Feb. 2016</u>:    Warwick acknowledged both overcrowded conditions and inadequate staffing at the SCJ;

b.    <u>Aug. 2016</u>:    Board and Warwick discussed the necessity for a new jail facility; the Northern Saguache County Ambulance District representative advised the Board and Warwick that inadequate staffing makes the SCJ unsafe; Warwick commented that handling patients with mental health issues at the SCJ is difficult, and made worse by jail conditions; Warwick acknowledged that he could fill 20 new cells;

c.    <u>Jan. 2017</u>:    Warwick shared a letter from a Colorado State Trooper identifying safety issues at the SCJ with the current jail/dispatch structure; Board openly questioned Warwick about publicizing the letter when "the Commissioners understand the need for a new jail, they are just trying to figure out how the new jail will be paid for;" Warwick told the Board the jail should be a top priority, and that "[t]he Band-Aid approach previously taken is not working any longer."

d.    <u>May 2017</u>:    Warwick acknowledged his office has been "extremely overwhelmed and very understaffed."

e.    <u>Jul. 2017</u>:    A report was circulated to place jail funding on the ballot; however, the city attorney explained that where a sale tax failed in the previous year, a new sales tax cannot be put on the ballot for 1 year and 350 days; a decision to cease all medical attention for all inmates is discussed with an acknowledgment that medical care is most crucial for people with psychological issues;

f.    <u>Aug. 2017</u>:    Warwick acknowledged that the SCJ is at capacity and understaffed, and that the number of arrestees with mental health issues is

increasing; Warwick advised the Board that his small budget made it difficult to house people in other jurisdictions, and that extra-jurisdictional housing depended on the economics;

g.   Nov. 2017:   Commissioner Lovato received call from Jim Fellows with County Jail Systems in Minnesota about ways Saguache County could use their services to build a new facility;

h.   Dec. 2017:   Commissioners received a formal outline for jail construction from County Jail Systems, LLC; Warwick stated Board and Sheriff "need to get on the same page," and that he had repeatedly asked for jail funding because the SCJ is out of compliance; Warwick forecasted a lawsuit if funding is not obtained soon;  Valley Wide Health Systems, Inc. noted it would no longer serve as the medical provider for the SCJ as of 1/1/18; Board discussed SCSO deputies walking out if pay demands were not met; 14 members of the public commented about the lack of funding for the SCSO, and that SCSO is funded less than all surrounding counties; the SCSO victim's advocate told Board the SCJ was not safe for inmates, and that Board needed to adequately fund the SCSO so Warwick could pay a living wage to retain staff; Commissioner Anderson stated Warwick was fully funded and that SCSO should apply for outside funding grants despite inadequate staffing to apply for grants; Anderson stated that Warwick is an elected official, and Board does not micromanage the sheriff; Warwick runs the SCSO "as he sees fit;"

i.     Jan. 2018:     Wilson informed Board that the SCSO/SCJ would be looking for a nurse because Valley Wide will no longer see inmates;

j.     Feb. 2018:     Commissioner Lovato spoke with Warwick about a request for salary increases for staff, and that through policy and statute, Warwick would have to come before the Board for such requests;

k.     Mar. 2018:     Warwick acknowledged wages are so far out of market that SCSO is not getting applicants, and that one jailer left for another county starting at a higher rate than some of SCSO's most seasoned deputies; Commissioner Anderson acknowledged that Warwick's hiring and retention concern related to an official policy of Saguache County that "needs to be reviewed" but "can't just be changed in the spur of the moment"; Warwick informed commissioners that he must furlough inmates with medical needs because the county cannot cover the expense since Valley Wide left; Warwick acknowledged that his choices for inmate care are limited because his budget cannot cover the cost;

l.     May 2018:     Warwick acknowledged that he "still does not have a full staff;"

m.     Jun. 2018:     Warwick acknowledged he needs to hire more staff; Board and Warwick discussed funding a new jail, and one citizen questioned why Warwick needs additional funds given that he did not exhaust appropriated funds in the prior year;

n.     <u>Sept. 2018</u>:    Board agreed in principle to a MOU with Rio Grande County for shared inmates medical services; Warwick advised Board he lost another jail employee;

o.     <u>Oct. 2018</u>:    Other department heads made budget cuts to allocate funds for Warwick to distribute for deputy raises;

p.     <u>Nov. 2018</u>:    A discussion occurred regarding the passage of sales tax to fund new jail with an erroneous title submitted to voters that resulted in approval of a 1.5% sales tax rather than the intended tax of 0.015%;

q.     <u>Dec. 2018</u>:    Warwick advertised for new hires, but had issues staffing medical and nursing care;

r.     <u>Jan. 2019</u>:    Warwick wanted to hire a jail nurse as a part time employee;

s.     <u>May 2019</u>:    Warwick asked Board to release 25% of the 1.5% sales tax for staff retention; one staff resigned and another gave notice; staff are leaving for other agencies with higher pay/better benefits; training costs are high for staff to leave; Warwick can't keep up with Alamosa; Warwick would like to offer increased salaries to staff considering other agencies; a release of funds was approved;

t.     <u>Jun. 2019</u>:    Warwick started staff pay increases, but was not providing them until earned;

u.     <u>Jul. 2019</u>:    Multiple citizens complained that SCSO is not fully funded; Board rejected the complaints stating the "sheriff is fully funded;" bids are presented for a new jail;

      v.    <u>Oct. 2019</u>:    Warwick hired four new staff; all are road deputies; none are designated as jail staff;

25.    In addition to knowledge of jail conditions memorialized in the minutes, Board and Warwick also knew about dangerous conditions at the SCJ from an audit performed by County Technical Services, Inc.

26.    The letter from CTSI included the following warning: "[I]t is imperative that action be taken to eliminate any identified risk or exposure, wherever possible, to minimize losses incurred by the Pools and their members."

27.    The letter is copied to "Chairman, Board of County Commissioners."

28.    The audit report accompanying the letter to Saguache includes the following recommendations:

      a.    "Consider[] removing items which may present inmate self-harm;" and

      b.    "Adequate inmate medical treatment is a necessity; additional on-sight medical care provided by a qualified county employee or a third-party contractor could provide improved care."

**C.    SYSTEMIC CONDITIONS AT THE SCJ (OCTOBER - NOVEMBER 2019)**

29.    On or about October 26, 2019, a detainee with "violent tendencies" escaped from the SCJ during Macias' shift.

30.    A report prepared by Wilson the same day acknowledged that Macias failed to pursue the escapee, that Macias did not leave the building to determine the route of the escapee, and that Macias was "very generally disconnected during the event."

31.     Upon information and belief, the actions or inactions of Macias on October 26, 2019 increased the risk of harm to innocent people in the Saguache community, and constituted a terminable offense.

32.     Upon information and belief, the escape on October 26, 2019 did not result in the immediate termination of Macias because the SCJ already suffered from chronic understaffing as memorialized in numerous Board minutes and exchanges between commissioners and Warwick dating back to 2016.

33.     Upon information and belief, Board's failure to adequately fund the SCSO over several years, and its failure to provide an adequate jail facility that would attract and retain staff, were the direct and proximate cause of chronic understaffing at the SCJ.

34.     Alternatively, the Board adequately funded the SCSO, but Warwick failed to allocate funds sufficient to alleviate the chronic and longstanding staffing and retention deficiencies at the SCJ that Warwick acknowledged in numerous meetings with the Board dating back to 2016.

35.     Upon information and belief, the chronic understaffing, lack of funding, and the inadequate physical plant caused Warwick to fill jailer positions with unqualified or untrained individuals like Macias, and then leave people like Macias in those positions, even when it became apparent that the employee could not adequately perform the essential functions of the job or supervise the inmate population without exposing the community and inmate population to a substantial risk of serious harm.

36.     As a direct and proximate cause of the inadequate funding, chronic understaffing, and inadequate physical plant, Warwick did not terminate Macias, and allowed him to continue supervising inmates at the SCJ.

37.     On November 10, 2019, Macias provided a letter of resignation advising Warwick and Wilson of the following: (1) he had become less and less satisfied with the work situation; (2) he was unhappy with having to work every weekend; (3) he had not received a raise when others with less experience had; (4) the rate of pay was "exceptionally low;" (5) he received "little to no training on many things [he] was expected to do/perform," and (6) that his resignation was effective on November 24, 2019.

38.     A two-page training record for Macias produced by the SCSO does not identify any training on suicide prevention, identification of at-risk arrestees, or how to obtain a medical clearance for intoxicated or high-risk arrestees.

39.     Upon information and belief, Warwick and Wilson were exposed to the content of the Macias resignation letter, and both Warwick and Wilson allowed Macias to continue working, with no additional training, in a capacity where Macias had direct responsibility for the safety and welfare of people in the SCJ, including Jackson Maes

D.      THE ARREST AND DETENTION OF JACKSON MAES

40.     On November 16, 2019, Jackson was in Crestone, CO at a local establishment. He was intoxicated and appeared depressed.

41.     According to reports, Wells received a call from dispatch about an intoxicated male in Crestone.

42.     When Wells arrived, she encountered Jackson and appreciated that "he was heavily intoxicated and could barely walk without falling down."

43.     Wells discovered that Jackson had an outstanding misdemeanor warrant for failure to appear at a hearing arising from a traffic ticket Jackson received on September 16, 2019. Dispatch informed Wells the warrant was a $250.00 cash bond.

44. At 9:15 p.m., Wells arrested Jackson on the warrant and transported him to the SCJ.

45. The Arrest-Booking Details page for Jackson indicates that he was not suicidal or violent.

46. The assertion in the Arrest-Booking Details page is contradicted by reports from witnesses at the time of Jackson's arrest who overheard him express acute suicidal ideations to Wells.

47. Wells remained at the SCJ and was present when a jailer advised Jackson that he was too intoxicated for booking, and that he would be placed in a holding cell until the alcohol was out of his system. At that point, Jackson would be booked and then he would be able to bond out.

48. Wells remained at the SCJ as Jackson was placed into the holding cell, but there is no indication that she communicated knowledge of Jackson's suicidal ideation at the time of arrest to any other SCJ staff.

49. A timestamp on video from the SCJ surveillance system recorded Wilson placing Jackson in the holding cell at approximately 9:45 p.m. The video includes images of Wells accompanying Wilson.

50. At 9:57 p.m. on the SCJ surveillance video, Wells, Wilson, Macias, and Shields appreciated that Jackson started banging his head on the wall of the cell.

51. Jackson banged his head on the toilet enclosure a total of seven times.

52. Macias entered the cell block after the fifth head strike and communicated to Wilson, Wells, and Shields that Jackson was hitting his head.

53. Wells told Jackson that he needed to lay down and get some rest.

54. Jackson responded by saying, "I'm trying to kill myself right now."

55. Macias and Wilson were present for the statement, and one of them acknowledged Jackson by responding, "You're trying to kill yourself right now?!"

56. Wells responded by telling Jackson that he needed to lay down.

57. Jackson responded by telling Wells, "No . . .no, no, no no no."

58. Wilson asked "Is detox not accepting people, or what?"

59. Wells responded, "I don't know!"

60. Wilson responded, as he walked out of the cell block, that something more needed to be done for Jackson.

61. Nothing more was done for Jackson by anyone involved, including Wilson, Wells, Macias, or Shields.

62. Video shows all staff leave the cell block as Jackson is left alone, at which point he strikes his head again.

63. Macias then returned and told Jackson to sleep it off; Jackson responded, "Nooooo! It [would] be better if I could just go where I wanna [hits head again] go."

64. Jackson kept hitting his head in the presence of Macias.

65. Macias told Jackson that he's going to hurt himself as Jackson hit his head again.

66. Macias told Jackson "Don't do that," as Jackson struck his head again.

67. Macias told Jackson "Don't do that, man," as Jackson struck his head again.

68. Macias told Jackson "That's not good," as Jackson struck his head again.

69. Jackson continued striking his head against the wall in the presence of Macias.

70. Macias then tried to interrupt the head strikes by asking Jackson, "Hey, what's your name?"

71. Jackson responded by asking Macias "What's YOUR name?"

14

72.     Macias responded, "My name is Deputy Macias."

73.     Jackson responded by continuing to hit his head.

74.     Macias tried to talk over Jackson as he strikes his head a few more times.

75.     Macias told Jackson to stop again.

76.     At 10:00:18 p.m. on the surveillance video, Jackson returned to the toilet enclosure and continued the head strikes.

77.     Macias responded by telling Jackson, "Don't do that, come on . . . Dude, you'll have a really bad headache if you do that"

78.     Jackson responded, "yeahhh, [inaudible] too, huh? What's your first name?"

79.     Macias and Jackson engaged in small talk; exchanging names as Jackson continued striking his head on the wall.

80.     Jackson then told Macias that he would like some juice, and Macias responded by telling Jackson, "I will get you some juice, Jackson, if you promise me you won't hit your head again. How 'bout that? Sound like a deal?"

81.     Jackson responded, "yeah, no, yeah, I won't -- I won't try to kill myself, anymore, haha."

82.     Macias asked Jackson to "promise," and Jackson responded, "[a]s long as you bring me some fucking shit so that I don't fucking want to . . . "

83.     Macias responded, "I'll bring you some juice, if you don't hit your head, ok?" He then told Jackson, "can't break a promise though . . . cool? And then after that it's lights out and you can go to sleep."

84.     Jackson responded, "you break my promise, you're gonna have to fuckin' deal with a fuckin' dead person."

85.     Macias responded, "No. No no no no no. We don't want that."

86.     Jackson is seen on video walking back towards the bunk.

87.     Macias responded, "let me go get – let me go get you something, ok? …Alright Jackson?"

88.     Jackson responded, "Alright."

89.     Jackson is seen on video, hands in prayer position, "Please, I need -- I need some food and, like, whatever the fuck you can get me . . ."

90.     Macias laughed and responded, "sounds good man. I'll be right back, ok?"

91.     Macias then returned to the booking area leaving Jackson alone in his cell.

92.     Jackson is then seen on video getting on the lower bunk.

93.     Wells and Macias then decided to contact mental health for an evaluation.

94.     Wells, Macias, and Shields then discussed whether to call mental health or a medical provider to address Jackson's intoxication.

95.     A decision was collectively made between Macias, Wells, and Shields to call mental health, but nobody answered, and no message was left.  No one called 911 or an ambulance, no alternative steps were taken, and no other measures were implemented. These inactions, both individually and collectively, were consistent with the official practice at the SCJ.

96.     Upon information and belief, Wells, Macias, and Shields all knew that no one answered the call to mental health, and they all knew that no message was left.

97.     Upon information and belief, Wilson had actual knowledge that Wells, Macias, and Shields did not make contact with any mental health or medical provider to respond to Jackson's acute suicidal ideations, or alternatively, Wilson had no expectation they would make contact

because he knew the SCJ policy permitted jailers to admit highly intoxicated persons expressing suicidal ideation without obtaining a mental health or medical clearance.

98.     Shields abandoned efforts to obtain a mental health assessment because the shift was "hectic," the main console was down, and she was trying to focus on dispatch.

99.     Shields' inability to handle the numerous tasks expected of her, while also ensuring that a mental health assessment was obtained for Jackson, is directly attributable to facility policy and the practice of chronic underfunding, understaffing, and inadequate training.

100.     At 10:06:50 p.m., video shows Macias bring two items to Jackson's cell.

101.     Jackson was sitting on the bottom bunk with the privacy curtain from the toilet enclosure torn from where it had been hanging and now held between his left leg and the cell wall.

102.     Macias told Jackson, "So Jackson? I kept my promise. Here you go, sir. Lemme know when you [inaudible—finish?] ok?"

103.     Jackson responded, "Yeah . . . thank you."

104.     As he's leaving and closing the door between the cell block and booking, Macias said, "Yeah. Enjoy. That is, uh . . . grape juice. And some crackers."

105.     Jackson then asked, "um, so, I just – I just need to know, like, so, when [inaudible] let me out?"

106.     Macias responded, "umm, yeah, if you bond out, yeah."

107.     Jackson responded, "what do you mean if you bond out?"

108.     Macias then explained the charge ("you missed court") and bond ("if you get $250, you're outta here, man.")

109.     Jackson asked Macias if he "Would [] be able to talk to somebody tomorrow morning?"

110. Macias told Jackson, "Actually, you know what, Jackson, probably not tomorrow just cause it's Sunday . . . but, if you're here Monday – if you bond out tomorrow, you're outta here – but if you're still here Monday, you could talk to somebody on Monday."

111. Jackson responded, "ok . . . and then will I be able to like call people?"

112. Macias responded, "yeah"

113. Jackson responded, "ok cool, thank you."

114. Macias responded, "ok, just sleep it off, man, you know? Just sober up a little, and uh, lemme know if you need anything, ok?"

115. Jackson said, "should've stayed home . . . alright, later."

116. At 10:08:53 p.m., video shows Macias close the door to the cell block as Jackson returned to the bunk.

117. If Wilson, Wells, Shields, or Macias had been performing 15-minute suicide checks, the next mandatory check would have been required at or before 10:23:53 p.m.

118. At 10:15:22 p.m., video shows Jackson standing on the top bunk facing the toilet enclosure while manipulating a long strip of cloth or curtain with his hands.

119. During this time, Wilson, Wells, and Shields are socializing in the booking area; there is no regard for Jackson's welfare, and no effort to supervise his cell.



120.    At 10:20:14 p.m., video shows Jackson standing in front of his bunk with a strip of the curtain around his neck and draped down his right side.



121.    At the same time, Wells, Shields and Wilson are in the booking area; there is no regard for Jackson's welfare, and no effort to supervise his cell.

122.    At 10:20:29 p.m., video shows Jackson turn and face the camera with a strip of the curtain clearly visible around his neck:



123.    At the same time, Wilson, Wells, and Shields remain the booking area; there is no regard for Jackson's welfare, and no effort to supervise his cell.

124.    At 10:20:41 p.m., video shows Jackson climbing the bunk with the curtain wrapped around his neck as he attempts to tie the loose end to the cell bars.



125. At the same time, Wells and Shields remain in the booking area socializing. There is no effort to check on Jackson's welfare, and there is no effort to supervise his cell.

126. From 10:20:41 p.m. through 10:21:19 p.m., video shows Jackson consistently manipulating the curtain in what appears to be an effort to tie the loose end to the cell bars.

127. At 10:20:20 p.m., video shows Jackson slip his head through a loop fashioned from the curtain:



128. At the same time, Wells and Shields remain in the booking area socializing. There is no effort to check on Jackson's welfare, and there is no effort to supervise his cell.

129. From 10:20:20 p.m. through 10:21:58 p.m., video shows Jackson continually working the noose into position.

130.    At 10:21:58 p.m., with the curtain positioned around his neck, video shows Jackson lower his neck and upper body and begin to lift his weight off the bunk.



131.    At 10:21:59 p.m., video shows Jackson's legs swing off the lower bunk.

132.    The video clearly depicts Jackson hanging in his cell for almost two full minutes before expiration of any purported 15-minute window to perform a suicide check.

133.    At 10:22:34 p.m., video shows Wells and Shields in the booking area; there is no effort to supervise Jackson or check on his welfare.



134.    By 10:23:53 p.m., video shows that all staff have left the booking area; no one is supervising Jackson from either the booking area or the cell block.

135.    The 15-minute window to check on Jackson's welfare expired without any supervision as Jackson hanged from the curtain wrapped around his neck.

136.    Wilson and Macias were still at the SCJ when Jackson placed his neck in the ligature as depicted in the preceding paragraphs.

137.    Like Wells and Shields, neither Wilson nor Macias conducted any check on Jackson's welfare within the 15-minute window, or at any time thereafter.

138.    The video of Jackson is unobstructed; his need for immediate medical attention would be obvious to anyone adequately supervising him, and Wilson, Wells, Shields, and Macias explicitly acknowledged Jackson's need for urgent medical attention before consciously abandoning those efforts while Jackson continued to express acute suicidal ideation.

139.    Jackson remained in a hanging position until he was discovered more than eight hours later.

140.    In a recorded interview, Shields disclosed that both Wells and Macias "feared that [Jackson] was suicidal, but nothing was ever done about it."

141.    In that interview, Shields acknowledged that she could have stopped Jackson's suicide if she wasn't distracted by Wells.

142.    Upon information and belief, the ability of Wells to distract Shields, and to prevent Shields from adequately supervising Jackson, is directly attributable to Board's practice of inadequate funding, Warwick's practice of understaffing the SCJ, and the creation of post orders where the dispatcher has more duties than she can safely handle.

143.    Upon information and belief, Warwick continued to rely on this practice in November 2019 despite a Colorado State Trooper warning the Board and Warwick in January 2017 about the dangerous jailer/dispatcher structure.

144. There were no further sight checks on Jackson.

145. By 10:27 p.m., it is likely that Jackson began to experience the onset of brain damage.

146. At 11:00 p.m., Macias recorded a phantom sight check.

147. At 11:59 p.m., Macias turned the lights out to the cell block.

148. At midnight, Macias recorded a second phantom entry.

149. Macias then ended his shift, turning over control to Deputy Montoya.

150. Montoya did not perform any physical sight checks and only supervised the SCJ by monitor checks.

151. At 7:00 a.m., Montoya began opening the cells for morning and discovered Jackson deceased.

E. **RESPONSE TO JACKSON'S DEATH**

152. On November 18, 2019, Wilson prepared a report terminating Macias for the phantom entries.

153. Although Wilson was directly involved in the failure to obtain a mental health assessment, and the failure to conduct a 15-minute suicide check, Warwick left him in charge of the investigation into Jackson's death.

154. Wilson did not impose or recommend any discipline for (1) the failure to obtain a mental health assessment, or (2) the failure to conduct a 15-minute suicide check with respect to himself, Wells, Shields, or Macias.

155. Despite multiple failures by multiple employees resulting in the death of Jackson Maes, no person was held accountable for his preventable death – only Macias was disciplined, and only for the falsification of records.

156.    On July 15, 2020, the Center Post-Dispatch published an article titled, "*November 2019 jail suicide questioned*."

157.    That article quotes Warwick discussing Jackson's suicide at the SCJ; it includes a statement indicating that Jackson told Wells he wanted to commit suicide before she ever transported Jackson to the SCJ.

158.    The article attributes comments to Warwick explaining that "even if contacted, mental health personnel will not come to the [SCJ] to speak with those under the influence of drugs or alcohol; they must sober up first."

159.    The comment attributed to Warwick accurately expressed the official policy or practice of the SCSO as it relates to obtaining a mental health clearance for highly intoxicated persons expressing acute suicidal ideation, *i.e.*, the SCJ accepts highly intoxicated persons expressing acute suicidal ideation without consulting a mental health provider.

160.    The article attributes an additional comment to Wilson and Warwick acknowledging that "understaffing and the lack of an adequate jail facility [were] contributing factors in the incident."

161.    The article attributes comments to Warwick implicating the longstanding practice of underfunding and understaffing: "the pay [SCSO] can offer entry-level officers simply is not enough to attract anyone to work in the county."

162.    The article goes on to cite Warwick's "frustration over the fact that the hands of law enforcement are so often tied by circumstances, also lack of funding and personnel to deal successfully with these situations."

163. The lack of funding, understaffing, and lack of an adequate jail facility identified by Warwick and Wilson in the Center Post-Dispatch article represent official policies or practices of Saguache County.

164. The Board, Warwick, and Wilson all had actual knowledge of the deficiencies identified in the Post-Dispatch article prior to the death of Jackson Maes, and those practices served as the moving force behind Jackson's death.

165. All three failed to take adequate steps to respond to the deficiencies with deliberate indifference to the consequences.

166. The Defendants acted jointly and in concert to bring about Jackson's death, and to the extent damages cannot be apportioned among them, liability for satisfying judgment is joint and several.

## IV.

### STATEMENT OF CLAIMS

### CLAIM NO. 1

### 42 U.S.C. § 1983
### CONDITIONS OF CONFINEMENT
### INADEQUATE PHYSICAL PLANT
### BOARD

167. Plaintiff adopts the preceding Paragraphs as if fully set forth herein.

168. When evaluating the impact of jail conditions, "[i]t is important to recognize that various deficiencies in prison conditions 'must be considered together.'" *Rhodes v. Chapman*, 452 U.S. 337, 362-63 (1981) (*quoting Holt v. Sarver*, 309 F.Supp., 362, 373 (E.D.Ark.1970)). The individual conditions "exist in combination; each affects the other; and taken together they [may] have a cumulative impact on the inmates." *Id*.

169. Board is responsible for providing an adequate physical plant for the SCJ. As set forth in Section III, Board did not provide an adequate physical plant, with deliberate indifference to the consequences, and that failure was the direct and proximate cause of the injuries and damages suffered by the Plaintiff for which Board is liable.

170. The specific deficiencies existing at the SCJ were longstanding and widespread, and included, without limitation:

    a)    the absence of any direct supervision for intoxicated persons with acute suicidal ideation;

    b)    the use of cells with exposed bars that facilitate suicide by intoxicated persons with acute suicidal ideation; and

    c)    the use of secure privacy curtains in cells with exposed bars that facilitate suicide by intoxicated persons with acute suicidal ideations;

171. A constitutional violation involving a highly intoxicated person, expressing acute suicidal ideation, was a highly predictable or plainly obvious consequence of Board forcing Warwick to use the SCJ with these deficiencies.

172. These deficiencies presented a substantial risk of serious harm to intoxicated persons with acute suicidal ideation, both individually and in combination, for which the Board is liable.

**CLAIM NO. 2**

**42 U.S.C. § 1983**
**CONDITIONS OF CONFINEMENT**
**INADEQUATE FUNDING**
**BOARD**

173. Plaintiff adopts the preceding Paragraphs as if fully set forth herein.

174. Board is responsible for providing adequate funding for operations and staffing at the SCJ. As set forth in Section III, Board did not provide adequate funding with deliberate indifference to the consequences, and that failure was the direct and proximate cause of the injuries and damages suffered by Ms. Lieberenz and by the Estate for which Board is liable.

175. The specific funding deficiencies existing at the SCJ were longstanding and widespread, and included, without limitation:

    a)     a failure to adequately fund staffing, retention, and supervision at the SCJ;

    b)     a failure to adequately fund the SCSO to provide medical and mental health care for intoxicated persons with acute suicidal ideations;

    c)     a failure to provide adequate funding for housing highly intoxicated persons expressing suicidal ideation in other jurisdictions despite knowledge of existing deficiencies at the SCJ that substantially increase the risk of harm to a specific and reoccurring population of arrestees;

    d)     a failure to fund the construction of a jail that is adequate for the safekeeping of persons.

176. A constitutional violation involving a highly intoxicated person, expressing acute suicidal ideation, was a highly predictable or plainly obvious consequence of Board forcing Warwick to use the SCJ with these deficiencies.

177. These deficiencies presented a substantial risk of serious harm to intoxicated persons with acute suicidal ideation, both individually and in combination, for which the Board is liable.

**42 U.S.C. § 1983**
**POLICY OR PRACTICE**
**INADEQUATE SUPERVISION**
**WARWICK IN HIS OFFICIAL CAPACITY**

178.     Plaintiff adopts the preceding Paragraphs as if fully set forth herein.

179.     Warwick in his official capacity is responsible for providing adequate supervision at the SCJ. As set forth in Section III, it was the official policy or practice of Warwick in his official capacity to provide inadequate supervision at the SCJ for persons with acute suicidal ideation with deliberate indifference to the consequences, and that failure was the direct and proximate cause of the injuries and damages suffered by Ms. Lieberenz and by the Estate for which Warwick in his official capacity is liable.

180.     The specific deficiencies existing at the SCJ were longstanding and widespread, and included, without limitation:

> a)     a failure to adopt, ratify, and enforce a staffing pattern that provided adequate supervision of intoxicated persons with acute suicidal ideations;

> b)     a failure to adopt, ratify, and enforce adequate suicide precautions for intoxicated persons with acute suicidal ideations, including:

>> (i)     a failure to provide direct supervision;

>> (ii)     a failure to use double-celling techniques;

>> (iii)     a failure to discourage staff reliance on suicide contracts;

> c)     allowing jailers to substitute monitor checks for direct supervision welfare checks;

d)      a failure to adopt, ratify, and enforce any requirement that SCJ staff obtain a mental health clearance for intoxicated persons presenting with known acute suicidal ideation;

e)      adoption of a policy or practice to admit highly intoxicated persons expressing acute suicidal ideation without consulting any mental health provider, along with the additional risk of knowing the facility itself presents a significant suicide risk, and is staffed by persons who lack adequate training;

f)      a failure to adopt, ratify, and enforce any standardized suicide checks for intoxicated persons with acute suicidal ideation that would predictably prevent death or serious bodily injury; and

g)      supervising intoxicated persons with acute suicidal ideations by jail staff who (i) expressly communicated to Warwick a concern over their own lack of training; (ii) have a recent history, known to Warwick and Wilson, of acting with indifference towards the welfare of others; and (iii) had recently communicated an intention to resign following an investigation into prior misconduct.

181.      A constitutional violation involving a highly intoxicated person, expressing acute suicidal ideation, was a highly predictable or plainly obvious consequence of Warwick operating the SCJ with these deficiencies.

182.      These deficiencies presented a substantial risk of serious harm to intoxicated persons with acute suicidal ideation, both individually and in combination, for which Warwick in his official capacity is liable.

**42 U.S.C. § 1983**
**POLICY OR PRACTICE**
**INADEQUATE TRAINING**
**WARWICK IN HIS OFFICIAL CAPACITY**

183.    Plaintiff adopts the preceding Paragraphs as if fully set forth herein.

184.    Warwick in his official capacity is responsible for providing adequate training for employees at the SCJ. As set forth in Section III, it was the official policy or practice of Warwick in his official capacity to provide inadequate training to employees at the SCJ with deliberate indifference to the consequences, and that failure was the direct and proximate cause of the injuries and damages suffered by Ms. Lieberenz and by the Estate for which Warwick in his official capacity is liable.

185.    The specific deficiencies existing at the SCJ were longstanding and widespread, and included, without limitation:

  a)    an expectation that jailers would routinely make housing and classification decisions relative to intoxicated persons with acute suicidal ideation without adequate training to know when to elevate care decisions;

  b)    an expectation that jailers would respond to intoxicated persons expressing acute suicidal ideation without training to understand suicide contracts;

  c)    an expectation that jailers would monitor intoxicated persons expressing acute suicidal ideation in cells with exposed bars, and without direct supervision, using only monitor checks, and without training them to remove all items that could facilitate suicide, as explicitly warned by the letter from CTSI;

d)      an expectation that jailers would monitor intoxicated persons expressing acute suicidal ideation without training to account for the deficiencies presented by the physical plant, funding, and staffing;

e)      an expectation that jailers would have direct responsibility for obtaining mental health clearance for intoxicated persons expressing acute suicidal ideation without training to ensure that clearance is obtained;

186.      A constitutional violation involving a highly intoxicated person, expressing acute suicidal ideation, was a highly predictable or plainly obvious consequence of Warwick operating the SCJ with these deficiencies.

187.      Warwick knew to a moral certainty that SCJ employees would confront highly intoxicated people with acute suicidal ideation, and how to adequately respond in these scenarios presents a difficult choice of the sort that training or supervision will make less difficult. Making the wrong choice in this scenario will frequently cause the deprivation of constitutional rights. Accordingly, the failure to provide the necessary training reflects deliberate indifference by Warwick.

188.      These deficiencies presented a substantial risk of serious harm to intoxicated persons with acute suicidal ideation, both individually and in combination, for which Warwick in his official capacity is liable.

### CLAIM NO. 5

### 42 U.S.C. § 1983
**POLICY OR PRACTICE**
**INADEQUATE STAFFING**
**WARWICK IN HIS OFFICIAL CAPACITY**

189.      Plaintiff adopts the preceding Paragraphs as if fully set forth herein.

190.    Warwick in his official capacity is responsible for providing adequate staffing to account for the conditions at the SCJ. As set forth in Section III, it was the official policy or practice of Warwick in his official capacity to provide inadequate staffing at the SCJ with deliberate indifference to the consequences, and that failure was the direct and proximate cause of the injuries and damages suffered by Ms. Lieberenz and by the Estate for which Warwick in his official capacity is liable.

191.    The specific deficiencies existing at the SCJ were longstanding and widespread, and included, without limitation:

  a)    a failure to provide adequate number of staff to supervise intoxicated inmates expressing suicidal ideation;

  b)    reliance on untrained or inexperienced staff to supervise high risk inmates; and

  c)    reliance on a dangerous staffing pattern that involved use of a dangerous jailer/dispatch structure that substantially increased the risk of harm to intoxicated inmates expressing acute suicidal ideation.

192.    A constitutional violation involving a highly intoxicated person, expressing acute suicidal ideation, was a highly predictable or plainly obvious consequence of Warwick operating the SCJ with these deficiencies.

193.    These deficiencies presented a substantial risk of serious harm to intoxicated persons with acute suicidal ideation, both individually and in combination, for which Warwick in his official capacity is liable.

## CLAIM NO. 6

### 42 U.S.C. § 1983
#### SUPERVISORY LIABILITY
#### WILSON IN HIS INDIVIDUAL CAPACITY

194.     Plaintiff adopts the preceding Paragraphs as if fully set forth herein.

195.     Wilson in his individual capacity is responsible for supervising the operational aspects of the SCJ. As set forth in Section III, Wilson in his individual capacity failed to provide adequate supervision over the SCJ with deliberate indifference to the consequences, and that failure was the direct and proximate cause of the injuries and damages suffered by Ms. Lieberenz and by the Estate for which Wilson in his individual capacity is liable.

## CLAIM NO. 7

### 42 U.S.C. § 1983
#### INDIVIDUAL LIABILITY
#### WILSON IN HIS INDIVIDUAL CAPACITY

196.     Plaintiff adopts the preceding Paragraphs as if fully set forth herein.

197.     As set forth in Section III, Wilson in his individual capacity exhibited deliberate indifference to the welfare of Jackson despite actual knowledge that Jackson had communicated suicidal ideation at the SCJ while appreciating that Jackson was extremely intoxicated. Wilson's failure was the direct and proximate cause of the injuries and damages suffered by Ms. Lieberenz and by the Estate for which Wilson in his individual capacity is liable.

## CLAIM NO. 8

### 42 U.S.C. § 1983
#### INDIVIDUAL LIABILITY
#### MACIAS IN HIS INDIVIDUAL CAPACITY

198.     Plaintiff adopts the preceding Paragraphs as if fully set forth herein.

199.    As set forth in Section III, Macias in his individual capacity exhibited deliberate indifference to the welfare of Jackson despite actual knowledge that Jackson had communicated suicidal ideation at the SCJ while appreciating that Jackson was extremely intoxicated. Macias's failure was the direct and proximate cause of the injuries and damages suffered by Ms. Lieberenz and by the Estate for which Macias in his individual capacity is liable.

**CLAIM NO. 9**

**42 U.S.C. § 1983**
**INDIVIDUAL LIABILITY**
**WELLS IN HER INDIVIDUAL CAPACITY**

200.    Plaintiff adopts the preceding Paragraphs as if fully set forth herein.

201.    As set forth in Section III, Wells in her individual capacity exhibited deliberate indifference to the welfare of Jackson despite actual knowledge that Jackson had communicated suicidal ideation at the SCJ while appreciating that Jackson was extremely intoxicated. Wells' failure was the direct and proximate cause of the injuries and damages suffered by Ms. Lieberenz and by the Estate for which Wells in her individual capacity is liable.

**CLAIM NO. 10**

**42 U.S.C. § 1983**
**INDIVIDUAL LIABILITY**
**SHIELDS IN HER INDIVIDUAL CAPACITY**

202.    Plaintiff adopts the preceding Paragraphs as if fully set forth herein.

203.    As set forth in Section III, Shields in her individual capacity exhibited deliberate indifference to the welfare of Jackson despite actual knowledge that Jackson had communicated suicidal ideation at the SCJ while appreciating that Jackson was extremely intoxicated. Shields' failure was the direct and proximate cause of the injuries and damages suffered by Ms. Lieberenz and by the Estate for which Shields in her individual capacity is liable.

CLAIM NO. 11

**CGIA**
**C.R.S. § 24-10-106(1)(B)**
NEGLIGENT OPERATION OF A JAIL
SAGUACHE COUNTY

204. Plaintiff adopts the preceding Paragraphs as if fully set forth herein.

205. Board, SCSO, and/or Warwick had a state law duty to provide a jail that was adequate for the safekeeping of pretrial detainees.

206. Based on the special relationship between Jackson and Board, SCSO, and/or Warwick, and the fact that Jackson was not free to seek out care on his own, these Defendants owed a duty that included the provision of reasonable care for alcohol use disorder in patients expressing acute suicidal ideation.

207. In breaching that duty, Board, SCSO, and /or Warwick created a dangerous condition at the SCJ for people with alcohol use disorder and expressing acute suicidal ideation.

208. Jackson suffered substantial injuries as a direct and proximate result of the dangerous conditions caused by the negligent operation of the SCJ for which the Board, SCSO, and/or Warwick are liable under state law.

**V.**

**RELIEF REQUESTED**

209. Based on the forgoing claims, Plaintiff respectfully requests the Court enter judgment against the Defendants and enter the following relief:

    a) Compensatory damages against all Defendants;

    b) Punitive damages against Warwick, Wilson, Wells, Shields, and Macias in their individual capacities;

    c) Declaratory relief relative to the practices enforced at the SCSO;

d) Pre and post judgment interest at the highest lawful rate;

e) An award of reasonable attorney fees;

f) Costs;

g) Any other relief the Court deems just and equitable.

**PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE**.

Dated this 3rd day of March, 2021.

Respectfully submitted,

BRYAN & TERRILL

s/*J. Spencer Bryan*
J. Spencer Bryan, CO Bar No. 51933
333 W. Hampden, Suite 420B
Englewood, Colorado 80110
Tele/Fax:        720.923.2333
jsbryan@bryanterrill.com
*Attorney for Ms. Lieberenz and for the*
*Estate of Jackson Maes*

Respectfully, submitted

DORMER HARPRING

s/ *Sean M. Dormer*
Sean M. Dormer, CO Bar No. 44962
K.C. Harpring, CO Bar No. 47760
Erik D. Moya, CO Bar No. 55074
3457 Ringsby Ct., Unit 110
Denver, CO  80216
Phone: (303) 756-3812
Fax:    (303) 477-7400
smd@denvertrial.com
kch@denvertrial.com
edm@denvertrial.com
*Attorney for Ms. Lieberenz and for*
*the Estate of Jackson Maes*