**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No.       1:21-CV-00628-WJM-NRN

SARAH LIEBERENZ, Individually and as Personal Representative of THE ESTATE OF
JACKSON MAES, deceased,
Plaintiff,

v.

BOARD OF COUNTY COMMISSIONERS OF THE COUNTY OF SAGUACHE,
COLORADO, in its official capacity;
SAGUACHE COUNTY SHERIFF'S OFFICE, a governmental entity;
DAN WARWICK, SHERIFF OF SAGUACHE COUNTY, in his official capacity;
KENNETH WILSON, in his individual capacity;
ELKE WELLS, in her individual capacity;
MIGUEL MACIAS, in his individual capacity; and
SHELBY SHIELDS, in her individual capacity,
Defendants.

---

**COUNTY DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

---

The Board of County Commissioners, Saguache County Sheriff's Office, Sheriff

Warwick, Kenneth Wilson, and Shelby Shields (collectively, "the County Defendants"), hereby

submit their Motion for Partial Summary Judgment with supporting authority as follows:

## INTRODUCTION

Jackson Maes entered a cell at the Saguache County Jail at 9:45 p.m. on November 16,

2019. Tragically, just thirty-seven minutes later, he took his own life.

On the date of his arrest, none of the Defendants were aware that Maes had suffered from

acute suicidal ideation for years, having expressed repeatedly to his mother and ex-girlfriend

attempts to take his own life. Instead, Maes presented as a congenial, albeit intoxicated, arrestee

who discussed with the jailer how soon he could be released. None of the County Defendants were subjectively aware of a substantial risk that he was suicidal.

Mr. Maes' Estate seeks to hold the County Defendants liable on no fewer than eight separate theories of liability under 42 U.S.C. § 1983. Yet a common problem pervades through all of the Estate's claims: it has failed to show a pattern of constitutional violations in the Jail such that the County was deliberately indifferent to a known risk of intoxicated inmates committing suicide. It has similarly failed to show that the individual County Defendants were subjectively indifferent to any risk of suicide. The County Defendants thus seek summary judgment over the Estate's federal claims. The County Defendants also seek dismissal of Ms. Lieberenz as a party for much the same reasons asserted in Defendant Macias' Motion for Partial Summary Judgment. [ECF 101].

## STANDARD OF REVIEW

"Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Neal v. Lewis*, 414 F.3d 1244, 1247 (10th Cir. 2005). It is not a disfavored shortcut, but rather is an integral part of the rules. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986). Once the moving party shows the absence of a genuine issue of material fact, the burden shifts to the nonmoving party to establish a genuine issue of material fact. *Vitkus v. Beatrice Co.*, 11 F.3d 1535, 1539 (10th Cir. 1993).

Where defendants have asserted immunity, the burden shifts to the plaintiff to demonstrate not only a constitutional or statutory violation, but also clearly established law that would be known to every reasonable official at the time of the alleged unlawful activity. *Riggins v. Goodman*, 572 F.3d 1101, 1107 (10th Cir. 2009).

# MOVANT'S STATEMENT OF MATERIAL FACTS[1]

### *The Saguache County Jail*

1. The Jail is a small, rural jail, with four cells and one holding tank. [Ex. A, Wilson, 166:3-5].

2. The holding tank is designed to house inmates who have been placed on suicide watch, as well as inmates who are intoxicated or display behavioral problems. [Ex. B, County 30(b)(6) deposition, 197:3-7; Ex. C, Standard Operating Procedures, p. 5; Ex, A, Wilson, 167:17-21].

3. On a normal shift, the Jail has one dispatcher and one jailer. [Ex, A, Wilson, 123:17-18].

4. The dispatcher is responsible for handling phone calls, coordinating responses for road deputies, and entering information into the County's computer-aided dispatch system. [Ex. A, Wilson, 21:23 – 22:8 (describing radio traffic and console duties)].

5. The dispatcher also has access to a series of cameras showing the cells, but it is not the dispatcher's job to monitor the cameras full time; rather, it is a secondary duty. [*Id.*, 168:8-17].

6. The jailer is responsible for monitoring the inmates and conducting physical checks of the cells every hour. [*Id.*, 131:15-17].

7. Due to staffing shortages, the Jail sometimes has to employ a "single jailer/dispatcher structure," in which one person performs both job duties. [Ex. D, Warwick, 45:18-23].

8. Because a single/jailer dispatcher structure is not ideal, the Sheriff only employs that structure in the overnight shift, from midnight to 8 a.m. [Ex. B, County 30(b)(6), 48:25 – 49:8].

---

[1] These facts are taken in the light most favorable to the Estate, as required for purposes of summary judgment. Were this case to proceed to trial, the County Defendants would dispute many of the facts stated herein.

***The arrest and suicide of Maes***

9.   On November 16, 2019, after a concerned citizen called in a report of an intoxicated male, Maes was arrested by Officer Elke Wells on a warrant for failure to appear. [Ex. E, Wells, 79:4-9].

10. At the time of his arrest, Shelby Shields was the dispatcher on duty. [Ex. F, Shields, 67:13-16].

11. Shields had been employed by the County for two months. [Ex. M, Personnel File (notation upper right-hand corner)].

12. The jailer on duty at the time was Miguel Macias. [Ex. F, Shields, 40:19-23].

13. Additionally, Captain Wilson, who oversees the Jail, happened to be present at the Jail solely in an effort to fix the dispatcher's radio console, which was down. [Ex. A, Wilson, 21:6-10].

14. When Maes was brought to the Jail, he briefly passed the dispatch area, where Ms. Shields observed that he appeared intoxicated and high. [Ex. F, Shields, 44:18-20].

15. Because of his level of intoxication, Maes could not be properly booked into the Jail; instead, he was placed in a cell until he sobered up. [Ex. D, Warwick, 71:22 – 72:1].

16. Had the Jail's "tank" not been occupied by an inmate with behavioral problems, Maes would have been placed in the tank. [Ex. A, Wilson, 171:2-8].

17. Instead, Maes was placed in cell one, which was unoccupied that evening. [*Id*., 171:14-15].

18. When Wilson helped Macias and Wells place Maes in a jail uniform and move him to cell one, Wilson described Maes as "funny, lighthearted, [and] cordial." [*Id*., 186:25 – 187:1].

19. Approximately twelve minutes after he was placed in cell one, Maes began making loud noises by banging into a metal wall in the cell. [ECF 1, ¶ 50].

20. Wilson attributed Maes' conduct to a drunk person attempting to get attention. [Ex. A, Wilson, 185:2-7].

21. When Wilson and Macias entered the area around the cell, Wells followed and told Maes that he needed to lay down and get some rest. [ECF 1, ¶ 53].

22. While standing in the middle of the cell, Maes responded out of the blue by stating "I'm trying to kill myself right now." [*Id.*, ¶ 54].

23. Wilson responded with the rhetorical question of "You're trying to kill yourself right now?" in part because Maes was not actually doing anything to kill himself. [Ex. A, Wilson, 185:19-24; 263:18-23].

24. Based on this single statement Wilson did not believe Maes was suicidal. [*Id.*, 187:5-9].

25. Wilson then left the area near Maes' cell and heard no further statements from or about Maes concerning self-harm. [*Id.*, 226:23 – 227:4].

26. Shields, as dispatcher, remained at her station in the dispatch room when Wilson, Macias, and Wells responded to the noise coming from cell one. All of the interactions between Maes and Wilson, Macias, and Wells occurred outside the presence of Shields. [Ex. F, Shields, 48:11-24].

27. At no time during her shift did Shields believe Maes was suicidal. [*Id.*, 52:22 – 53:1; 62:15 – 63:1; 66:4-6].

28. When Shields heard Maes was banging on the cell, she thought it was a possibility that he could be suicidal, although she did not actually draw that inference – noting that angry individuals can engage in like behavior. [*Id*., 51:14-25; 66:4-6].

29. Although she does not recall the impetus for making such calls, Shields placed one or more calls to the County's outside vendors to obtain care for Maes. [*Id*., 61:13-16; 63:2-6].

30. She does not recall if she was attempting to contact mental health or the detox facility used by the Jail; in fact, she was not even sure what kind of assistance she was seeking. [*Id*., 64:1-4].

31. Shields described that evening as "hectic," in part because her radio console was down and she was having to do everything manually. [*Id*., 61:25 – 62:2].

32. Shields was also engaged in a conversation with Wells, in which Wells was giving her constructive criticism on a protocol for road deputies. [*Id*., 66:16 – 67:8].

33. Prior to committing suicide, Maes had several conversations with Macias in which he discussed how to bond out of jail, whether he could obtain food (which Macias provided), and whether he could make calls the following day. [Ex. H, Macias, 155:12-22; 180:2-15].

34. At approximately 10:22 p.m., or 37 minutes after he arrived in the facility, and only 14 minutes after his last interaction with Macias, Maes used the privacy curtain in his cell to commit suicide. [ECF 1, ¶¶ 131-32].

35. According to the independent coroner who examined Maes, and whom both parties have endorsed as an expert, Maes died within approximately three minutes. [Ex. G, Danielsen, 99:4-24].

36. At midnight, approximately an hour and thirty-eight minutes after Maes committed suicide, a shift change occurred at the Jail, with Shields and Macias being replaced for the overnight shift. [Ex. H, Macias, 187:15-21].

### *The County's policies and training on suicide prevention*

37. The County has a suicide prevention policy that requires potentially suicidal parties be placed in the holding tank with nothing but a suicide suit and mattress. [Ex. C, Standard Operating Procedures, p. 5].

38. The procedures require jailers to conduct 10-minute camera checks and 20-minute in-person checks. [*Id*.].

39. Jailers are also instructed to call the San Luis Valley Behavioral Health Group; or, alternatively, they have access to the Rio Grande Hospital and Alamosa Hospital. [*Id*.; Ex. A, Wilson, 117:10-15].

40. Jail employees receive a mandatory fourteen-week on-the-job training program while working at the Jail, which includes training on potentially suicidal parties. [Ex. D, Warwick, 41:16 – 42:1; Ex. A, Wilson, 74:9 – 75:9].

### *The lack of any similar suicides in the Jail*

41. Since 1995, the Jail has only experienced two suicides besides Maes. [Ex. D, Warwick, 107:25 – 108:6].

42. Years earlier, in 2013, an inmate by the name of William Starkey committed suicide by hanging his pants and a white sheet over an electrical conduit pipe in cell four of the Jail. [Ex., I, Excerpt of CBI report, Starkey, p. 1].

43. Starkey was not an intoxicated inmate who had just arrived at the Jail, but rather had been in custody for four or five months. [*Id*., p. 2].

44. In 2008, or more than a decade prior to Maes' suicide, an inmate by the name of Felix Granados committed suicide in cell one by using the privacy curtain. [Ex. J, Excerpt of Granados report, p. 3].

45. Immediately prior to his death, Granados had been evaluated by a mental health agency in the San Luis Valley and had been cleared for return to the Jail. [*Id*., p. 1].

### *Miscellaneous facts*

46. Approximately ten days before Maes' arrest, Macias had submitted his resignation to Wilson and Warwick. [Ex. K, Resignation Letter].

47. Although Macias listed almost half a dozen reasons for resigning, only one of them was his perception of having little or no training on certain aspects of his job, and he did not specify what aspects those were. [*Id*.].

48. In 2018, the County's insurer conducted an audit of the Jail and recommended removal of extension cords based upon security and inmate self-harm concerns. [Ex. L, Audit Letter, p. 2].

49. The audit did not discuss removal of the privacy curtain used by Maes to harm himself. [*Id*.].

## LEGAL ARGUMENT

**A.    The Estate has not shown the Board Of County Commissioners ("BOCC") was deliberately indifferent to constitutional inadequacies of the Jail. (First Claim for Relief)**

In its first clam for relief, the Estate alleges the BOCC did not provide an adequate physical structure for the housing of "intoxicated persons with acute suicidal ideation." [ECF 1, ¶

169]. As support for its claim, the Estate notes the absence of direct supervision of intoxicated inmates within the Jail, the use of bars within certain cells, and the use of a privacy curtain in front of the toilet. [*Id*., ¶ 170(a-c)]. The Estate's claim fails because it lacks any evidence that the BOCC was aware of a danger to intoxicated persons with acute suicidal ideation based on the physical nature of the Jail, much less deliberately disregarded such a risk.

It is well established in the Tenth Circuit that to show a municipality was deliberately indifferent, a plaintiff must present evidence "showing a pattern of similar instances" of allegedly unconstitutional conduct. *George v. Beaver Cnty.*, 32 F.4th 1246, at *12 (10th Cir. 2022). It is also well established that one prior incident, even if involving an identical set of circumstances, does not rise to the level of a "pattern," as required to prove deliberate indifference. *Waller v. City and County of Denver*, 932 F.3d 1277, 1287 (10th Cir. 2019).

As an initial matter, the Estate has presented no rational argument that an old, rural jail is constitutionally inadequate simply because *some* of its cells have bars or use a privacy curtain. Indeed, the Jail has a cell that is designed to hold both intoxicated and suicidal inmates – it merely happened to be occupied that evening by an inmate with severe behavioral problems. Beyond the night in which Maes was at the Jail, the Estate has provided no evidence that the Jail regularly or consistently lacked a cell in which to house intoxicated or suicidal inmates. A one-off inability to house an intoxicated or suicidal inmate does not amount to a "practice" of the municipality for purposes of *Monell*.

Furthermore, as noted above, the County has only experienced two suicides since the turn of the century. The Starkey suicide from 2013 bears no similarity to the current case. Starkey was neither intoxicated nor had he just arrived at the facility. Also, Starkey used his own bedding

and pants as suicide implements, which were attached to an overhead conduit – facts that bear no relation to Maes' suicide. While the Granados suicide from 2008 is arguably closer to the facts of this case, it is also more than a decade old and Granados was not intoxicated and had been in the facility for months. His death thus lacks the requisite connection to the facts of this case. And even if such a connection could be shown, his death cannot sustain a "practice" of the County such that it is liable under *Monell*. *See, e.g., Martin v. Malhoyt*, 830 F.2d 237, 255 (D.C. Cir. 1987) ("One instance, however egregious, does not a pattern or practice make."). Finally, the County's insurer conducted an audit in 2018 and did not specifically raise concern with the Jail's use of a privacy curtain.

From a global perspective, the Estate's theory of an "inadequate physical plant" would render almost every small, rural community vulnerable to constitutional challenge. The County operates within the confines of its budget and existing Jail, which, while admittedly old, does provide for a cell that can house intoxicated or suicidal inmates. Because the Estate has failed to present evidence of a recurring problem of housing intoxicated and acutely suicidal inmates, much less that the County was deliberately indifferent to that risk, its first claim for relief fails.

**B.     The Estate has failed to identify any funding decisions of the BOCC, necessitating dismissal of its claim for inadequate funding. (Second Claim for Relief)**

The Estate next claims the BOCC is constitutionally liable for certain funding decisions regarding operation of the Jail. [ECF 1, ¶ 174]. Evaluation of this claim for relief is substantially frustrated by the Estate's failure to actually identify any specific funding decisions of the BOCC. Thus, the BOCC and the Court are left with generalized notions of "underfunding." Beyond this fundamental error, the Estate's underfunding claim suffers from a myriad of other defects.

In general, federal courts have been wary of imputing *Monell* liability on the basis of inadequate funding because almost every municipal action can be traced to budget decisions. *McDowell v. Brown*, 392 F.3d 1283, 1292 (11th Cir. 2004). It is not enough for a plaintiff to show a budget decision would make a constitutional injury more likely; instead, to prevent *Monell* liability from collapsing into *respondeat superior* liability, a claim "must be premised on a finding that *this* budget decision was highly likely to inflict the *particular* injury" suffered by the plaintiff. *Id*. (emphasis in original) (internal citations and quotations omitted). As stated, such analysis is impossible here, as the Estate has not identified any such funding decisions. But even if the Court were to consider the general allegations of underfunding in the Complaint, the Estate's claim fails with respect to the elements of causation and deliberate indifference. [*See* ECF 1, ¶ 175 (setting forth categories of underfunding)].

With respect to causation, the Estate first claims the BOCC failed to adequately staff the Jail. [*Id*. at ¶ 175(a)]. Yet at the time of Maes' suicide, the County employed both a dispatcher and a jailer. The Estate has made no showing that additional employees were necessary that evening, nor that the absence of additional employees was the result of a funding decision by the BOCC. Indeed, it hasn't even been shown the Sheriff's Office requested funding for more than two employees on any given shift at the Jail.

Next, the Estate claims the BOCC failed to adequately fund medical and mental health treatment for "intoxicated persons with acute suicidal ideations." [*Id*. at ¶ 175(b)]. Yet the County has access to the San Luis Valley Behavioral Health Group, as well as the Rio Grande and Alamosa Hospitals. The Estate has not shown these resources were constitutionally

insufficient, nor that any budget request or denial involving the BOCC caused a lack of mental health resources at the Jail.

The Estate also claims the County failed to provide adequate funding to house inmates in other jurisdictions (*Id*., ¶ 175(c)), yet the Estate fails to establish that such a request for funding was ever made, much less denied by the BOCC. And, even if true, there is no causal connection between a lack of funding for housing in alternative jurisdictions and Maes' suicide. There is simply no evidence in the record that Maes was considered for transfer, yet deputies declined or were unable to move him to another facility because of a budgetary constraint. *See McDowell*, 392 F.3d at 1292 (noting lack of causation between funding and alleged injury given none of the defendants "believed they could not perform medical transports because of understaffing.").

Finally, the Estate claims there is a causal connection between the BOCC's failure to fund a new jail and Maes' suicide. [ECF 1, ¶ 175(d)]. The BOCC was unable to find any precedent accepting a causal connection to a suicide based on a municipality's failure to fund a new facility. Such connection is tenuous to an impermissible degree given the inherent complexities of any jail suicide and the decision to construct a new facility. Put another way, the Estate has presented no evidence Maes would have been unable to commit suicide in a newer facility, rendering the Estate's claim speculative as a matter of law.

With respect to deliberate indifference, the Estate was required to show the BOCC knew that suicide was a "highly predictable consequence" of any particular budgetary decision. *See Waller*, 932 F.3d at 1285. It is insufficient for the Estate to show only that a particular decision made suicide more likely to occur. *Id*. Again, the Estate's inability to identify any actual decisions of the BOCC frustrates the analysis. Nonetheless, the evidence in the record fails to

yield any *specific* references to an increased risk of suicide by highly intoxicated inmates based on budgetary constraints. While the Estate claims the Sheriff stated that funding concerns generally made it more difficult to recruit new employees and provide mental health care, the Estate has not identified any specific complaint putting the BOCC on notice of an increase in the risk of inmates committing suicide, much less substantially so. Critically, the Estate also cannot demonstrate the two prior suicides were the result of underfunding, such that the BOCC was on notice that a particular budgetary decision could result in a particular constitutional injury. *George*, 32 F.4th at *9-10 (requiring pattern of prior violations for purposes of *Monell* liability).

In sum, the Estate's inadequate funding claim is wholly speculative and unsupported, requiring dismissal.

## C.   The Estate's claim of inadequate supervision lacks any factual support. (Third Claim for Relief)

In its third claim for relief, the Estate alleges Sheriff Warwick, in his official capacity, failed to provide adequate supervision at the Jail. The problem with the Estate's criticisms, however, is the Sheriff was not on notice of the specific deficiencies the Estate claims existed during Maes' death – especially since the Sheriff's Office has never experienced a pattern of suicides that would have highlighted such deficiencies. Because proving deliberate indifference requires a pattern of previous violations, the Estate's claim fails as a matter of law. *See id*. at *14.

In paragraph 180 of its Complaint, the Estate lists seven separate areas of allegedly deficient supervision. The Sheriff will address each in turn.

The Estate first claims the Sheriff's Office failed to adopt and enforce a staffing pattern that provided adequate supervision of inmates. [ECF 1, ¶ 180(a)]. While it is not clear from the

Complaint, it is presumed that the Estate's focus is on the Jail's use of a single jailer/dispatcher structure during graveyard shifts. This "structure" refers to any shift where one person fulfills both the dispatcher and jailer duties.

Yet, as addressed in more detail below, the focus on the single jailer/dispatcher structure is purely conjectural because the Jail was not utilizing that structure at the time of Maes' suicide; rather, the Jail had both a jailer and dispatcher on duty. Furthermore, to the extent this allegation is aimed at the Jail's procedures regarding cell checks, the Sheriff's Office had a policy of requiring cell checks, including more frequent cell checks for potentially suicidal inmates. The Estate has not pointed to evidence in the record that the Sheriff was aware of previous instances where cell checks were not completed or where the frequency or pattern of cell checks were insufficient. Because it cannot show any pattern, the Estate's claim fails. *George*, 32 F.4th at *11 ("plaintiff must prove a pattern of untrained employees' constitutional violations to show deliberate indifference.").

The Estate next claims the Sheriff was deliberately indifferent to "precautions" within the Jail, including the lack of direct supervision and "double celling techniques," as well as the failure to discourage reliance on suicide contracts. [ECF 1, ¶ 180(b)]. With respect to the latter, while the Sheriff disputes a suicide contract was utilized in this case, there is no evidence in the record establishing a suicide contract was ever used for any prior inmate. With respect to the layout of the Jail and the lack of double celling, such complaints are directed, at best, towards the negligent design of the Jail. *See Bame v. Iron Cnty.*, 566 Fed App'x 731, 740 (10th Cir. 2014) (noting argument "about the water pipe, the blind spot, and the lack of a surveillance camera all sound remarkably like the tort of negligent design, a state remedy, not a constitutional

violation."). The Estate thus fails to show the Sheriff was on notice of a substantial risk posed to potentially suicidal inmates given the lack of prior instances of similar constitutional injuries.

The Estate next claims the Sheriff allowed jailers to substitute monitor checks for direct supervision of inmates. [ECF 1, ¶ 180(c)]. But the Estate failed to establish in discovery any other instance where direct supervision checks were not completed by jailers, much less the Sheriff was aware of such conduct and failed to correct it.

In the next three subparagraphs, the Estate criticizes the Sheriff's Office for failing to ratify or enforce any requirement for mental health clearances and checks for intoxicated individuals with acute suicidal ideation, as well as the admission of such inmates into the Jail. [ECF 1, ¶ 180(d-f)]. Yet as with its other criticisms, even assuming Maes could be classified as an intoxicated inmate with an acute suicidal ideation, the Estate has produced no evidence of a pattern of prior inmates not receiving adequate mental health clearances. Indeed, given no other inmate had committed suicide under Warwick's tenure as Sheriff, the only conclusion to be drawn from the available evidence is the Sheriff's suicide policy was sufficient to address the mental health needs of potentially suicidal inmates. *See Waller*, 932 F.3d at 1287 (pattern must show prior instances of similar violations). The Estate has not shown the Jail's suicide policy was constitutionally insufficient, much less the Sheriff was deliberately indifferent to such risk of constitutional injury.

In its final allegation, the Estate alleges Macias claimed he lacked sufficient training in the Jail. [ECF 1, ¶ 180(g)]. With respect to jailer training and deliberate indifference, the Tenth Circuit just recently considered similar allegations to what the Estate alleges here. In *George v. Beaver County*, the court considered an inmate suicide where several jailers testified they were

completely unaware of the city's suicide prevention policy. 32 F.4th at *10-11. The Tenth

Circuit nonetheless held that because officers could look at the policy and received on-the-job

training about certain job functions, including suicidal inmates, the city was not deliberately

indifferent to the needs of potentially suicidal inmates. *Id*. The court's reasoning was further

bolstered by the fact that the plaintiff had failed to show a pattern of identical, or at least similar,

instances where a lack of training had resulted a in suicide. *Id*. at *14.

The same rationale applies with equal effect in this case. The Sheriff has implemented a

suicide prevention policy that necessitates on the job training regarding assessment of potentially

suicidal parties. To date, the Estate has not established a pattern of conduct through prior,

identical instances of a failure to place an intoxicated inmate on suicide watch. And beyond

Macias, the Estate has not presented any evidence that any other jailer had complained about

insufficient training at the Jail. At best, evidence related to Macias' employment represents the

exception, not the norm. The Estate has provided no evidence to the contrary.

In sum, a failure to supervise claim against a sheriff in his official capacity must be based

on evidence that would place the office holder on notice of a substantial risk of suicide.

Otherwise, the claim lacks the requisite deliberate indifference necessary to align with U.S.

Supreme Court precedent. The Estate has failed to produce such evidence with respect to its

failure to supervise claim.

**D.    The Estate has not established the Sheriff's Office was deliberately indifferent to any training deficiency in the Jail. (Fourth Claim for Relief)**

*Monell* liability is at its "most tenuous where a claim turns on a failure to train." *Connick*

*v. Thompson*, 563 U.S. 51, 61 (2011). To sustain liability against the Sheriff on a failure to train

theory, the Estate must present evidence establishing the Sheriff's Office was deliberately indifferent to a known training deficiency, in this case suicide prevention. *George*, 32 F.4th at *9-10. As with its other *Monell* claims, the Estate must "prove a pattern of untrained employees' constitutional violations to show deliberate indifference." *Id*. at *10. A single prior incident is insufficient to show a "pattern" of constitutionally deficient training.

Consistent with its other claims, the Estate makes the general assertion that the Sheriff's Office provided inadequate training. [ECF 1, ¶ 184]. Yet in specific application to this case, the Estate has not produced any evidence in discovery showing the Sheriff's Office had a pattern of failing to address suicidal ideation in inmates, whether intoxicated or not. While the Jail had experienced two prior suicides since the turn of the century, the Estate has failed to draw any connection between those suicides and a lack of training, much less that any pattern emerged that could connect those suicides to Maes' brief incarceration in the Jail. The Estate's allegations are thus insufficient as a matter of law to show the Sheriff's Office was deliberately indifferent to a known and substantial risk that inadequate training would lead to inmate suicides.

Certainly the Estate will argue the Sheriff's Office only mandates that employees undergo a fourteen-week on-the-job training program. Yet as already discussed, the Tenth Circuit just considered a very similar training program in *George v. Beaver County*, where deputies were offered almost exclusively on-the-job training, including with respect to suicide prevention. *George*, 32 F.4th at *11. The plaintiff argued such training was insufficient, especially since certain staff members could not articulate the policy in discovery. *Id*. Yet because the policy was available at the detention facility and officers could view it in combination with their on-the-job training, the Tenth Circuit held that "while BCCF could have

offered more or better suicide-prevention training, 'showing merely that additional training would have been helpful in making difficult decisions does not establish municipal liability.'" *Id*. (citing *Connick*, 563 U.S. at 68).

*George* controls over the present litigation. Simply because the Sheriff's Office could have provided additional training beyond on-the-job training does not mean it was deliberately indifferent to a substantial risk of suicide by intoxicated inmates. Indeed, the absence of any similar or related incidents involving assessments of intoxicated inmates who had just entered the Jail implies the Sheriff's training regime was sufficient.

**E.    The Estate's inadequate staffing claim bears no relations to the facts of this case. (Fifth Claim for Relief)**

Like its inadequate funding claim, the Estate's inadequate staffing claim suffers from a myriad of problems, especially with respect to causation.

Seemingly the Estate's biggest focus has been on the Jail's use of a "single jailer/dispatcher structure." [ECF 1, ¶ 191(c)]. As the Sheriff himself has admitted, this structure is not ideal and he attempts to employ it only during the overnight shift, when inmates are asleep and radio traffic is lower. But analysis of that structure is purely academic, as the Jail did not employ a single dispatcher/jailer at the time of Maes' suicide. Rather, as already discussed, Shields was the dedicated dispatcher and Macias was the jailer. While it's true, the overnight shift transitioned to a single jailer/dispatcher structure, that shift change did not occur until midnight, or approximately an hour and thirty-eight minutes after Maes committed suicide. According to the coroner, who has been endorsed as an expert by both sides in this case, Maes died within approximately three minutes of him hanging within the cell. The single

jailer/dispatcher structure thus has no relation to Mr. Maes' suicide. *Monell*, 436 U.S. at 692

(Congress did not intend § 1983 liability to attach where . . . causation was absent.").

The Estate's remaining complaints focus on an allegedly inadequate number of staff

members and/or "reliance on untrained or inexperienced staff to supervise high risk inmates."

[ECF 1, ¶ 191(a-b)]. Yet in an error that persists throughout its claims, the Estate failed to

produce evidence that the Sheriff was deliberately indifferent to the specific risk of suicide due

to a lack of adequate staffing. The Jail has only four cells, plus one "tank." The Estate has

produced no evidence in discovery that the Sheriff was on notice that one jailer, with the

secondary assistance of a dispatcher, is constitutionally insufficient to guard four cells. Indeed,

the Estate failed to even allege, through an expert or otherwise, how many deputies were

constitutionally necessary for operation of the Jail on the night of Maes' suicide. In short, as with

its other claims, the Estate has not shown a pattern of prior suicides that were purportedly

accomplished because of a lack of coverage in staffing. *Schneider v. City of Grand Junction*, 717

F.3d 760, 771 (10th Cir. 2013) ("notice can be established by proving the existence of a pattern

of tortious conduct."). The Estate has also failed to show that suicide would be an "obvious

consequence" of operating a rural jail the size of a residential home with one jailer and one

dispatcher. The Estate's inadequate staffing claim should thus be dismissed.

**F.      The Estate's claim against Wilson in his individual capacity lacks evidentiary support. (Seventh Claim for Relief)**

It is well established that individual capacity claims based upon an inmate's suicide are

evaluated under the standard for failure to provide medical care. Under the relevant test, a jail

official must be deliberately indifferent to an inmate's risk of suicide, although "prison

officials are not required to unerringly detect the tendency for self-harm in prisoners." *Coad v. Waters*, No. 11-cv-01564-PAB-CBS, 2012 U.S. Dist. LEXIS 122742, 2012 WL 3744640, at *2-3 (D. Colo. June 14, 2012). Negligent conduct cannot form the basis of deliberate indifference. Rather, a plaintiff must show: (1) the injury or deprivation is sufficiently serious from an objective standpoint, and (2) the official subjectively "knows of and disregards an excessive risk to inmate health or safety." *Sealock*, 218 F.3d at 1209. With respect to the latter, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and []he must also draw the inference." *Mata v. Saiz*, 427 F.3d 1227, 1231 (10th Cir. 2006). The Estate's claim against Wilson in his individual capacity fails on the latter prong of deliberate indifference, as the Estate has failed to show Wilson subjectively disregarded a substantial risk that Maes was going to commit suicide.

During their brief interaction, Wilson noted that Maes was funny, lighthearted, and cordial. Like all of the Defendants in this case, Wilson was not aware of Maes' previous history of mental illness, nor would his arrest on a failure to appear warrant have reasonably apprised Wilson of a substantial risk of suicide. After assisting Maes into a jail uniform, Wilson only had one interaction with Maes. When the deputies heard Maes banging on the metal wall in the cell, Wilson entered the area in cell one. When Wilson inquired what Maes was doing, he stated in part he was "trying to kill myself right now." At the time Maes made that statement, however, he was simply standing in the middle of the cell. Wilson inferred Maes was simply making a disturbance in the Jail, as intoxicated people frequently do while in custody. Based on that singular statement, Wilson did not believe Maes was suicidal. Wilson was not present during any other interactions with Maes.

In a recent 2020 decision, Judge Varholak considered a deliberate indifference claim in which an inmate stated he was "feeling suicidal and informed [a deputy] that he had plans to kill himself." *Carey v. Buitrago*, 2020 U.S. Dist. LEXIS 70955, at *2 (D. Colo. Mar. 18, 2020). When the deputy called into question the veracity of the inmate's statement, the inmate began banging on his cell door. *Id*. In his ensuing claim against the deputy, the inmate asserted his singular statement of suicidal ideation was sufficient to show the deputy was subjectively aware of and disregarded a substantial risk of suicide. *Id*. Yet in an analysis that is directly relevant to Wilson's liability, Judge Varholak held that in the absence of a known history of mental illness or knowledge that an inmate was being treated for any conditions that would make him susceptible to suicidal ideation, a single statement was insufficient to support a finding of deliberate indifference. *Id*., at *22.

The same analysis applies here. While Maes had made loud noises by banging on the flexible metal wall, Wilson subjectively connected that behavior to Maes' intoxication and a desire to get attention. While the Estate will surely argue Wilson should have reached a different conclusion about Maes' behavior, a mistaken inference does not rise to the level of deliberate indifference. Indeed, Maes' lighthearted attitude during processing, coupled with the relatively benign reason for his warrant and arrest and Maes' behavior and comments inconsistent with suicidal ideation, would not provide Wilson with any concrete data points upon which to infer greater concern over Maes' singular remark. Again, while the Estate will argue Wilson should have reached a different interpretation of Maes' singular remark, that argument runs up against the fact that Wilson did not *actually* arrive at an inference that Maes was suicidal. Since a subjective inference is absolutely required to sustain a claim against Wilson, the Estate's claim

should be dismissed. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994) ("the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.").

Finally, even to the extent the Estate could show a factual issue regarding the second prong of the deliberate indifference standard, Wilson would be entitled to qualified immunity. As well stated by Judge Varholak, "it was not clearly established that a single statement of suicidal ideation would satisfy the subjective component of an Eighth Amendment claim." *Carey*, 2020 U.S. Dist. LEXIS 70955, at *22. If the law was not clearly established in 2020, the same is certainly true of the law in 2019.

**G.  The Estate cannot hold Wilson personally liable in his supervisory capacity. (Sixth Claim for Relief)**

Supervisory liability under § 1983 requires evidence that: "(1) the defendant promulgated, created, implemented or possessed responsibility for the continued operation of a policy that (2) caused the complained of constitutional harm, and (3) acted with the state of mind required to establish the alleged constitutional deprivation." *Dodds v. Richardson*, 614 F.3d 1185, 1199-20 (10th Cir. 2010). With respect to inmate suicides, the same deliberate indifference standard applies, requiring "actual knowledge by a prison official of an individual inmate's substantial risk of suicide." *Cox v. Glanz*, 800 F.3d 1231, 1249 (10th Cir. 2015). The Estate asserts Wilson is liable in his supervisory capacity because of a purported failure to provide adequate supervision.

The Estate's claim fails because it lacks evidence demonstrating Wilson was subjectively aware of and disregarded a substantial risk that Maes would commit suicide based upon

inadequate supervision at the Jail. The Tenth Circuit's recent opinion in *George* again provides an on-point analysis of an inmate-suicide claim in the supervisory context. In *George*, the plaintiff argued that a jail supervisor could be liable based upon "generalized risks presented by conditions at the jail," including a failure "to train officers on suicide prevention." *Id*. at *17-18. The court again rejected that approach, noting it was inconsistent with prior U.S. Supreme Court and Tenth Circuit precedent. *Id*. at *20. Instead, a plaintiff must continue to offer evidence showing "a pattern of untrained employees constitutional violations showing deliberate indifference to suicide prevention…" *Id*. at *19-21.

The Estate has failed to produce evidence that Wilson promulgated or continued a policy of failing to supervise deputies who interacted with potentially suicidal inmates. Indeed, the Estate failed to even question Wilson about any other instance in which a deputy failed to adequately address an inmate who had expressed suicidal ideation. In fact, the opposite inference is true, as during Wilson's tenure no other inmate had committed suicide. The Estate is thus limited to establishing a supervisory policy based solely on the facts of this case – a method of proof the Tenth Circuit has consistently rejected, including just recently. *See George*, 32 F.4th at *15-16 (rejecting vicarious liability for supervisory liability under § 1983).

The Estate will undoubtedly note that Macias had already submitted correspondence noting his intent to resign, and in that correspondence he mentioned insufficient training. Yet Macias never discussed or raised a concern about his training on the Jail's suicide prevention policy. In the absence of knowledge of a specific risk to inmates based upon a lack of training on suicide prevention, the Estate cannot show Wilson was deliberately indifferent to a substantial risk of inmate suicide.

But even if the Estate could demonstrate Wilson was responsible for promulgating or sustaining a policy that caused Maes' suicide, Wilson did not have actual knowledge that *Maes* was at a substantial risk of suicide, principally because he only had a single interaction where Maes made an offhand remark in what was otherwise a cordial processing and cell placement. Having not received any additional information regarding Maes' potential suicidal ideation, the Estate cannot show Wilson had the "requisite mens rea" to support a claim of supervisory liability. *See George*, 32 F.4th at *20 ("Plaintiff must offer evidence that Notal had actual knowledge of Bradshaw's substantial risk of suicide…").

Finally, consistent with the claim against him in his personal capacity, Wilson is entitled to qualified immunity in the absence of case law demonstrating that it was clearly established that his supervisory conduct was unconstitutional. The Estate has failed to identify case law putting Wilson on notice that his supervisory actions with respect to the Maes' incident were constitutionally insufficient.

## H.     There are no facts to support the Estate's deliberate indifference claim against Shields. (Eighth Claim for Relief)

On the night of Maes' arrest, Shields had been working for two months as a dispatcher. The dispatcher post has no primary duties overseeing inmates, only a secondary duty to monitor the cell cameras in the dispatch room. Other than observing Maes when he walked into the Jail, in which she described him as intoxicated and high, Shields never communicated with Maes. She never heard him make any statement of suicidal ideation, nor did she observe him in his cell. She was also not a party to any of the conversations with the jailer about Maes. Really, the only "data

point" Shields was aware of with respect to Maes is that she overheard him hitting something on some portion of the jail cell.

The Estate has nonetheless argued Shields was deliberately indifferent to a substantial risk of suicide based largely on three tangential facts.

First, as stated in her deposition, Shields speculated that one of the possible reasons a person might bang their head on a wall is because they are potentially suicidal. Yet Shields specifically stated *she* did not draw such an inference at the time Maes engaged in that behavior – noting people can hit their head in a jail for any number of reasons, including being angry. In this respect, the Tenth Circuit's decision in *Cox v. Glanz* controls. In *Cox*, the Tenth Circuit held the subjective prong of deliberate indifference is not met if the "observable symptoms were susceptible to a number of interpretations," even if suicide was one of them. *Cox*, 800 F.3d at 1253. Rather, in accordance with *Cox*, the risk of suicide must be *substantial* and be based on something greater than "strange behavior" or conduct that is subject to multiple interpretations. *Id*.

Second, the Estate has noted Shields' secondary duty was to monitor the cell cameras, and had she glanced up at the proper moment, she might have caught Maes preparing to commit suicide. Yet Shields testified it was "hectic" that evening because her dispatch console was not functioning properly. She was further distracted by Wells' explanation of the importance of a particular reporting requirement for patrol deputies. Because Shields had drawn no inference that Maes was at substantial risk of suicide, not viewing the cameras in a hectic and distracting environment describes, at worst, negligent conduct. As the Tenth Circuit has repeatedly held,

negligent conduct does not rise to the level of deliberate indifference. *Verdecia v. Adams*, 327 F.3d 1171, 1177 (10th Cir. 2003).

Third, the Estate has argued Shields attempted to contact either a mental health provider or detox after Maes was placed in a cell – apparently drawing some inference that Shields knew of a risk of suicide based on the placement of a call. But, as already established, at the time Shields called those providers, she had no knowledge of whether Maes was suicidal. Additionally, she wasn't even sure what type of care Maes needed (*i.e.*, medical treatment or detox). Finally, Shields did not receive any additional information about Maes after placing those calls (which went unanswered). Again, in accordance with *Cox*, a general knowledge of a need for medical care is insufficient to demonstrate a government employee was deliberately indifferent to a substantial risk of suicide.

Even if the Estate could create a triable issue of fact over the merits of its claim against Shields, it cannot overcome the defense of qualified immunity. The Estate has failed to identify case law establishing every reasonable *dispatcher* in Shields' position would know that she had to take action when: (1) she was not responsible for the supervision of inmates, (2) she never directly interacted with Maes, (3) did not think he was suicidal, and (4) did not hear any statements, either from Maes or others, indicating a suicidal ideation.

Shields should thus be dismissed from the present lawsuit.

## I.    Ms. Lieberenz should be dismissed as a party.

For identical reasons to those set forth in Macias' dispositive motion, Ms. Lieberenz should be dismissed as party with respect to both the Estate's federal and state claims. With respect to the latter, the Estate has pled only a negligence claim under Colorado law. Ms.

Lieberenz did not pursue a wrongful death claim under state law. Because any negligence claim belongs to the Estate, not her, she should be dismissed as a party. *See, e.g., Galindo v. Valley View Ass'n*, 399 P.3d 796, 798 n.1 (Colo. App. 2017) (explaining difference between wrongful death and survival statutes).

## CONCLUSION

For the reasons set forth herein, the Estate's federal claims against the County Defendants should be dismissed, with prejudice. Ms. Lieberenz, in her personal capacity, should be dismissed as a party, with prejudice.

Respectfully submitted this 30th day of June, 2022.

*s/Nick Poppe*
Marni Nathan Kloster
Nicholas C. Poppe
NATHAN DUMM & MAYER P.C.
7900 E. Union Avenue, Suite 600
Denver, CO  80237-2776
Phone Number: (303) 691-3737
Fax: (303) 757-5106
Attorneys for County Defendants

## CERTIFICATE OF SERVICE

I hereby certify that on this 30th day of June, 2022, I electronically filed the foregoing **COUNTY DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT** with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following at their e-mail addresses:.

J. Spencer Bryan
Bryan & Terrill Law, PLLC
333 W. Hampden, Suite 420B,
Englewood, Colorado 80110
jsbryan@bryanterrill.com
*Attorney for Ms. Lieberenz and for the Estate of Jackson Maes*

Andrew R. McLetchie
Eden R. Rolland
FOWLER, SCHIMBERG, FLANAGAN & MCLETCHIE, P.C.
350 Indiana St., Suite 850
Golden, CO 80401
a_mcletchie@fsf-law.com
E_rolland@fsf-law.com
*Attorneys for Defendant Miguel Macias*

Sean M. Dormer, #44962
Blaire G. Bayliss, #55221
Dormer Harpring, LLC
3457 Ringsby Ct., Unit 110
Denver, CO 80216
smd@denvertrial.com
bgb@denvertrial.com
*Attorney for Ms. Lieberenz and for the Estate of Jackson Maes*

James D. Murdock II (Bar No. 47527)
John T. Osgood (Bar No. 34999)
1670 Broadway, Suite 900
Denver, CO 80202
Jmurdock@talawfirm.com
Josgood@talawfirm.com
*Attorney for Defendants Board of County Commissioners of the County of Saguache, Saguache County Sheriff's Office, Sheriff Dan Warwick, Kenneth Wilson, and Shelby Shields*

Leslie L. Schluter
DAGNER | SCHLUTER | MITZNER | WERBER, LLC
8400 East Prentice, Suite 1401
lschluter@lawincolorado.com
*Attorneys for Defendant Elke Wells*

*s/Nick Poppe*
NATHAN DUMM & MAYER P.C.