EXHIBIT

**A**

_____

_____

# SARAH LIEBERENZ VS. BOARD OF COUNTY COMMISSIONERS OF THE COUNTY OF SAGUACHE, COLORADO, ET AL.
## Expert Witness Report by Donald A. Misch, MD, CIME
## January 6, 2022

# TABLE OF CONTENTS

**INTRODUCTION** ............................................................................................................. 2

**SUMMARY OF CASE** ..................................................................................................... 2

**MATERIALS RELIED UPON AND REVIEWED FOR EXPERT OPINION** ........................................... 2

**EXPERT OPINION** .......................................................................................................... 7

    **1)    Alcohol Use Disorder (AUD) or "alcoholism" and Major Depressive Disorder (MDD) are serious psychiatric illnesses with biological bases and potential life-threatening consequences, including suicide.  Yet, both conditions are responsive to a variety of evidence-based treatments.** ................. 7

    **2)    Acute suicidality is a psychiatric emergency, and all the more so in the setting of alcohol abuse or AUD.** ....................................................................................................... 10

    **3)    Suicide Contracts for Safety Are Ineffective.** ........................................................... 11

    **4)    The likely course of subsequent care if Jackson Maes had been immediately transported from the Saguache County Jail to an Emergency Department.** .................................................. 12

    **5)    The likely prognosis if Jackson Maes had been immediately transported from the Saguache County Jail to an Emergency Department.** ......................................................... 14

**QUALIFICATIONS** ......................................................................................................... 16

**DISCLOSURE STATEMENTS** ........................................................................................... 16

SARAH LIEBERENZ VS. BOARD OF COUNTY COMMISSIONERS OF THE COUNTY OF SAGUACHE, COLORADO, ET AL.
Expert Opinion by Donald A. Misch, MD, CIME
Page **2** of **17**
_____

# INTRODUCTION

I was retained by the law firm of Dormer Harpring as a plaintiff psychiatric expert to review aspects of Sarah Lieberenz vs. Board of County Commissioners of the County of Saguache, Colorado, et al.  I have reviewed relevant documents and records, as detailed in "Materials Relied Upon and Reviewed for Expert Opinion," below.  I present my opinions to a reasonable degree of medical certainty and certify my opinions are based on the information sources noted below as well as my training, knowledge, experience, and expertise as a psychiatrist over the past 33 years.  I reserve the right to amend, modify, and add to those opinions if warranted by additional information.

# SUMMARY OF CASE

Jackson Maes was a 27-year-old mixed race male with a long history of alcoholism and depression as well as various legal/criminal difficulties who was arrested on November 16, 2019 for having an open warrant after he was questioned for being severely inebriated and intruding on local businesses.  Mr. Maes was not taken to a local detox center because he was felt to be combative (although others dispute this characterization) and, instead, brought to the Saguache County Jail (SCJ).  There he was not formally booked into the jail but placed in a holding cell because SCJ policy apparently prevented formal booking of a severely inebriated individual.

The arresting officer and various SCJ staff acknowledge that Mr. Maes expressed suicidal ideation, although there is disagreement as to whether these statements actually represented serious threats to take his own life.  In any event, once in his cell, Mr. Maes proceeded to bang his head repeatedly on the wall and make at least one suicidal comment.

It is alleged that SCJ staff did not appropriately respond to Mr. Maes' suicidality and inebriation.  An attempt was made to call for a mental health consultation, but the phone was not answered and no message was left; moreover, it was asserted that no mental health consultation would occur in any event while Mr. Maes was severely intoxicated.  Thereafter, according to the records available to me, SCJ staff did not appropriately monitor Mr. Maes in his cell.  Later the night of November 16th, he committed suicide by hanging himself with a sheet strung over the upper bars of the cell.  His body was not discovered until the next morning.

# MATERIALS RELIED UPON AND REVIEWED FOR EXPERT OPINION

Note:  All records and other documents were provided to me by plaintiff law firm Dormer Harping, and all records found to be relevant to my charge were reviewed.

_____

1. <u>Defense Documents</u>

   a. ExA Accident Report Maes, 9/17/2019
   b. ExB Arrest-Booking (Maes2), 11/16/2019
   c. ExC Arrest-Booking Sheet, 11/16/2019
   d. ExD Calls for Service – Detail Page, printed on 11/19/2019
   e. ExE CBI Bkgd (Maes), Undated
   f. ExF CBI Report by Julie Petterson (CBI-Pueblo-Investigations), 12/16/2019
   g. ExG Custody Form (Maes), 11/16/2019
   h. ExH Custody Form (Maes2), 11/16/2019
   i. ExI Email Warwick to CBI, 12/12/2019
   j. ExJ Employ file (Macias)
   k. ExK Employ file (Shields)
   l. ExL Employ file (Wilson)
   m. ExM Evidence release form – ME, 11/18/2019
   n. ExN Incident Photos (SCJ), Undated
   o. ExO Incident Report (Wells), 11/25/2019
   p. ExP ME Report (Maes), 12/9/2019
   q. ExQ Medical Intake (Maes), 11/16/2019
   r. ExR Post article (Maes), 3/4/2021
   s. ExT SCJ Log, 11/17/2019
   t. ExU SCJ SOP, Undated
   u. ExV SCSO Investigation (Maes), 11/18/2019, 11/21/2019 (multiple), 11/25/2019
   v. ExW Def Macias Responses to Written Discovery, 8/6/2021
   w. ExX 2021 08 30 Defs Responses
      i. 2021 08 30 Def BOCC Responses to WD, 8/30/2021
      ii. 2021 08 30 Def Shields Responses to WD, 8/30/2021
      iii. 2021 08 30 Def Warwick Responses to WD, 8/30/2021
   x. ExY Def Wells Responses to WD
      i. Resps. RFA. RFP, 8/30/2021
      ii. Resps. Rogs, 8/30/2021


2. <u>Plaintiff Documents</u>

   a. Plaintiff Complaint and Jury Demand, 3/3/2021
   b. 2021 03 03-1-Complaint, 3/3/2021
   c. 2021 09 30 Plf Responses to Cty Defs First Set of Written Discovery, 9/30/2021
   d. 2021 10 01 Plf 2nd Supp a1, 10/1/2021
   e. Ex01 Coroner Autopsy Report, 12/9/2019
   f. Ex07 Center Post Dispatch_November 2019 jail suicide questioned, 7/15/2020
   g. Ex09 Macias Criminal Case Docs, 1/17/2020 and Undated
   h. Ex10 Denver Health Recs, Multiple Dates

SARAH LIEBERENZ VS. BOARD OF COUNTY COMMISSIONERS OF THE COUNTY OF SAGUACHE, COLORADO, ET AL.
**Expert Opinion by Donald A. Misch, MD, CIME**
Page **4** of **17**

_____

     i.    Ex11 Kaiser Recs, Multiple Dates
     j.    Ex12 Death Cert, 12/13/2019
     k.    Ex13 Burial_Memorial expenses
     l.    Ex14 Statement from Juniper Good, 4/18/2020
     m.   Ex15 Statement from Ava Radigan, Undated
     n.    Ex16 Lieberenz Statement, Undated
     o.    Ex17 Lieberenz Letter to Jackson, Undated
     p.    Ex18 Crestone Brewery Employment Recs, 1/11/2021
     q.    EX19 CO GED Transcript for Jackson, Undated
     r.    Ex20 High School Equivalency Diploma for Jackson E. Maes, 2/23/2009
     s.    Ex21 Photos of Jackson
     t.    Ex22 Jackson burial_memorial photos
     u.    Ex25 Northglenn PD Recs, 12/3/1991 and 2/18/2013
     v.    2021 10 01 Disclosure Docs (discovery response)
          i.    Ex23 Shared Photos-Memories of Jackson
          ii.    Ex32 Messages with Jackson Maes … Radigan
          iii.    Ex33 Messages from Jackson Maes … Lieberenz
          iv.    Ex34 Sarah Lieberenz Conversation … and Will
          v.    Ex35 Sarah Lieberenz Conversation with Will
          vi.    Ex21 Photos of Jackson with dates and credits
          vii.    Ex36 Sarah's Nursing School Records Midland College
          viii.    Ex37 Sarah's MSUDenver School Records
          ix.    Ex38 Sarah Lieberenz Resume Updated 12.19.17
          x.    Ex39 Lieberenz initial call to jail

Books

1. American Psychiatric Association: <u>Diagnostic and Statistical Manual of Mental Disorders, 5th Edition</u>. American Psychiatric Association, Arlington, VA 2013.
2. American Psychiatric Association: <u>Practice Guideline for the Assessment and Treatment of Patients with Suicidal Behaviors</u>.  American Psychiatric Association, 2010.
3. Galanter M, Kleber HD, Brady KT: <u>The American Psychiatric Publishing Textbook of Substance Abuse Treatment, 5th Edition</u>.  American Psychiatric Publishing, Washington, DC, 2015.
4. Mack AH: Chapter 52: Forensic Addiction Psychiatry. In: Galanter M, Kleber HD, Brady KT: <u>The American Psychiatric Publishing Textbook of Substance Abuse Treatment, 5th Edition</u>.  American Psychiatric Publishing, Washington, DC, 2015.
5. Maldonado JR & Garcia R: Chapter 2: Suicide Risk Management and Assessment. In: Riba MB, Ravindranath D, Winder GS (Eds): <u>Clinical Manual of Emergency Psychiatry, 2nd Edition</u>. American Psychiatric Association Publishing, Arlington, VA, 2016.
6. Mee-Lee D & Gastfriend DR: Chapter 8: Patient Placement Criteria. In: Galanter M, Kleber HD, Brady KT: <u>The American Psychiatric Publishing Textbook of Substance Abuse Treatment, 5th Edition</u>.  American Psychiatric Publishing, Washington, DC, 2015.

**Plaintiff Expert Disclosures - Exhibit 1**

_____

7. Miller AD, Winder GS, Krower KJ: Chapter 9: Substance-Related Psychiatric Emergencies. In: Riba MB, Ravindranath D, Winder GS (Eds): <u>Clinical Manual of Emergency Psychiatry, 2nd Edition</u>. American Psychiatric Association Publishing, Arlington, VA, 2016.
8. Ries RK, Fiellin DA, Miller SC, & Saitz R (Eds): <u>The ASAM Principles of Addiction Medicine, 5th Edition</u>. Wolters Kluwer, Philadelphia, 2014.
9. Saddock BJ, Saddock VA, Ruiz P (Eds): <u>Kaplan & Saddock's Comprehensive Textbook of Psychiatry, 10th Edition</u>.  Lippincott Williams & Wilkins, Philadelphia, PA 2017.
10. Wasserman, D: Psychiatric Emergencies. In: Saddock BJ, Saddock VA, Ruiz P (Eds): <u>Kaplan & Saddock's Comprehensive Textbook of Psychiatry, 10th Edition</u>.  Lippincott Williams & Wilkins, Philadelphia, PA 2017.
11. Weinstein HC & Penn JV: Correctional Psychiatry.  In: Saddock BJ, Saddock VA, Ruiz P (Eds): <u>Kaplan & Saddock's Comprehensive Textbook of Psychiatry, 10th Edition</u>.  Lippincott Williams & Wilkins, Philadelphia, PA 2017.

<u>Peer-Reviewed Journal Articles</u>

1. Amiri S & Behnezhad S: Alcohol use and risk of suicide: a systematic review and meta-analysis. Journal of Addictive Diseases 38(2):200-213, 2020.
2. Darvishi N, Farhadi M, Haghtalab, T, et al.: Alcohol-related risk of suicidal ideation, suicide attempt, and completed suicide: a meta-analysis. PLOS One, DOI: 10.1371/journal.pone.0126870, 5/20/2015.
3. Harris EC & Barraclough B: Suicide as an outcome for mental disorders. A meta-analysis. British Journal of Psychiatry 170:205-228, 1997.
4. Kaplan MS, Huguet N, McFarland BH, et al.: Use of alcohol before suicide in the United States. Annals of Epidemiology 24(8):588-592.e2, 2014.
5. Leshner AI: Addiction is a brain disease, and it matters. Science 278(5335):45-7, 1997.
6. Murphy GE & Wetzel RD: The lifetime risk of suicide in alcoholism. Archives of General Psychiatry 47:383-392, 1990.
7. Norstrom T & Rossow I: Alcohol consumption as a risk factor for suicidal behavior: a systematic review of associations at the individual and at the population level. Archives of Suicide Research. Oct-Dec 2016;20(4):489-506. doi: 10.1080/13811118.2016.1158678. Epub 2016 Mar 8.
8. O'Brien CP & McLellan AT: Myths about the treatment of addiction. Lancet 347(8996):237-40, 1996.
9. Perez J, Beale E, Overholser J, et al.: Depression and alcohol use disorders as precursors to death by suicide. Death Studies 2020 Apr 2;1-9.  doi: 10.1080/07481187.2020.1745954. Online ahead of print.
10. Pompili M, Serafini G, Innamorati, M, et al.: Suicidal behavior and alcohol abuse. International Journal of Environmental Research and Public Health 7:1392-1431, 2010.
11. Gardner ER: Addiction and Brain Reward and Antireward Pathways. Advances in Psychosomatic Medicine 30:22-60, 2011.
12. Volkow N: What does it mean when we call addiction a brain disorder? National Institute on Drug Abuse, Nora's Blog, March 23, 2018.

**Plaintiff Expert Disclosures - Exhibit 1**

**SARAH LIEBERENZ VS. BOARD OF COUNTY COMMISSIONERS OF THE COUNTY OF SAGUACHE, COLORADO, ET AL.**
**Expert Opinion by Donald A. Misch, MD, CIME**
Page **6** of **17**
_____

**Plaintiff Expert Disclosures - Exhibit 1**

SARAH LIEBERENZ VS. BOARD OF COUNTY COMMISSIONERS OF THE COUNTY OF SAGUACHE, COLORADO, ET AL.
Expert Opinion by Donald A. Misch, MD, CIME
Page **7** of **17**
_____

# EXPERT OPINION

1) <u>Alcohol Use Disorder (AUD) or "alcoholism" and Major Depressive Disorder (MDD) are serious psychiatric illnesses with biological bases and potential life-threatening consequences, including suicide.  Yet, both conditions are responsive to a variety of evidence-based treatments.</u>

   a) Both AUD and MDD are formal psychiatric diagnoses detailed in the <u>American Psychiatric Association Diagnostic and Statistical Manual of Mental Disorders, 5th Edition (DSM-5)</u>.  Both disorders may be precipitated, exacerbated, or maintained by a variety of psychosocial factors; yet, it is recognized that these illnesses have underlying biological bases with genetic influences and changes in brain structure and function.  Thus, individuals do not "choose" to become alcoholic or depressed; nor can they simply "snap out of it" by their own volition or at the command of others.

      i) With respect to addiction (including alcohol addiction) as a disease of the brain, Nora Volkow (2018) notes that "Addiction is a chronic but treatable medical condition involving changes to [brain] circuits involved in reward, stress, and self-control."  While initial use is occasional (e.g., recreational, self-medication, etc.), in later stages of drug abuse/addiction the driving mechanisms are different.  Pleasure seeking gives way to pain avoidance, and drugs are used "just to stay even" and avoid the pain of withdrawal.  This is not an issue of morals or willpower but the result of neuroanatomical and structural changes in the brain that reinforce substance use.

         1. Thus, progression from occasional recreational use to impulsive use to habitual compulsive use correlates with progression from reward-driven to habit-driven drug-seeking behavior.  This behavioral progression correlates with a neuroanatomical progression from ventral striatal (nucleus accumbens) to dorsal striatal control over drug-seeking behavior. (Gardner, 2011)

         2. "That addiction is tied to changes in brain structure and function is what makes it, fundamentally, a brain disease.  A metaphorical switch in the brain seems to be thrown as a result of prolonged drug use.  <u>Initially, drug use is a voluntary behavior, but when that switch is thrown, the individual moves into the state of addiction, characterized by compulsive drug seeking and use</u>." (Leshner, 1997)

         3. At some point after continued repetition of <u>voluntary drug-taking, the drug 'user' loses the voluntary ability to control its use.</u>  The 'drug misuser' becomes 'drug addicted' and there is a compulsive, often

_____

overwhelming involuntary aspect to continuing drug use and to relapse after a period of abstinence. (O'Brien and McLellan, 1996)

4. This is not to deny other biopsychosocial factors, recognizing the complex interactions between biology, behavior, and environment. Addiction is many things: a maladaptive response to environmental stressors, a developmental disorder, a disorder caused by dysregulation of brain circuits, and a learned behavior. And just as many factors cause addiction, many factors (biological, psychological, environmental) may affect the ability to recover from addiction.

5. It is appropriate to briefly address the alcohol self-medication hypothesis. It is true that alcohol may be used in an attempt to self-treat a variety of perceived difficulties such as psychiatric disorders and symptoms (e.g., MDD, anxiety disorders, PTSD, personality disorders, etc.), stress, low self-esteem and insecurity, and various psychosocial stressors (interpersonal conflict, job difficulties, financial strain, etc.). Nevertheless, continued use, even for self-medication purposes, may lead to the cascade of psychological and biological changes described above and result in a true AUD.

b) Both AUD and MDD are associated with an increased risk of suicide, and the co-occurrence of both disorders greatly raises that risk, typically requiring urgent psychiatric intervention. Indeed, AUD and MDD often have a reciprocal relationship, each exacerbating the other.

i) "Alcohol use disorder is an important contributor to suicide risk during severe intoxication and in the context of a temporary alcohol-induced depressive and bipolar disorder. There is an increased rate of suicidal behaviors as well as of completed suicide among individuals with the disorder" (American Psychiatric Association, 2013). In addition, "AUD can be considered an important predictor of suicide and a great source of premature death" (Darvishi et al, 2015). See also Murphy & Wetzel (1989), Harris & Barraclough (1997), Pompili et al. (2010), Norstrom & Rossow (2016), Maldonado & Garcia (2016), and Amiri & Behnezhad (2020). Moreover, use of alcohol and heavier alcohol consumption often occurs immediately prior to suicide (Kaplan et al. 2014, Maldonado & Garcia 2016, Norstrom & Rossow 2016). Importantly, "[S]ome serious suicide attempts and completed suicides in jails occur within the first 24 to 48 hours of admission and are often carried out by inmates who are intoxicated or experiencing withdrawal symptoms." (Weinstein & Penn 2017)

ii) There are many possible mechanisms by which alcohol abuse or AUD can increase the risk of suicide. Alcohol intoxication causes impaired judgement and cognitive constriction, behavioral disinhibition and impulsivity, and aggressive

**Plaintiff Expert Disclosures - Exhibit 1**

_____

behavior, all of which can precipitate suicidal ideation or actions.  Depression, low self-esteem, and hopelessness associated with alcohol intoxication and AUD may also engender suicidal thoughts and actions.  More generally, AUD often results in interpersonal difficulties/conflict (e.g., with partners, family, co-workers, and others) and ensuing social isolation, job loss and financial stress, legal difficulties, and impaired self-esteem, all stressors that can precipitate or worsen suicidality (and depression as well).  It is also possible that alcohol use may enhance courage or numb fears of dying, serving as a "means to an end" as the suicide method itself.  See Pompili (2010) and also Perez et al. (2020).

c)  Yet, both AUD and MDD are treatable illnesses with good prognoses in the majority of those afflicted, if the individuals are willing to accept and commit to treatment.  In the case of AUD, it is critical that that individual ultimately accept the reality of his alcohol disorder and its repercussions.

   i)  Alcohol Use Disorder

      1.  A variety of inpatient, outpatient, and residential treatments are effective in treating AUD, and Alcoholics Anonymous (as well as similar programs such as SMART Recovery which may be more acceptable to some individuals) continue to provide substantial relief and positive prognoses.  Treatment modalities include, but are not limited to, cognitive behavioral therapies, motivation enhancement, twelve-step facilitation, contingency management, network therapy, group therapy, family therapy, and psychodynamic psychotherapy.

      2.  The pharmacologic armamentarium for treatment of AUD has significantly broadened and includes medications proven to reduce alcohol craving, use, and relapse.

   ii)  Major Depressive Disorder:

      1.  MDD has long been treated effectively with a variety of psychotherapeutic approaches.  Perhaps the most common and well recognized psychotherapeutic modality for depression is Cognitive Behavioral Therapy (CBT), but there are many others that are also evidence-proven.

      2.  MDD is responsive to a variety of antidepressants (including but certainly not limited to Selective Serotonin Reuptake Inhibitors such as Prozac, Zoloft, and Lexapro), mood stabilizers (e.g., lithium and various anticonvulsants), and second-generation antipsychotics.  In addition, a number of brain stimulation techniques including electroconvulsive therapy (ECT) and repetitive transcranial magnetic stimulation (rTMS)

**Plaintiff Expert Disclosures - Exhibit 1**

_____

are effective, and newer brain stimulation techniques have shown increasing evidence of efficacy.  Increasingly, ketamine (an anesthetic) has shown remarkable effects on those with depression, including very rapid and robust symptom response that includes a reduction in suicidality.  Indeed, a number of psychedelic/dissociative drugs are now under active investigation for their antidepressant properties.

2) **Acute suicidality is a psychiatric emergency, and all the more so in the setting of alcohol abuse or AUD.**

a) Individuals at high risk of imminent suicide constitute a psychiatric emergency requiring intensive intervention; such patients must be taken seriously rather than dismissed as "not serious."  The most immediate concern is protecting the individual's physical safety which may require transportation to an Emergency Department or psychiatric hospitalization.  Once in a protected environment, a structured approach to data gathering that includes the patient, family and other outside informants, and available records should be pursued to inform treatment planning and disposition.

b) Jackson Maes had multiple risk factors for MDD, AUD, and suicide.  As above, both MDD and AUD are associated with an increased risk of suicide, and their combination confers an even higher risk.  According to his mother and others, he had a long history of MDD and AUD and had been in various types of therapy multiple times when younger. Relevant recent psychosocial stressors affecting Jackson Maes, as determined by review of the document provided to me, include, but are not necessarily limited to:

   i) An undesired breakup with his girlfriend 6-8 weeks previously which he "did not take well."
   ii) Loss of job.
   iii) Recent car crash.
   iv) Poorly described need to leave Denver and move to Crestone because of various problems occurring in the former city.
   v) Legal difficulties including the open warrant.
   vi) Other psychosocial stressors not apparent from the records and documents provided to me.

c) Suicidal individuals with concomitant alcohol intoxication are at high risk for suicide attempts and completed suicide, but their assessment and management is complicated. As above, the first consideration is ensuring the individual is in a safe environment where he or she has limited access to means for self-harm or suicide and where there is adequate monitoring by those knowledgeable or trained in dealing with such mental health emergencies.  Yet information gathering to assist in decision making is impaired by alcohol intoxication, such that often the individual cannot be interviewed until they have had some time to "sober up."  Moreover, decision makers must be aware of the

SARAH LIEBERENZ VS. BOARD OF COUNTY COMMISSIONERS OF THE COUNTY OF SAGUACHE, COLORADO, ET AL.
Expert Opinion by Donald A. Misch, MD, CIME
Page **11** of **17**

_____

possibility that the individual, once sober, will minimize his or her alcohol use, concomitant depression or other mental illness, and the immediate situation or difficulties, often to seek release and a return to alcohol consumption.  The above considerations emphasize the importance of obtaining collateral information from all available relevant sources.  This is yet another reason for voluntarily or involuntarily holding (whether in the Emergency Department or an inpatient psychiatric setting) an intoxicated, suicidal individual for sufficient time in order to adequately assess the problem and make appropriate treatment and discharge decisions.

d)  It should also be underscored that an inebriated individual may subsequently suffer significant withdrawal symptoms, not the least of which is increased anxiety, such that the risk of suicide may not dissipate simply because the blood alcohol level has fallen or even become zero.  Moreover, underlying psychiatric illness and psychosocial stressors do not suddenly disappear because one is no longer intoxicated.  Thus, suicide risk does not disappear simply because one is no longer drunk.  As a corollary, decision makers must be aware of the danger of immediately discharging an inebriated individual following alcohol detoxification in the Emergency Department or a detox facility.

3)  **Suicide Contracts for Safety Are Ineffective.**

a)  There is a question as to whether there occurred in this case a "suicide contract for safety" between Jackson Maes and Officer Macias.  The records demonstrate that Officer Macias made the following offer: "I will get you some juice, Jackson, if you promise me you won't hit your head again. How 'bout that? Sound like a deal?"  Jackson Maes then responded: ""Yeah, no yeah I won't – I won't try to kill myself, anymore, haha."  Thus, Macias' offer of juice appears to be in exchange for an agreement to cease head banging rather than as a pledge not to commit suicide, although Jackson Maes' response leaves this unclear.  Nevertheless, to the extent that a "suicide contract for safety" was entered into by Jackson Maes and Officer Macias, an opinion is warranted on such contracts.

b)  Suicide contracts for safety have been widely discredited as ineffective, and they are inadvisedly used at the current time except in specific circumstances and for specific purposes, neither or which are relevant in this case. (American Psychiatric Association, 2010)  In fact, a variety of experts have assertively stated that such contracts should <u>not</u> be used (especially without a concomitant, full, psychiatric suicide evaluation) because they provide a false sense of security that a suicidal individual will be safe in the immediate or near future.  These authorities note not only that such "contracts" are unenforceable; but, more importantly, there is no evidence that they are effective in preventing suicide.  This is all the more true where suicide contracts for safety are made between a suicidal individual and someone with whom he or she has little or no ongoing relationship and to whom there is no personal commitment.  Thus, it is one thing to promise one's spouse, mother, child, or long-time psychiatrist that he or she will not

**Plaintiff Expert Disclosures - Exhibit 1**

_____

commit suicide within a certain time frame (although there is little or no evidence that even in these instances such promises or "contracts" can be relied upon or are effective).  It is quite another, however, to make such a promise to an officer at a county jail, an individual with which a suicidal person has no personal relationship or commitment.  Thus, even to the extent that Jackson Maes and Officer Macias established a suicide contract for safety, reliance thereon is unwarranted and insufficient to ameliorate concerns about ensuing suicide.

4) <u>**The likely course of subsequent care if Jackson Maes had been immediately transported from the Saguache County Jail to an Emergency Department.**</u>

   a) Had Jackson Maes been immediately transported from Saguache County Jail to an Emergency Department, the following would likely have occurred:

      i) An appropriate mental health emergency evaluation would have been performed by a trained professional, sometimes the Emergency Department physician but at other times by a psychologist, social worker, or mental health-trained physician assistant or nurse practitioner.  This evaluation would occur in a controlled setting with sufficient time and staff for an appropriate evaluation, including making contact with key collateral informants (such as Jackson Maes' mother in this instance).

      ii) It is more likely than not that had Jackson Maes been transported to an Emergency Department, he would have been voluntarily or involuntarily (e.g., 72-hour mental health hold) hospitalized on an inpatient psychiatric unit.  Transfer to a detox facility would have been unlikely given the expressed suicidality and head banging, as well as the history (although disputed) of combative behavior.  In contrast, an inpatient psychiatric unit would have been the most appropriate setting for an individual such as Jackson Maes with MDD, AUD, self-harm behavior (e.g., banging his head) and suicidality.  "No hospitalization … is not a viable option for patients who lack a support structure, those who are too unstable or psychotic, or those who have already exhibited dangerous or self-injurious behavior." (Maldonado & Garcia, 2016)

         1. Closed or "locked" inpatient psychiatric units are designed to help patients recover and limit the potential of patient self-harm or suicide, and they do so in ways that differ from those of Saguache County Jail.  For example:

            a. On an inpatient psychiatric unit sufficient, trained mental health professional staff would be available at all times of the day and night, the setting is one designed to be calming, and the staff have a variety of tools to limit self-harm or suicidal behavior

**Plaintiff Expert Disclosures - Exhibit 1**

_____

(e.g., they know how deescalate situations or "talk patients down") and they can administer medications or other interventions to reduce anxiety, depression, impulsivity, and other adverse symptoms or behaviors.

b.  Not only is the panoply of psychiatric medications available on an inpatient unit, but staff are there to administer them whenever needed, day or night, and they are trained to recognize efficacy or lack thereof as well as side effects.  These medications cannot be accessed by patients alone; they are administered by the mental health staff.

c.  Inpatient psychiatric units limit means of self-harm (e.g., belts, sharp objects, and medications as above).

d.  The physical design of inpatient psychiatric units is typically such so as to make self-harm or suicide much more difficult (although not impossible).  For example, death by hanging is limited by ceilings constructed so that there is no solid object available to a patient with which to wrap around a sheet for hanging; structures such as shower heads and door knobs are designed to be breakaway or downsloping, again making hanging difficult.  Patient room doors open outward to hallways, making it difficult or impossible for patients to barricade themselves inside their room.

e.  Many rooms on inpatient psychiatric units are doubles, as the presence of a roommate limits self-harm potential.

f.  Importantly, for those at heightened risk of self-harm or suicide, 1:1 observation with a "sitter" can be arranged throughout the day or night.  This individual remains physically with the patient at all times.

g.  Inpatient psychiatric units provide daily structure and activities that limit the time patients can spend alone in their rooms. These structured activities (e.g., group therapy, art/music therapy) are designed to be therapeutic as well.

h.  Patients are typically seen daily by a psychiatrist as well as psychologists, occupational therapists, social workers, and other trained staff.  There is extended time for adequate observation, diagnosis, and treatment planning as well as resources to

**Plaintiff Expert Disclosures - Exhibit 1**

**SARAH LIEBERENZ VS. BOARD OF COUNTY COMMISSIONERS OF THE COUNTY OF SAGUACHE, COLORADO, ET AL.**
**Expert Opinion by Donald A. Misch, MD, CIME**
Page **14** of **17**

_____

provide a full work up for all relevant psychiatric and medical disorders.

    i.    Patient and family education about mental illness, monitoring and treatment, and post-discharge plans are prominent in such settings.

    j.    Inpatient psychiatric settings allow for intensive discharge planning, typically coordinated by social workers, with attention to appropriate placement (e.g., partial hospitalization program, residential treatment, or individual outpatient psychotherapy), future medication management by a psychiatrist, insurance and financial concerns, and other issues necessary for a successful transition from inpatient to outpatient.

2.    Given his AUD, MDD, and recent suicidality, it is more likely than not that post-discharge Jackson Maes would have been placed, if possible, in a partial hospitalization program or residential treatment. Both offer a safe, structured environment with ongoing monitoring by staff and other patients, a variety of psychotherapeutic interventions—individual, group, Cognitive Behavioral Therapy (CBT), Dialectical Behavior Therapy (DBT), social skills training—as well as occupational/housing/financial assistance. It would be expected that medication management would be provided by a psychiatrist knowledgeable in general psychiatry and addiction psychiatry.

5)    **The likely prognosis if Jackson Maes had been immediately transported from the Saguache County Jail to an Emergency Department.**

    b)    It is problematic to provide a prognosis for Jackson Maes had the above occurred. This is partially due to the fact that prognosis studies typically look at large groups of patients, but the prognosis for a given individual may be significantly better or worse than that of the group at large or the "average" outcome. Even more problematic, the records and documents provided to me do not contain any formal mental health evaluation by a qualified professional, nor any treatment records. Thus, I know little about past diagnoses, treatment efforts, and response to treatment, and I do not know if there are additional psychiatric or medical illnesses beyond those in the available records that may be relevant. In addition, assessment of psychosocial stressors, financial limitations, available treatment facilities, and sources of social and emotional support is similarly limited by the records and documents available to me. Nonetheless, I can and do find the following:

SARAH LIEBERENZ VS. BOARD OF COUNTY COMMISSIONERS OF THE COUNTY OF SAGUACHE, COLORADO, ET AL.
Expert Opinion by Donald A. Misch, MD, CIME
Page **15** of **17**

_____

i)   Insofar as the major psychiatric issues for Jackson Maes were Alcohol Use Disorder and Major Depressive Disorder, <u>both of these entities are treatable with a variety of biologic and psychotherapeutic interventions</u>, as I stated above.  Thus, most people, but not all, with AUD, MDD, and even a combination of both, do improve and are able to live reasonably productive and successful lives.  On the other hand, there exist no proven "cures" for either AUD or MDD.  Indeed, while not always the case, many individuals with MDD will experience future episodes of depression and some will be found to have bipolar disorder.  Similarly, AUD is a chronic illness that often consists of exacerbations, "slips," and relapses.  It is for this reason that those who have been and/or are in treatment for AUD typically refer to themselves as "recovering alcoholics" rather than "former alcoholics."  They recognize that the danger of alcohol craving and recurrent alcohol abuse/alcoholism remains, even when doing well.  It should be emphasized, however, that AUD relapses are not uncommon, often respond well to interventions, and often offer opportunities for better understanding and enhanced coping mechanisms.

ii)  With respect to AUD, but also MDD, much would have depended on Jackson Maes' willingness and motivation to seek and accept treatment.  In addition, available treatment options, financial issues and occupational opportunities, and social support from family, friends, and others in recovery may all enhance or worsen prognosis.  Jackson Maes' strengths are also relevant factors; in this respect, at least based on the information available to me, he had many positive attributes including intelligence, resilience, social relatedness, musical talent, and a gift with animals.

iii) Whatever his ultimate prognosis might have been, had Jackson Maes survived, one thing is clear.  I find to a reasonable degree of medical probability (i.e., more likely than not) that <u>Jackson Maes would not have died by suicide on November 16, 2019 or the ensuing days had he been promptly transported to an Emergency Department with trained mental health professionals to protect his safety, assess his condition, and institute appropriate treatment and placement.</u>

**Plaintiff Expert Disclosures - Exhibit 1**

SARAH LIEBERENZ VS. BOARD OF COUNTY COMMISSIONERS OF THE COUNTY OF SAGUACHE, COLORADO, ET AL.
Expert Opinion by Donald A. Misch, MD, CIME
Page **16** of **17**
_____

# QUALIFICATIONS

I am a Board-Certified psychiatrist with over 30 years of experience in the assessment, treatment, and teaching of mental illness.  I received my A.B. Degree in biology from Harvard College in 1974 and my M.D. Degree from Rush Medical College in 1978.  I completed a residency in Internal Medicine from 1978 to 1981 at Rush-Presbyterian-St. Luke's Hospital in Chicago and subsequently a residency in Psychiatry at Evanston Hospital (Northwestern University) from 1986-1988.  I was first Board-Certified (Diplomate) in Psychiatry by the American Board of Psychiatry and Neurology in 1991 and then recertified in 2012.  In September 2019 I became certified by the American Board of Independent Medical Examiners (CIME).

I have cared for patients in both inpatient and outpatient settings, in private practice, academic medical centers, and university student health care services.  My work has included assessment and treatment of a wide variety of psychiatric disorders including psychosis (e.g., schizophrenia), depression, bipolar disorder, posttraumatic stress disorder, anxiety, alcohol and other substance abuse, and personality disorders.  At the Medical College of Georgia I served as the Director of Education, the Director of Residency Training in Psychiatry, and the Director of Medical Student Education within the Department of Psychiatry and Health Behavior.  I was the Executive Director of the Northwestern University Student Health Service and thereafter the Senior Assistant Vice Chancellor for Health and Wellness as well as Executive Director of Wardenberg Health Services at the University of Colorado-Boulder.  I have also served as an Associate Medical Director for the Colorado Physician Health Program.  Academically, I have been an Assistant and Associate Professor of Psychiatry at the Medical College of Georgia, Clinical Associate Professor of Psychiatry at the Northwestern University Medical School, and Associate Professor of Psychiatry at the University of Colorado School of Medicine.

# DISCLOSURE STATEMENTS

The above analysis and opinions are based upon the information available to me at this time, consisting of the information sources noted above.

I hold these opinions to a reasonable degree of medical certainty and certify my opinions are based on the information sources noted above as well as my training, knowledge, experience, and expertise as a psychiatrist over the past 33 years.  I reserve the right to amend, modify, and add to those opinions if warranted by additional information.

Donald A. Misch, MD, CIME

**Plaintiff Expert Disclosures - Exhibit 1**

**SARAH LIEBERENZ VS. BOARD OF COUNTY COMMISSIONERS OF THE COUNTY OF SAGUACHE, COLORADO, ET AL.**
**Expert Opinion by Donald A. Misch, MD, CIME**
Page **17** of **17**
_____

Board-Certified Psychiatrist (American Board of Psychiatry and Neurology)
6057 Red Hill Road, Boulder, CO 80302
Phone/Fax: 303-834-3414

**Plaintiff Expert Disclosures - Exhibit 1**