EXHIBIT

A

Richard G. Kiekbusch, Ph.D.
2825 Goddard Place
Midland, Texas 79705
Office Phone#: (432) 552-2357
Cell Phone#: (432) 520-4516
E-mail: Kiekbusch_r@utpb.edu

Re: Lieberenz v. Board of County Commissioners of the County of Saguache, Colorado, et.al.

## I. BIOGRAPHICAL SUMMARY

I am an Assistant Professor of Criminology at the University of Texas Permian Basin in Odessa, Texas. I hold a BA, MA, and PH.D., all in Sociology, from the University of Notre Dame. I have over 20 years' experience in correctional administration-including 13 years in jail management in Washington State, Virginia, and North Carolina. I am active in a number of professional associations, and I was President of the American Jail Association 1992-1993. In addition to carrying out my academic responsibilities, I provide expert witness and other consulting services in the area of jail management. I also serve on the editorial boards of several practitioner publications and scholarly journals.

## II. PERSONAL STATEMENT

Suicide is the leading cause of inmate death in local jails accounting for 335, or 30 percent, of 1,120 jail in-custody deaths in 2018 (Carson, Figure 5, Tables 1-2). Furthermore, it is a broadly held contention among jail professionals that the most critical time with respect to inmate suicide prevention are those hours immediately following arrest and incarceration. For those reasons it is imperative that any entity responsible for the operation of a jail be familiar with what we currently know about the effective identification and management of suicidal inmates, and run its facility accordingly.

Over the years, first as a practitioner and now as an academician/consultant, I have developed a personal perspective regarding jail suicide prevention. And while this perspective is mine, it is one that is widely shared in the jail community. My perspective is based upon: my years of experience in running jails and jail systems; my work as an expert in jail suicide-related litigation; my familiarity with the jail suicide prevention-related standards of the American Correctional Association, the National Commission on Correctional Health Care, and the Commission on Accreditation for Law Enforcement Agencies (specifically, the Commission's standards for police holding facilities); numerous conversations with correctional and mental health professionals on the topic of jail inmate suicide prevention; my familiarity with the 1981 and 1988 national studies of jail suicides and my discussions with one of the studies' authors; my attendance at conference workshops on the topic; my reading of related journal articles; and my continuing involvement with jails and the men and women who run them. My perspective on jail suicide prevention features nothing unique or original. Rather, it simply reflects my efforts to organize and apply the observations and experiences of recognized leaders in the field -

observations and experiences which were germane and had been widely circulated by the time of Jackson Maes' 11-16-19 admission to the Saguache County Jail. It is this perspective which guided my review of the materials listed in ATTACHMENT A, as well as the formulation of my opinions and the reasons for those opinions as they are articulated in sections V and VI below

My perspective on jail suicide prevention is as follows:

A. Jail administration is an undertaking of probability, not certitude. There are no "sure things". There is, for example, no jail that is escape-proof, contraband-proof, or suicide-proof.
B. Sound jail management consists of operating a facility so as to maximize the probability of favorable circumstances (eg, the absence of escapes or suicides) and minimize the probability of unfavorable ones (eg, the occurrence of escapes or suicides).
C. This type of facility management requires the awareness of, and the application of, what we in the jail profession currently know about the best ways to prevent the occurrence of these unfavorable events.
D. Regarding jail inmate suicides, we know that the best way to reduce suicide risk is the implementation of a three-step intake process: (1) Custody or medical staff, using well known suicide risk factors, screen incoming inmates in order to identify those who might be suicidal; (2) those inmates so identified are referred to whatever mental health agency the facility works with; and (3) pending the involvement of mental health professionals, those inmates who have been identified as possibly suicidal are placed under close and continuous supervision (often called suicide watch).
E. Well known suicide risk factors include the following: Inmate is thinking about killing him/herself; Arresting/transporting officer thinks inmate is suicidal; Inmate is under the influence of drugs and/or alcohol; Inmate is assaultive or agitated.
F. It is essential that a trained mental health professional assess the inmate for suicide risk and, if the inmate is in fact suicidal, recommend a proper housing location and level of supervision. At no time should a member of the jail's custody or medical staff be expected or allowed to make a determination regarding an inmate's suicide risk unless he/she has been specially trained to do so.
G. Possibly suicidal inmates referred to mental health should be placed on suicide watch pending the intervention of mental health professionals. An effective suicide watch protocol consists of four fundamental elements: (1) the inmate is continuously and readily observable; (2) the cell in which the inmate is housed contains no implements which could be used by the inmate in an attempt to take his/her life (eg, bars, protruding hangers and light fixtures, bed sheets and blankets, clothing items which the inmate is allowed to keep such as a belt or shoe laces); (3) the inmate is directly observed at least every 15 minutes; and (4) the inmate's supervisory needs are periodically reassessed by jail staff.
H. At all times in the management of a possibly suicidal inmate, the jail staff's responsibility to keep the inmate alive " trumps" all other considerations (eg, the inmate's privacy concerns or comfort level, other calls to service in the case of police holding facilities). If that means that an officer has to be re-deployed or brought in on overtime to sit with inmate in the booking area or elsewhere, then so be it.

## III. BASES FOR MY OPINIONS

My Opinions (Section V) and my reasons for those opinions (Section VI) are based upon:

A. My review of documents provided by plaintiff's counsel (ATTACHMENT A); and
B. My education and experience.

## IV. EVENTS OF JUNE 12-JULY 3, 2017

Based upon my review of the documents listed in ATTACHMENT A, my understanding of events November 16-17, 2019 is as follows:

**A. November 16, 2019**

1. Sometime after receiving a call from Saguache County Sheriff's Office (SCSO) Dispatch at approximately 8:48 p.m., SCSO Deputy Elke Wells arrested Jackson Maes. Maes was arrested on a misdemeanor warrant for failure to appear on a traffic offense.
2. Deputy Wells arrived at the Saguache County Jail (SCJ) with Maes at approximately 9:15 p.m.
3. Because he was highly intoxicated, Maes was not booked into the SCJ. Rather, it was decided by SCJ staff that Maes would be held in a cell by himself and booked November 17 a.m. when he was no longer intoxicated.
4. Maes was placed in Cell #1, by himself, at approximately 9:45 p.m. by SCSO Capt. Ken Wilson, SCSO Deputy Miguel Macias, and Deputy Wells.
5. At approximately 9:57 p.m. Maes began banging his head on one of the interior cell walls. Both Capt. Wilson and Deputy Macias spoke with Maes. Maes subsequently agreed to stop banging his head if Deputy Macias would bring him some crackers and juice. A short time later Macias brought the requested crackers and juice to Maes, and Maes stopped banging his head.

**B. November 17, 2019**

1. At approximately 7:00 a.m., when Deputy Jerry Montoya came to Cell #1 to deliver breakfast to inmate Maes, he found Maes hanging, deceased, from a seldom-used door located at the rear of the cell.
2. Maes was officially declared dead, in the SCJ, at 7:23 a.m. by Saguache EMS in consultation with a Dr. Martinez in Del Norte.

## V. MY OPINIONS

Staff of the Saguache County Sherriff's Office contributed to the November 16-17, 2019 death of jail inmate Jackson Maes by failing to:

A. Identify Maes as possibly suicidal.
B. Refer Maes to mental health professionals for definitive evaluation of his suicide risk.
C. Place Maes on suicide watch pending the completion of such evaluation.

## VI. REASONS FOR MY OPINIONS

**A. Failure to Identify Maes as Possibly Suicidal:**

1. A well-known -- and, in fact, the most important -- suicide risk factor in the jail setting is an inmate's statement that he is thinking about killing himself (Kiekbusch, 12-3, 12-12).
2. Jackson Maes made such a statement to Deputy Wells (stated "he may as well kill himself" ) when she arrested him 11/16/2019, minutes before her 9:15 p.m. arrival with Maes at the SCJ (Colorado Bureau of Investigation (CBI) Report, County 00070; SCSO Investigation Report, County 000008).
3. Deputy Wells did not inform the booking officer, Deputy Macias, of Maes' suicide threat (CBI agent Petterson's interview of Macias, County 000410), and Macias proceeded to identify Maes as non-suicidal (SCSO Arrest-Booking Detail Page, County 000055).
4. The next morning, 11/17/2019, during a visit to the jail, Deputy Wells gave as her reason for not informing Deputy Macias of Maes' suicide threat her assessment of Maes' threat as an off-hand comment not indicative of a serious intent to kill himself (CBI Report, County 000070). Unless her background includes specialized education, training, and experience of which I am unaware, Wells was not qualified to make such an assessment. A definitive determination of an inmate's suicide risk can only be made by a specially trained and credentialed mental health professional.
5. Ironically, Deputy Wells was concerned enough about Maes' welfare to visit the SCJ the next morning to check on him, an 11/17/2019 jail visit alluded to in paragraph 4 above. Her stated reasons for her concerns about Maes were his high level of intoxication and his threats of suicide (CBI Report, County000070).
6. Another well-known suicide risk factor in the jail setting is if the inmate is under the influence of drugs and/or alcohol (Kiekbusch, 12-4, 12-12). Maes' extremely intoxicated condition, coupled with his just-stated suicide threats, should have prompted Wells to report those threats to Macias.
7. The SCSO Jail and Dispatch Standard Operating Procedures (SOP) correctly note that an inmate may not present suicidal tendencies until sometime into his confinement (SOP, County 000089). Apart from his severe intoxication and his arrest-related suicide threats made to Deputy Wells, inmate Maes further demonstrated his suicide risk following his 11/16/2019 placement in Cell #1:
   a. At one point Maes stated that he might kill himself (Wells Incident Report, County 000039; Cell#1 security camera footage @ 11-16-19, 21:58:30). Deputies Wells and Macias discussed Maes' statement and a decision was made to contact Mental Health for a mental evaluation (Wells Incident Report, County 000039).
   b. In his most pronounced demonstration of his suicide risk, from approximately 10:05 p.m. to approximately 10:22 p.m. Maes made deliberate preparations to hang himself, in full view of on-duty staff (Wells, Macias, and Dispatcher Shelby Shields) via video feed to the dispatch office: tore the privacy the sheet

away from the toilet stall in his cell; wrapped one end of the sheet around his neck; and wrapped the other end of the sheet around the bars atop a seldom-used door at the rear of his cell (SCSO Investigation Report, County 000009; 000011; Video: Ex 02 2020 06 22).

8. In summary:
    a. By virtue of his arrest-related suicidal statement to Deputy Wells, his high level of intoxication, his second suicide threat in Cell #1, and his deliberate video-taped suicide preparations, Jackson Maes presented himself as an inmate, who was, without question, possibly suicidal.
    b. SCSO staff, however, ignored Maes' threats and his severe intoxication as suicide risk factors and apparently failed to see the video feed of his suicide preparations. In so doing, SCSO staff failed to identify Maes as a possibly suicidal inmate and manage his brief incarceration accordingly.

**B. Failure to Refer Maes to Mental Health Professionals:**

1. As illustrated in section A above, Jackson Maes was unquestionably a possibly suicidal inmate. Given his unmistakable condition, the responsible management of his incarceration should have involved a referral of Maes to mental health professionals for definitive assessment of his suicide risk. Because SCSO staff – despite Maes' presentation of multiple well known suicide risk indicators (paragraph A2, A6, A7a, and A7b above) – failed to identify Maes as possibly suicidal, such a referral never took place.
2. The Jail's Standard Operating Procedures mirror the critical importance of mental health involvement with their mandate that, when an incoming inmate displays suicidal tendencies, San Luis Mental Health is to be notified and asked to come and do an evaluation (SOP, County 000089).
3. In fact, following Maes' second suicidal threat Deputies Wells and Macias were concerned enough to decide to contact Mental Health for a mental evaluation (paragraph A7a above). Mental Health, however, was never contacted. Sgt. Pascoe reported a 50-second unanswered call to Behavioral Health in Alamosa, and Dispatcher Shields recounted making that call and leaving no message (SCSO Investigation Report, County 000009, 000016). Citing reports from the Sheriff's Office, a 4/16/2021 Denver Post story on Maes' suicide disclosed that deputies tried to call mental health but, when no one answered the deputies neither left a message nor tried to contact anybody else for help (Denver Post 4/16/2021, County 000082).
4. In Summary:
    a. Inmate Maes' second threat of suicide voiced shortly after his placement in cell #1, prompted Deputies Wells and Macias to make a call to Mental Health to request an evaluation of Maes.
    b. Dispatcher Shields, who made the call to Mental Health, received no answer. Shields neither left a voicemail message nor attempted to contact someone else for help. I have seen no evidence of any further efforts on the part of SCSO staff to obtain mental health assistance with respect to Maes.

c. In effect, SCSO staff:
    (1) Had in their secure custody Jackson Maes - - clearly a possibly suicidal inmate who had displayed, over the course of approximately two hours, multiple suicide risk factors.
    (2) Made no legitimate effort to refer Maes to mental health professionals for definitive assessment of his suicide risk.

**C. Failure to Place Maes on Suicide Watch:**

1. The failure of SCSO to identify Jackson Maes as possibly suicidal was inexcusable. Within the course of approximately two hours Maes presented multiple suicide risk factors, including the verbal threats of suicide and videotaped step-by-step preparations to hang himself (section A above). Maes was, unmistakably, a possibly suicidal inmate.
2. Whenever a jail is holding an inmate who is possibly suicidal and has not yet been evaluated by mental health staff, it is imperative that the inmate be housed and supervised in such a way that the likelihood of the inmate taking his/her life has been substantially minimized. Such an effort at inmate suicide prevention, commonly called suicide watch, is accomplished by housing the inmate in such a way that he/she:
    a. Is the object of heightened supervision (e.g., readily observable, checked at least every 15 minutes by medical and/or correctional staff).
    b. Has no access to implements which could be used in a suicide attempt (e.g., bars, protruding hangers and light fixtures, bedding, belts, shoe laces) (Kiekbusch, 12-6, 12-7, 12-8; National Commission on Correctional Health Care, J-G-05).
3. The SCSO's Standard Operating Procedures for the Jail, which mandate both the placement of suicidal inmates on suicide watch and the referral of those inmates to Mental Health, mirror the elements of suicide watch referenced in paragraphs 2a-b above: A mattress is the only bedding; Inmate is dressed in a suicide suit; Staff are to conduct 10 minute camera checks and 20 minute manual checks (SOP, County 000089).According to Deputy Wells, the Sheriff had a policy regarding possibly suicidal inmates that entailed a referral to mental health for an evaluation, placement on suicide watch, and frequent observation (Wells' Responses to Interrogatories, 2).Of particular note: the toilet stall privacy sheet with which Maes fashioned a ligature to hang himself would likely not have been available to him.
4. Of additional relevance, the County had received a report from County Technical Services Inc. (CTSI) following CTSI's audit of the Saguache County Jail. The audit was completed with the assistance of Jail Commander Capt. Ken Wilson, and a copy of the audit report was sent to the Chairman of the Board of County Commissioners. In its report CTSI recommended the removal of items which inmates might use to harm themselves (Saguache County Jail Audit, CTSI Inc., 12-4-18, Recommendation 18-12-02). While the removal of all potential self-harm implements from a jail is unrealistic, possibly suicidal inmates should never be housed in cells containing such

implements. Cell #1—with its toilet stall privacy sheet, its two-tiered bunk bed, and its bars – should not have been used to house Jackson Maes.

5. Had Maes been placed on suicide watch as the Jail's Standard Operating Procedures require (SOP, County 000089), such placement would have substantially increased the likelihood that he would have been alive for his release on bail and/or his mental health evaluation. Either, or both, of these outcomes would likely have occurred in the several days following his 11/16/2019 admission to the Jail.
6. SCSO staffs' failure to identify Maes as possibly suicidal and place him on suicide watch was exacerbated, and any remotely possible chance to rescue and resuscitate Maes was eliminated, by the following:
   a. By his own admission and confirmed by the Jail's video surveillance system, Deputy Macias did not perform the last three required in-person hourly checks of Cell #1, in which Maes was housed, on his 11-16/2019 shift – 10 p.m., 11 p.m., and midnight (CBI Report, County 000067, 000069-000070, 000077; SCSO Investigation Report, County 000008-000009, 000016; Saguache County Jail Log 11/16/2019, County 000029; Macias Employee File @ 11/18/2019, County 000132; CBI agent Petterson's interview with Macias, County 000418-000419). Macias explained to CBI agent Petterson that it was his practice to enter his checks in the jail log in advance when he came on-duty. The three aforementioned 11/16/2019 cell checks, though entered in the log by Macias, were never performed (CBI Report, County 000077).
   b. Despite not having performed the required in-person cell checks of Cell #1, at 10 p.m., 11 p.m., and midnight, Deputy Macias assured oncoming Deputy Jerry Montoya that everything in the jail was okay (CBI Report, County 000069, 000009, 000011). Because of this Deputy Montoya was unaware of the presence of possibly suicidal, and possibly still alive, inmate Maes in that cell.
   c. Deputy Montoya was, in effect, unable to monitor inmate Maes in cell #1 during the early morning hours of his 11/17/2019 shift. This inability was especially crucial during the initial hours of his tour when, though it was not likely, Maes may still have been alive and responsive to resuscitation efforts. This critical inability was traceable to three SCSO practices in the Jail:
      (1) The night deputy was also the dispatcher (CBI Report, County 000070, 000076). In the early morning hours of 11/17/2019 Deputy Jerry Montoya was responsible for both supervising the Jail's inmates and performing the SCSO's dispatching function. This particular practice, generally found in the jails and sheriff's offices of small counties (e.g., Saguache County) is broadly recognized among jail professionals as dangerous and unacceptable. Officers who are responsible for the management and supervision of a jail and its inmates should be responsible for that – and that alone.
      (2) Because he was also responsible for the SCSO's dispatch function and had to remain in the dispatch office, Deputy Montoya supervised

the jail and its inmates by monitor only. He never walked through the jail, making in-person cell checks. Rather, in compliance with the SCSO's practice for night deputies (CBI Report, County 000070), Montoya performed hourly monitor checks only (CBI Report, County 000071; SCSO Investigation Report, County 000008; Saguache County Jail log 11/17/2019, County 000028). According to Deputy Macias monitor checks entail only looking through the camera (presumably watching the video feeds displayed on the video monitor located in the dispatch office) and are not accompanied by in-person cell checks (CBI agent Petterson's interview with Macias, County 000413). This manner of remote inmate supervision is absolutely unacceptable as the lone manner of such supervision. Cameras should be used to supplement, not supplant, in-person inmate supervision (American Correctional Association, 4-ALDF-2A-06; Commission on Accreditation for Law Enforcement Agencies 72.81, 1). In effect and in accordance with accepted SCSO practice, Deputy Montoya did not supervise the Jail's inmates, including inmate Maes in Cell #1, during the overnight hours of his 11/17/2019 shift – including the earliest hours when Maes may still have been alive and possibly responsive to rescue and resuscitation attempts.

(3) At approximately 11:59 p.m. on 11/16/2019 the lights to Cell #1 were turned off – leaving, as I understand it, only a night light to illuminate the cell (CBI Report, County 000069; SCSO Investigation Report, County 000009). This is a common practice in jails all across the Country. In Saguache, however, this practice left Deputy Montoya irrefutably totally unable to supervise the Jail's inmates. This is because, as affirmed by Sheriff Warwick, surveillance cameras in the cells are not able to see all areas when the lights are out, even with the night lights on (Center Post Dispatch 8/3/2021). Deputy Montoya reported that he had checked the cameras but could see nothing (Center Post Dispatch 8/3/2021). In other words, in the Saguache County Jail, a jail in which the night Deputy is totally reliant upon a dark monitor to supervise the Jail's inmates, inmate Maes went unsupervised – including during the early morning hours of 11/17/2019 when he still may have been responsive to rescue and resuscitation efforts.

7. In summary:
   a. In Jackson Maes the SCSO had in its custody an inmate who had displayed multiple suicide risk factors both prior to and during his incarceration and who was, without question, possibly suicidal.
   b. Despite this, staff failed to place Maes on suicide watch and instead placed him in Cell#1 with its full complement of self-harm implements. In so doing,

they failed to manage his confinement in a manner which reduced the likelihood that Maes would take his own life.

c. Making matters worse, staff failed to supervise Maes in any way following their interruption of his head banging in Cell #1, thus effectively eliminating any chance of rescuing and resuscitating Maes.

## VII. ADDENDUM: SHERIFF AND COUNTY COMMISSIONERS

### A. Sheriff Warwick:

As I have explained in sections V and VI above, on-duty SCSO staff contributed to the November 16-17, 2019 death of jail inmate Jackson Maes. While on-duty staff played the primary roles with respect to the SCSO's responsibility in Mae's death, Sheriff Dan Warwick also bore significant responsibility. As the Colorado public official invested with the statutory obligation to maintain the Saguache County Jail, including its safety (C.R.S. 17-26-102), Sheriff Warwick condoned three practices which, taken together, rendered the supervision of the Jail's inmates literally non-existent during most of the midnight shift (midnight to 8 a.m.):

1. The jail deputy on the midnight shift also functioned as the dispatcher (CBI report, County 000070, 000076; C6c (1) above)—simultaneously performed roles which severely compromised his ability to effectively supervise the inmate population.
2. Because he was also responsible for the dispatch function, the midnight shift Jail deputy remained in the dispatch office throughout the shift and oversaw inmates solely by watching cell security camera video feeds to the monitor in the dispatch office. He made no in-person cell checks (CBI Report, County 000070; CBI agent Petterson's interview with former deputy Macias, County 000413). In the present case, it is my understanding that midnight shift Jail deputy Montoya did not lay eyes on any inmate until he delivered breakfast at the end of his shift on 11-17-19.
3. Underscoring the midnight shift jail deputy/dispatcher's inability to provide any supervision of the Jail's inmates was the fact that when the cell lights were turned off at the end of the 4p.m.-midnight shift, leaving only night lights to illuminate the cells, the security cameras delivering the video feeds to the dispatch office monitor were unable to provide coverage of all areas in the cells. This was confirmed by Sheriff Warwick in an August 2021 newspaper article and, in the same article, deputy Montoya reported that he could see nothing on the monitor (Center Post Dispatch article 8-31-21; C6c(3) above).

These three practices, all condoned by Sheriff Warwick, resulted in the total absence of inmate supervision on the midnight shift, except during the shift's final minutes. In the present case, this absence of supervision was especially crucial during the early minutes of the 11-17-19 midnight shift when Jackson Maes may still have been responsive to rescue efforts. Incredibly, Maes was left hanging in Cell #1 for over eight hours unobserved by staff.

### B. Board of County Commissioners:

Conceivably, Sheriff Warwick's adherence to the practice of posting a lone officer on the Jail's midnight shift and assigning that officer both inmate supervision and dispatching duties is

attributable to a shortage of jail staff. In reviewing minutes of meetings of the Saguache County Commissioners I note at least 10 occasions, in the two years and nine months immediately preceding the Maes suicide, on which Sheriff Warwick and others have brought to the Board's attention their concerns regarding jail staffing shortages, resulting jail safety issues, and compensation-related jail staff recruitment and retention problems ( Minutes: 2-16-16, 8-16-16, 1-24-17, 5-16-17, 8-15-17, 12-19-17, 2-6-18, 3-6-18, 7-7-18, 9-18-18). To the extent that the Sheriff's deployment of a single jail supervisor/dispatcher on the Jail's midnight shift and the resulting total absence of any supervision of the inmate population is attributable to the Commissioners' unresponsiveness to the aforementioned voiced concerns, the Board shares in the responsibility for Jackson Maes' death.

## VIII. CONCLUSION

A. My opinions and my reasons for these opinions are subject to revision if new information is brought to my attention.
B. Attached to this report are:
   1. A summary of the information which I considered in formulating my opinions and my reasons for those opinions (ATTACHMENT A).
   2. A list of my publications in the last 10 years (ATTACHMENT B).
   3. A list of the cases in which I have testified in the last four years (ATTACHMENT C).
   4. My fee schedule (ATTACHMENT D).

Richard G, Kiekbusch, Ph. D.
Midland, Texas
December 2, 2021

## ATTACHMENT A: INFORMATION CONSIDERED

1. Complaint and Jury Demand (3/32021)
2. Kiekbusch, Richard G., "Managing Suicidal Inmates in the Jail Setting", in Stojkovic, S.(ed.) MANAGING SPECIAL POPULATIONS IN JAILS AND PRISONS, VOL 2,Chapter 12, Kingston, NJ: Civic Research Institute, 2010
3. Carson, E. Ann, Bureau of Justice Statistics, MORTALITY IN LOCAL JAILS, 2000-2018 – STATISTICAL TABLES, April 2021
4. CBI Report, Agent Julie Petterson, County 000066-000078 (12/2019)
5. SCSO Investigation Report, Sgt. Richard Pascoe, County 000007-000017 (11-12/2019)
6. CBI agent Petterson's Interview with Miguel Macias, County 000395-000437 (1/8/2020)
7. SCSO Arrest-Booking Detail Page for Maes, Jackson Edward, County 000055 (11/16-17/2019)
8. Saguache County Jail and Dispatch Standard Operating Procedures, County 00085-000101 (undated)
9. SCSO Incident Report, Deputy Elke Wells, County 00037-000040 (11/16/2019)
10. Cell#1 security camera footage, 11-16-19
11. Denver Post article Maes' suicide, County 000079-000084 (4/16/2021)
12. National Commission on Correctional Health Care, STANDARDS FOR HEALTH SERVICES IN JAILS, 2014
13. Answers to Plaintiff's First Set of Written Discovery to Defendant Miguel Macias (8/2021)
14. Responses to Plaintiff's Requests for Admission and Requests for Production to Defendant Elke Wells (8/30/2021)
15. Responses to Plaintiff's Interrogatories – Elke Wells (8/30/2021)
16. SCSO Arrest-Booking Medical Page for Maes, Jackson Edward, County 000056 (11/16/2019)
17. Saguache County Jail Logs 11/16/2019 and 11/17/2019
18. Miguel Angel Macias Employee File
19. American Correctional Association, PERFORMANCE-BASED STANDARDS FOR ADULT LOCAL DETENTION FACILITIES, June 2004
20. Commission on Accreditation for Law Enforcement Agencies, STANDARDS MANUAL, Chapter 72 relating to police lock-up facilities, 2001
21. Center Post Dispatch article on Maes' suicide (8/3/2020)
22. Other Discovery materials provided by plaintiff's counsel
23. Saguache County Jail Audit, CTSI, 12-4-18
24. Colorado Revised Statues: C.R.S. 17-26-102
25. Minutes: Meetings of the Saguache County Board of County Commissioners

## ATTACHMENT B: PUBLICATIONS IN LAST 10 YEARS

- Assessing Liability Exposure in Jail Suicide Cases: Three Questions to Ask, Americans for Effective Law Enforcement (AELE) Monthly Law Journal (online) March 2020.
- Managing Suicidal Inmates in the Jail Setting, CORRECTIONS MANAGERS ' REPORT, October/November 2017, 1-2, 42-45.
- Managing Suicidal Inmates in the Jail Setting, CORRECTIONAL HEALTH CARE REPORT, July/August 2017, 1-2, 79-82.
- Influencing the Conduct of Line Officers: Some Tips for Chief Executives,
- CORRECTIONS MANGER'S REPORT, June/July 2014, 1-2, 14-15, with Ray J Leible, Reprint of an article that had originally appeared in CORRECTIONS MANAGERS' REPORT, Oct./Nov. 2004.
- Corrections Classics: Prison Evaluation in Lean Economic Times: Some Suggestions, CORRECTIONS MANAGERS' REPORT, February/March 2014, 65-66, 70, 72, 79. Reprint of an article that had originally appeared in CORRECTIONS MANAGERS' REPORT, April/May 2003.
- Corrections Classics: Jail Safety: Begin with Roll Call, CORRECTIONS MANAGERS' REPORT, Aug/Sept. 2013, 19-21. Reprint of an article that had originally appeared in CORRECTIONS MANAGERS' REPORT, Oct./Nov. 2000.
- Corrections Classics: Be a Role Model, CORRECTIONS MANAGERS' REPORT Apli1/May 2013, 81-82, 93-94. Reprint of an article that had originally appeared in CORRECTIONS MANAGERS' REPORT, June/July 2002.
- Corrections Classics: Dealing with the Reality of Politics in Corrections, CORRECTIONS MANAGERS' REPORT, Dec./Jan. 2013, 51-52. Reprint of an article that had originally appeared in CORRECTIONS MANAGERS' REPORT Aug./Sept. 1997.
- It just Depends, guest editorial on the jail profession and higher education in AMERICAN JAILS, January/February 2012, 5.

## C: TESTIMONY IN LAST FOUR YEARS

- Jordan v. City of Los Angeles, Superior Court of California, County of Los Angeles (deposition only)
- Gann v. Montgomery County, et.al., U.S. District Court for the Southern, District of Texas, Houston Division (deposition only)
- Pinnock, et.al. v. Board of County Commissioners of Grant County, et.al., U.S. District Court for the District of New Mexico (deposition only)
- Montgomery, et.al. v. King County, et. al., U.S. District Court for the Western District of Washington at Seattle (deposition only)

## D: FEE SCHEDULE

- Initial Review: $2,000
- Standard Work: $200/hour
- Testimony (deposition or trial): $250/hour