**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Nina Y. Wang**

Civil Action No. 21-cv-00628-NYW-NRN

SARAH LIEBERENZ, individually and as personal representative of THE ESTATE OF JACKSON MAES,

Plaintiff,

v.

BOARD OF COUNTY COMMISSIONERS OF THE COUNTY OF SAGUACHE, COLORADO, in its official capacity,
SAGUACHE COUNTY SHERIFF'S OFFICE,
DAN WARWICK, in his official capacity,
KENNETH WILSON, in his individual capacity,
ELKE WELLS, in her individual capacity,
MIGUEL MACIAS, in his individual capacity, and
SHELBY SHIELDS, in her individual capacity.

Defendants.

---

## ORDER

---

This matter is before the Court on four pretrial motions (collectively, "Motions"):

(1) County Defendants' Rule 702 Motion to Exclude One Opinion of Plaintiffs' Psychiatric Expert ("Defendants' First Motion to Exclude"), [Doc. 170, filed October 20, 2022];

(2) County Defendants' Rule 702 Motion to Exclude Two Opinions of Plaintiffs' Jail Practices Expert ("Defendants' Second Motion to Exclude"), [Doc. 171, filed October 20, 2022];

(3) Plaintiffs' *Daubert* Motion to Exclude Testimony from Defendants' Expert Jonathan Ritvo, MD ("Plaintiffs' Motion to Exclude"), [Doc. 172, filed October 20, 2022]; and

(4) Defendants' Motion to Strike Untimely Affidavits of Plaintiffs' Expert Witnesses ("Motion to Strike"), [Doc. 186, filed November 23, 2022].

The Court also considers the Parties' Responses to the Court's Order issued on November 30, 2022 directing Plaintiffs to show cause as to why Plaintiff Sarah Lieberenz should not be dismissed in her individual capacity ("Show Cause Order"). *See* [Doc. 187 at 13–14; Doc. 188; Doc. 191]. The Court concludes that oral argument would not materially assist in the resolution of the Motions or the Show Cause Order. Upon review of the Parties' briefing, the entire docket, and the applicable case law, Defendants' First Motion to Exclude is respectfully **GRANTED**, Defendants' Second Motion to Exclude is respectfully **DENIED**, Plaintiff's Motion to Exclude is respectfully **GRANTED**, and the Motion to Strike is respectfully **GRANTED IN PART** and **DENIED IN PART**. It is further **ORDERED** that Plaintiff Sarah Lieberenz is dismissed from this action in her individual capacity.

## BACKGROUND

The Court has previously discussed the background of this case, *see* [Doc. 187 at 2–5; Doc. 207 at 3–9], and repeats it only to the extent necessary to decide the pending Motions. This action arises out of the death of Mr. Jackson Maes ("Mr. Maes"), an individual who committed suicide while incarcerated at the Saguache County Jail ("SCJ") in Saguache, Colorado on November 16, 2019. *See, e.g.*, [Doc. 1; Doc. 187 at 2]. While at SCJ, Mr. Maes was visibly intoxicated and made multiple expressions of his intent to commit suicide before doing so. [Doc. 187 at 2–3].

Sarah Lieberenz ("Ms. Lieberenz"), Mr. Maes's mother, filed this lawsuit on March 3, 2021, bringing claims both individually and as the personal representative of the Estate

of Mr. Maes ("Estate," and collectively, "Plaintiffs"). [Doc. 1]. Plaintiffs asserted claims against the Board of County Commissioners of the County of Saguache (the "Board"); the Saguache County Sheriff's Office; Dan Warwick, the Sheriff of Saguache County ("Sheriff Warwick" and collectively, "County Defendants"); as well as four officers who were involved in Mr. Maes's incarceration and the operation of SCJ ("Officer Defendants," and collectively with the County Defendants, "Defendants"). [*Id.* at ¶¶ 7–10]. Counts One through Ten of the Complaint allege claims under 42 U.S.C. § 1983 for deprivations of Mr. Maes's constitutional rights, *see* [*id.* at ¶¶ 167–203], and Count Eleven alleges a state law claim for negligent operation of a jail, [*id.* at ¶¶ 204–08]; *see also* Colo. Rev. Stat. § 24-10-106(1)(B).

On November 30, 2022, the Court granted partial summary judgment against Plaintiffs to the extent that Counts One through Ten "assert any cause of action or damages suffered by Ms. Lieberenz as an individual." [Doc. 187 at 13]. The Court declined, however, to dismiss Ms. Lieberenz as an individual at that time. [*Id.*]. Recognizing that Ms. Lieberenz may still be able to bring Count Eleven's state law claim as an individual, the Court instead ordered Plaintiffs to show cause as to why Ms. Lieberenz should not be dismissed in her individual capacity. [*Id.* at 13–14]. The Court also permitted Defendants to file a Response, and both Parties submitted briefing accordingly. [Doc. 188; Doc. 191].

On February 3, 2023, the Court additionally granted partial summary judgment against Plaintiffs as to Counts One, Three, Five, Nine, Ten, and part of Count Four. *See generally* [Doc. 207]. Counts Two, Six, Seven, Eight, Eleven, and the remainder of Count Four were permitted to proceed to trial. [*Id.* at 66–67]. Defendants Shelby Shields and

Deputy Elke Wells were dismissed from the case. [*Id.*]. However, the case was administratively closed on March 8, 2023, pending Defendant Captain Kenneth Wilson's and Plaintiffs' appeals of the Court's summary judgment rulings. [Doc. 212]; *see also* [Doc. 208; Doc. 216]. On June 12, 2024, the United States Court of Appeals for the Tenth Circuit ("Tenth Circuit") affirmed this Court's denial of qualified immunity for Defendant Wilson and dismissed for lack of jurisdiction Plaintiffs' cross-appeal of this Court's grant of qualified immunity for Defendants Shields and Wells. *See* [Doc. 225 at 26–27]. This Court reopened the case on July 17, 2024, [Doc. 229], with trial set to commence on March 31, 2025, [Doc. 233].

After reopening the case, the Court reinstated its Show Cause Order, [Doc. 187], as well as the four pending Motions, *see* [Doc. 233]. In Defendants' First Motion to Exclude, Defendants ask the Court to exclude under Rule 702 an opinion offered by Dr. Donald Misch, who Plaintiffs retained as a psychiatric expert as to Mr. Maes's mental state and possible treatment outcomes. *See* [Doc. 170]. Defendants' Second Motion to Exclude challenges two opinions given by Dr. Richard Kiekbusch, Plaintiffs' jail practices expert. [Doc. 171]. Dr. Kiekbusch's report deals with the adequacy of the Officer Defendants' response to Mr. Maes's indications of suicidality, as well as the County Defendants' potential culpability. *See generally* [Doc. 171-1]. Defendants' Motion to Strike addresses affidavits by Dr. Kiekbusch and Dr. Misch that Plaintiffs attached to their Responses to Defendants' Motions to Exclude. [Doc. 186]. Plaintiffs also filed their own Motion to Exclude as to Defendants' medical expert, Dr. Jonathan Ritvo. [Doc. 172]. The Court begins with the Motion to Strike, next considers the three Motions to Exclude, and then resolves its Show Cause Order.

## LEGAL STANDARDS

### I.    Motions to Strike under Rule 26 and Rule 37

#### A.    Rule 26

Rule 26(a)(2) of the Federal Rules of Civil Procedure provides that a party must disclose to all other parties the identity of any person who may be used at trial to present evidence under Rules 702, 703, or 704 of the Federal Rules of Evidence.  Fed. R. Civ. P. 26(a)(2)(A).    A retained expert must provide a report that contains (1) a complete statement of all opinions the witness will express and the basis and reasons for them; (2) the facts or data considered by the witness in forming them; (3) any exhibits that will be used to summarize or support them; (4) the witness's qualifications, including a list of all publications authored in the previous 10 years; and (5) a statement of the compensation to be paid for the study and testimony in the case.    Fed. R. Civ. P. 26(a)(2)(B).  Rule 26(a)(2) also dictates that parties shall first disclose affirmative experts and then disclose rebuttal witnesses within 30 days after the other party's disclosure, unless the court orders otherwise.  Fed. R. Civ. P. 26(a)(2)(D).

For an expert report disclosed under Rule 26(a)(2), Rule 26(e) requires the party to supplement or correct the disclosure if the party discovers that the report is incomplete or incorrect "in some material respect."   Fed. R. Civ. P. 26(e)(1)(A).  Moreover, "the additional or corrective information" must not have "otherwise been made known to the other parties during the discovery process or in writing."  *Id.*  The duty to supplement extends to both information in the expert's report and information provided at the expert's deposition.  Fed. R. Civ. P. 26(e)(2).  Supplements must be disclosed no later than the deadline for disclosures under Rule 26(a)(3).  *Id.*  In this District, that deadline is the

deadline for submission of the parties' proposed Final Pretrial Order. D.C.COLO.LCivR 26.1(b); *see also Auraria Student Hous. at the Regency, LLC v. Campus Vill. Apartments, LLC*, No. 10-cv-02516-WJM-KLM, 2015 WL 72360, at *3 (D. Colo. Jan. 5, 2015).

Rule 26(e) is not, however, "intended to provide an extension of the expert designation and report production deadline[s]." *Metro Ford Truck Sales, Inc. v. Ford Motor Co.*, 145 F.3d 320, 324 (5th Cir. 1998). By its plain language, "Rule 26(e)(1) permits supplemental reports only for the narrow purpose for correcting inaccuracies or adding information that was not available at the time of the initial report." *SEC v. Nacchio*, No. 05-cv-00480-MSK-CBS, 2008 WL 4587240, at *3 n.3 (D. Colo. Oct. 15, 2008) (citing *Minebea Co. v. Papst*, 231 F.R.D. 3, 6 (D.D.C. 2005)). Permissible supplementation therefore "means correcting inaccuracies, or filling the interstices of an incomplete report based on information that was not available at the time of the initial disclosure." *Cook v. Rockwell Int'l Corp.*, 580 F. Supp. 2d 1071, 1169 (D. Colo. 2006) (quoting *Keener v. United States*, 181 F.R.D. 639, 640 (D. Mont. 1998)). And because Rule 26(a)(2) requires an expert's initial report to contain a "complete statement" of an expert's opinions, reasoning, and underlying data, a supplemental report that contains information or opinions beyond what was included in the initial report constitutes a violation of Rule 26(a) and (e). *See Stoker v. State Farm Mut. Auto. Ins. Co.*, No. 19-cv-03569-NYW, 2021 WL 4201583, at *11 (D. Colo. May 6, 2021) (citing *Galaxy Ventures, LLC v. Rosenblum*, No. 03-cv-01236-JH-LFG, 2005 WL 5988690, at *4 (D.N.M. July 21, 2005)) (observing that supplemental report containing new information violates Rule 26(a)); *Cook*, 580 F. Supp. 2d at 1169–70 (finding that supplemental report advancing new opinions or attempting to "strengthen" or "deepen" original opinions violates Rule 26(e)).

### B.    Rule 37

Rule 37(c) governs violations of Rule 26(a) or (e).  A party that provides a supplement to an expert report after the Rule 26(a)(3) deadline "is not allowed to use that information . . . to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."  Fed. R. Civ. P. 37(c)(1).  The determination as to whether a Rule 26(a) violation is justified or harmless is entrusted to the broad discretion of the Court.  *Woodworker's Supply, Inc. v. Principal Mt. Life Ins. Co.*, 170 F.3d 985, 993 (10th Cir. 1999).  In exercising this discretion, the Court's consideration is guided by the following four factors:  (1) the prejudice or surprise to the impacted party; (2) the ability to cure the prejudice; (3) the potential for trial disruption; and (4) the erring party's bad faith or willfulness.  *Id.*

To avoid a preclusion sanction, the party responsible for a Rule 26(a) violation bears the burden of showing the failure was substantially justified or harmless. *Sender v. Mann*, 225 F.R.D. 645, 655 (D. Colo. 2004); *see also Contour PAK, Inc. v. Expedice, Inc.*, No. 08-cv-01091-PAB-KMT, 2009 WL 2490138, at *1 (D. Colo. Aug. 14, 2009) ("The burden of establishing substantial justification and harmlessness is upon the party who is claimed to have failed to make the required disclosures." (quotation omitted)).

## II.    Motions to Exclude under Rule 702

Rule 702 of the Federal Rules of Evidence provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702. As noted by the Advisory Committee when the Rule was first promulgated, "[a]n intelligent evaluation of facts is often difficult or impossible without the application of some scientific, technical, or other specialized knowledge." Fed. R. Evid. 702 advisory committee's note.

It is well established that trial courts are charged with the responsibility of acting as gatekeepers to ensure that expert testimony or evidence admitted is not only relevant, but reliable. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147–52 (1999); *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 588–89 (1993). To fulfill that gatekeeper function, courts within the Tenth Circuit conduct a two-part inquiry. First, courts consider whether the expert's proffered testimony has a reliable basis in the knowledge and experience of his or her discipline by assessing the expert's qualifications and the admissibility of the proffered evidence, i.e., whether the reasoning or methodology underlying the testimony is valid. *Cook*, 580 F. Supp. 2d at 1082 (citing *Bitler v. A.O. Smith Corp.*, 400 F.3d 1227, 1232–33 (10th Cir. 2005)). Second, courts look to whether the proposed testimony is sufficiently relevant to the issues presented to the factfinder. *See id.* The party offering the expert opinion bears the burden of establishing its admissibility, including all foundational requirements, by a preponderance of the evidence. *United States v. Nacchio*, 555 F.3d 1234, 1251 (10th Cir. 2009) (en banc); *United States v. Crabbe*, 556 F. Supp. 2d 1217, 1220 (D. Colo. 2008).

"Generally, the district court should focus on an expert's methodology rather than the conclusions it generates." *Dodge v. Cotter Corp.*, 328 F.3d 1212, 1222 (10th Cir.

8

2003). To that end, courts consider the following non-exhaustive factors in analyzing whether a particular expert opinion meets the requirements of Rule 702, *Daubert*, and their progeny:

> (1) whether the opinion at issue is susceptible to testing and has been subjected to such testing; (2) whether the opinion has been subjected to peer review; (3) whether there is a known or potential rate of error associated with the methodology used and whether there are standards controlling the technique's operation; and (4) whether the theory has been accepted in the scientific community.

*Id.* The analysis is opinion-centric, rather than expert-centric. *See United States v. Nacchio*, 608 F. Supp. 2d 1237, 1250–51 (D. Colo. 2009).

## ANALYSIS

### I. Defendants' Motion to Strike

Defendants filed Motions to Exclude certain opinions of Plaintiffs' experts Dr. Richard Kiekbusch and Dr. Donald Misch. [Doc. 170; Doc. 171]. In Plaintiffs' respective Responses to the Motions to Exclude, Plaintiffs attached affidavits from Dr. Kiekbusch and Dr. Misch (the "Affidavits"). [Doc. 180-3; Doc. 181-3]. These affidavits purport to explain and "summarize" opinions provided in the experts' reports and depositions. *See* [Doc. 180-3 at 1–2 ¶ 4; Doc. 181-3 at 1–2 ¶ 4]. Defendants then filed their Motion to Strike several statements in the Affidavits. [Doc. 186]. Because the Motion to Strike impacts the Court's review of Defendants' Motions to Exclude, the Court considers the Motion to Strike and then proceeds to the Motions to Exclude.

#### A. Rule 26 Violations

Before the Court considers whether to preclude the portions of the Affidavits at issue, it must first determine whether the Affidavits violate Rule 26(a). Defendants argue that the Affidavits contain new "assertions and opinions" not included in Dr. Misch's and

Dr. Kiekbusch's reports. [*Id.* at 2]. The information underlying these purportedly new opinions was, according to Defendants, available when the experts prepared their reports. [*Id.*]. And because the deadline for the Parties' expert disclosures expired in March 2022, *see* [Doc. 71; Doc. 80], and the Affidavits were not filed until November 2022, Defendants conclude that the new opinions in the affidavits violate Rule 26(a), [Doc. 186 at 2]. Plaintiffs respond that the Affidavits only "clarify and/or elaborate" opinions already given in Dr. Misch's and Dr. Kiekbusch's reports and depositions and therefore do not run afoul of Rule 26(a).[1] [Doc. 190 at 5]. The Court addresses Dr. Kiekbusch's and Dr. Misch's respective Affidavits in turn.

***Dr. Kiekbusch.*** Defendants challenge four statements in Dr. Kiekbusch's Affidavit. [Doc. 186 at 4–5]. The Court finds that two of these statements are permissible clarifications to opinions Dr. Kiekbusch gave in his report and during his deposition. First, his statement that "jail staff have the responsibility to presume the inmate is still alive" until medical staff determine otherwise, [Doc. 181-3 at 2 ¶ 5(b)], merely elaborates on the underlying principles set forth in Dr. Kiekbusch's report, *see* [Doc. 186-1 at 2 (explaining that jail staff have a responsibility to monitor a suicidal inmate and take all possible steps to "keep the inmate alive")]. The Court agrees with Plaintiffs that this reiteration of a "foundational" principle does not constitute a new opinion. [Doc. 190 at 5]. Second,

---

[1] Although Plaintiffs refer to a post-deposition affidavit as a "supplement," their analysis appears to focus on Rule 26(a) and does not argue that the Affidavits are permissible supplements under Rule 26(e). *See* [Doc. 190 at 4–5]. The Court agrees with the Parties' decision to focus on Rule 26(a). By their own terms, the Affidavits seek to summarize or clarify previous opinions and do not purport to be Rule 26(e) supplements. *See generally* [Doc. 180-3; Doc. 181-3]. More importantly, neither Party asserts that the Affidavits contain additional or corrective information that was unavailable when Dr. Misch and Dr. Kiekbusch submitted their original reports. Accordingly, the Court does not consider the Affidavits as supplements under Rule 26(e).

Defendants challenge Dr. Kiekbusch's statement that while he used "toned-down language" in his deposition when referencing the County Defendants' liability, he still believes "the contribution of these entities to Mr. Maes' death is more probable than not." [Doc. 186 at 5; Doc. 181-3 at 3 ¶ 6(b)]. But Dr. Kiekbusch already addressed the County Defendants' liability in the "Addendum" of his report. [Doc. 186-1 at 9–10]. There, he concludes that the Board "shares in the responsibility for Jackson Maes'[s] death." [*Id.*]. The Court discerns no meaningful difference between these statements. Although the Court examines specific statements as to the County Defendants' liability below, it concludes that Dr. Kiekbusch's general statement on this subject in his Affidavit does not violate Rule 26(a).

For the other two statements challenged by Defendants, the Court reaches a different conclusion. First, the Court finds that Dr. Kiekbusch's statements as to training are new opinions. *See, e.g.*, [Doc. 181-3 at 3 ¶ 6(c)(i) ("Much of the [Officer] Defendants' conduct reflects some degree of training failure.")]. Dr. Kiekbusch's report does not address the adequacy of the County Defendants' training for jail staff. *See generally* [Doc. 186-1]. And the portions of Dr. Kiekbusch's deposition cited by Plaintiffs do not express any opinion as to the training provided to SCJ staff. *See* [Doc. 190 at 5–6]. The cited statements only discuss actions taken by SCJ staff on the night Mr. Maes died, *see, e.g.*, [Doc. 181-2 at 80:10–81:12, 82:1–11, 98:3–99:21], or refer to the County Defendants' liability at a broad level of generality without specifying whether the defect lies in policies, training, supervision, or some other area, *see* [*id.* at 70:1–10]. Thus, Dr. Kiekbusch's Affidavit's belated venture into the adequacy of training at SCJ violates Rule 26(a).

Second, Dr. Kiekbusch states in his Affidavit that a "staffing shortage was present to varying degrees throughout Jackson Maes' time in [SCJ]." [Doc. 181-3 at 3–4 ¶ 6(c)(ii)]. He analyzes the multitasking required of Defendant Macias and Defendant Shields during the "swing shift" between afternoon and midnight. [*Id.*; Doc. 186 at 4–5]. But as Defendants point out, and Plaintiffs do not contest, Dr. Kiekbusch's report confines any discussion of staffing shortages to the overnight shift. [Doc. 186-1 at 9–10]; *see also* [Doc. 181-2 at 94:11–95:8]. This distinction between the overnight shift and other shifts is significant because the overnight shift is the only time that SCJ is staffed by a single officer acting as both jail deputy and dispatcher. [Doc. 186-1 at 9]; *see also* [Doc. 207 at 3]. During other shifts, SCJ is staffed by two individuals—one jailer and one dispatcher. *See, e.g.*, [Doc. 207 at 3]. Dr. Kiekbusch's report does not opine that a two-officer staffing model is insufficient, nor does it suggest that Defendants Macias or Shields were hampered by such a model while working the swing shift on the day of Mr. Maes's death. Accordingly, any statements in Dr. Kiekbusch's Affidavit that claim a staffing shortage at SCJ during times other than the overnight shift constitute new opinions. *Cf. Cook*, 580 F. Supp. 2d at 1170 (finding that Rule 26(a) proscribes "expanded" opinions based on previously available information). The Court finds that Dr. Kiekbusch's new opinions in his Affidavit as to inadequate training and non-overnight staffing shortages violate Rule 26(a).

**Dr. Misch.** Defendants argue that three statements in Dr. Misch's Affidavit constitute new opinions. [Doc. 186 at 5–6]. First, they challenge Dr. Misch's statement that Mr. Maes needed a "comprehensive psychiatric assessment." [*Id.*; Doc. 180-3 at 5 ¶ 10(a)]. Defendants are correct that Dr. Misch's report and addendum do not use the

exact term "comprehensive psychiatric assessment."  Dr. Misch's report makes clear, however, that an individual suffering a mental health emergency like Mr. Maes's should receive a full evaluation.  *See, e.g.*, [Doc. 186-5 at 10–12 ¶¶ 2(a), 2(c), 3(b), 4(a)(i)]. Although the Court does not decide whether a "comprehensive psychiatric assessment" involves precisely the same procedures as those described in Dr. Misch's report, it finds that Dr. Misch's position that Mr. Maes needed a thorough assessment is not unique to the Affidavit.  This statement therefore does not violate Rule 26(a).

Defendants next ask the Court to strike Dr. Misch's statement that a deleted recording of a phone call between Defendant Wells and her supervisor regarding Mr. Maes would have helped his assessment of Mr. Maes's mental health conditions.  [Doc. 186 at 6; Doc. 180-3 at 6 ¶ 10(c)].  The Court agrees with Defendants that Dr. Misch's report, addendum, and deposition do not address any deleted phone recordings, and that this statement appears more relevant to Plaintiffs' Motion for Spoliation Sanctions, [Doc. 128], than Dr. Misch's testimony, [Doc. 186 at 6 & n.2]; *see also* [Doc. 200 (denying sanctions for spoliation)].  Plaintiffs' attempt to characterize this as a statement of fact, [Doc. 190 at 6], is irrelevant because the Affidavit would violate Rule 26(a) by including information beyond what was disclosed in Dr. Misch's report, *see Stoker*, 2021 WL 4201583, at *11.

The third statement challenged by Defendants is Dr. Misch's attempt to clarify a deposition answer regarding his opinion of Mr. Maes's long-term care prospects.  [Doc. 186 at 6–7].  Dr. Misch's report states that "it is more likely than not that post-discharge Jackson Maes would have been placed, if possible, in a partial hospitalization program or residential treatment."  [Doc. 170-1 at 14 ¶ 4(a)(ii)(2)].  During his deposition, Dr. Misch

and Defendants' counsel disagreed over whether Mr. Maes would have been placed or merely *recommended* for placement in long-term care. [Doc. 180-2 at 43:14–44:22]. The corresponding portions of Dr. Misch's Affidavit expressly try to clarify this disagreement, particularly the use of the term "recommend" in the context of psychiatric care. [Doc. 180-3 at 4–5 ¶¶ 9(g), (k)]; *see generally* [*id.* at 4–5 ¶¶ 9(g)–(l)]. These statements only attempt to further explain the opinions and methodologies already provided in Dr. Misch's report, culminating in Dr. Misch's conclusion that "I continue to hold the opinion I wrote in my report." [*Id.* at 4 ¶ 9(g)]; *see also Ngatuvai v. Lifetime Fitness*, No. 2:16-cv-00039-JNP-DBP, 2020 WL 5441442, at *3 (D. Utah Sept. 10, 2020) (admitting expert declarations filed in response to motions to exclude that made "arguments based upon the methodologies and qualifications that [the experts] disclosed in their original reports"). The Court finds that this portion of the Affidavit does not violate Rule 26(a).

### B.    Rule 37 Sanctions

Having found that certain statements in the Affidavits violate Rule 26(a), the Court turns to whether sanctions are appropriate under Rule 37(c). As explained above, the appropriate sanction is preclusion—preventing Plaintiffs from using the improper statements at trial or in defense against Defendants' Motions to Exclude. Fed. R. Civ. P. 37(c)(1). To avoid preclusion, Plaintiffs bear the burden of showing that the violations are harmless or substantially justified. *Sender*, 225 F.R.D. at 655. While this determination is ultimately discretionary, the four factors set forth in *Woodworker's* guide the Court's inquiry: (1) the prejudice or surprise to the impacted party; (2) the ability to cure the prejudice; (3) the potential for trial disruption; and (4) the erring party's bad faith or willfulness. 170 F.3d at 993.

The Court finds that the *Woodoworker's* factors do not indicate that Plaintiffs' violations of Rule 26(a) are harmless or substantially justified. As an initial matter, the Court notes that Plaintiffs attempt to improperly shift the burden for this determination onto Defendants. Plaintiffs contend that, because Defendants do not specify precisely how the violative statements prejudice them, Defendants "effectively conceded" the first *Woodworker's* factor. [Doc. 190 at 3]. Even setting aside the burden-shifting issue, Plaintiffs apparently miss Defendants' argument that to permit Defendants to properly respond to the Affidavits' improper statements, the Parties would need to undergo the time and expense of reopening discovery. [Doc. 186 at 7; Doc. 192 at 4–5]. And at trial, permitting use of the improper statements could further prejudice Defendants. Dr. Kiekbusch's statements as to the County Defendants' training and staffing cut directly to their liability, and Dr. Misch's assertion that a deleted phone recording would have helped an expert assess Mr. Maes's mental health condition could prejudice Defendants in the eyes of a jury. Plaintiffs make no effort to show that no risk of prejudice exists and instead dismiss the Motion to Strike as "nitpicking." [Doc. 190 at 3]. The Court finds that the first *Woodworker's* factor suggests that the Rule 26(a) violations were not harmless.

With respect to the second *Woodworker's* factor, the Court sees no effective or efficient cure for the prejudice to Defendants other than preclusion. Plaintiffs suggest that Defendants can counteract any prejudice caused by the violative statements through cross-examination, contrary evidence, and careful instruction on the burden of proof. [*Id.* (citing *Daubert*, 509 U.S. at 596)]. But such an outcome does not cure the prejudice; the jury would still hear the potentially prejudicial statements. Moreover, because these new opinions were issued late, Defendants did not have the chance to gather the full range of

"contrary evidence" that they might have marshaled if the opinions were provided in a timely manner. *See Galaxy Ventures*, 2005 WL 5988690, at *5 ("To allow supplementation of reports with new opinions would thwart opposing counsel's ability to evaluate the strength and weakness of a case and to prepare to meet proofs at trial." (quotation omitted)).  While the parties propose that the Court could reopen discovery instead of striking the violative statements, the Court respectfully declines this invitation. Discovery closed over two years ago, and there is no justification as to why these newly identified opinions could not have been addressed within the deadlines for expert disclosures.  Furthermore, the case has been appealed to the Tenth Circuit on certain issues, returned to this Court for trial, and trial in this matter (for an incident that occurred in 2019) is now approximately three months away.  There is no reasonable, efficient, or cost-effective manner to allow further discovery that would not disrupt trial that is set to commence on March 31, 2025.  Fed. R. Civ. P. 1.  The Court finds that only preclusion, rather than further discovery, will cure the prejudice to Defendants while facilitating a fair and economical resolution of this case.  Although there is no indication of bad faith by Plaintiffs, the Court finds that the other *Woodworker's* factors are dispositive.  The Court therefore concludes that Plaintiffs have failed to carry their burden of showing that their Rule 26(a) violations were harmless or substantially justified.

Accordingly, Defendants' Motion to Strike is respectfully **GRANTED** insofar as (1) Dr. Kiekbusch seeks to provide opinions as to the County Defendants' training for SCJ staff or staffing on shifts other than the overnight shift, and (2) Dr. Misch seeks to testify as to the value of any deleted phone recordings in an analysis of Mr. Maes's mental state while at SCJ.  The Court will not consider those opinions in ruling on Defendants' Motions

to Exclude, and Plaintiffs may not elicit any such testimony at trial. With respect to all

other Affidavit statements challenged by Defendants, the Motion to Strike is respectfully

**DENIED**.

## II. Motions to Exclude

### A. Defendants' First Motion to Exclude

Defendants' First Motion to Exclude asks the Court to preclude Dr. Misch, Plaintiffs'

psychiatric expert, from testifying as to what care Mr. Maes would have received had he

survived his stay at SCJ. *See generally* [Doc. 170]. Specifically, Defendants challenge

Dr. Misch's statement that "it is more likely than not that post-discharge Jackson Maes

would have been placed, if possible, in a partial hospitalization program or residential

treatment." [*Id.* at 3–4; Doc. 170-1 at 14 ¶ 4(a)(ii)(2)]. The dispute appears to arise from

Dr. Misch's statement at his deposition that "I didn't say he necessarily would [have been

placed in that type of treatment], but I think that's what would have been recommended,

whether it was voluntary or involuntary." [Doc. 170-2 at 35:20–36:5]. Defendants contend

that while Dr. Misch may opine as to what treatment would be recommended, it is

inadmissibly speculative to predict that Mr. Maes "would have actually gone to such a

facility for rehabilitation, whether on a voluntary or involuntary basis." [Doc. 170 at 4].

Plaintiffs respond that the Motion misconstrues Dr. Misch's report and deposition

testimony. [Doc. 180 at 3–4]. Their Response mostly relies on Dr. Misch's Affidavit, [Doc.

180-3], which attempts to clarify the statements identified in the First Motion to Exclude.

Dr. Misch states that while he cannot—and does not—opine with any certainty that Mr.

Maes would have voluntarily agreed to treatment, [*id.* at 5¶ 9(j)], this is immaterial to his

conclusion because a treating psychiatrist would have likely had sufficient information to

commit Mr. Maes to mental health treatment involuntarily, [*id.* at 3 ¶¶ 9(d)–(e)].  Dr. Misch's opinion that Mr. Maes could have been involuntarily committed for treatment extends to both an initial hospitalization and later "intensive outpatient treatment," which includes the "partial hospitalization program or residential treatment" specified in the statements challenged by Defendants.  [*Id.* at 4 ¶¶ 9(e)–(f), (i)].  Dr. Misch further explains that when a certain treatment is "recommended," the recommendation is the "probable result" so long as the treating psychiatrist maintains the applicable standard of care.  [*Id.* at 5 ¶ 9(k)].  And because Mr. Maes could have been involuntarily committed to any "recommended" treatment, Dr. Misch concludes that his statements as to recommended treatments are consistent with his predictions as to what treatments could ultimately be administered.  [*Id.*].

Before conducting its Rule 702 analysis, the Court observes that the portion of Dr. Misch's report disputed by the Parties is quite narrow.  Defendants do not contest Dr. Misch's qualifications as a psychiatry expert or the relevance of his testimony.  *See generally* [Doc. 170].  They do not challenge Dr. Misch's opinion that Mr. Maes could likely have been involuntarily committed to the Emergency Department, followed by a psychiatric hospitalization.  *See* [Doc. 170-1 at 12–14].  Nor do they take issue with Dr. Misch's testimony as to what treatment would have been recommended after Mr. Maes's discharge from a psychiatric hospitalization.  [Doc. 184 at 3–4 (seeking to limit Dr. Misch's testimony to "recommended" post-discharge care)].  The sole issue raised by Defendants is whether Dr. Misch may testify that it is probable that Mr. Maes would have received intensive outpatient or residential treatment—voluntarily or involuntarily—following a discharge from psychiatric hospitalization.  [Doc. 170 at 4].  The Court therefore focuses

its analysis on whether Dr. Misch's opinion regarding Mr. Maes's future outpatient or residential treatment is so speculative that the Court must exclude it.

An expert's opinion need not be a "certainty," but any inferences or assertions must be "derived by the scientific method." *Daubert*, 509 U.S. at 590. The proponent of an expert opinion must show that the "method employed by the expert in reaching the conclusion is scientifically sound and that the opinion is based on facts which satisfy Rule 702's reliability requirements." *Dodge*, 328 F.3d at 1222. Courts have therefore permitted expert testimony as to an individual's future psychiatric treatment or progress so long as the testimony is grounded in reliable facts and methods. *See, e.g.*, *Flores v. Henderson*, No. 20-cv-00618-RBJ, 2023 WL 7673407, at *2 (D. Colo. Aug. 7, 2023) (permitting psychiatrist's testimony as to individual's mental health "diagnoses and prognoses" where opinions were grounded in reliable facts and data). However, such testimony will be excluded if there is "simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997); *see also Hamilton v. McLemore*, No. 2:19-cv-00047-KS-MTP, 2021 WL 1654008, at *4 (S.D. Miss. Mar. 18, 2021) (excluding psychiatrist's opinions regarding future treatment as speculative where plaintiffs had not yet begun treatment); *cf. Lane v. Am. Airlines, Inc.*, No. 18-cv-06110-MKB, 2024 WL 1200074, at *8 (E.D.N.Y. Mar. 20, 2024) (excluding forensic psychologist's testimony for failure to sufficiently explain conclusion that sexual assault would have exacerbated only one of plaintiff's several mental health conditions).

With these principles in mind, the Court considers Dr. Misch's conclusion that "it is more likely than not" that, post-discharge, Mr. Maes would have received certain residential or outpatient treatment. [Doc. 170-1 at 14 ¶ 4(a)(ii)(2)]. Placement in those

programs can be either voluntary or involuntary. *See, e.g.*, [Doc. 180-2 at 35:6–19; Doc.
180-3 at 4 ¶ 9(i)]. But Dr. Misch conceded at his deposition and in his Affidavit that he
cannot opine that Mr. Maes would likely have agreed voluntarily to such treatment. [Doc.
180-2 at 41:7–15; Doc. 180-3 at 5 ¶ 9(j)]. His conclusion therefore depends on a finding
that Mr. Maes likely could have been involuntarily committed. While Dr. Misch has stated
that involuntary commitment could be a possible option based on the facts of Mr. Maes's
mental health, [Doc. 180-2 at 40:6–20], he has never stated that such an outcome would
be probable. More importantly, as Defendants point out, Dr. Misch provides no analysis
as to which facts support an involuntary commitment to post-discharge treatment or what
the applicable standard would be for such a determination. [Doc. 184 at 4]. His report
discusses only the possibility of involuntary hospitalization. [Doc. 170-1 at 11 ¶ 2(c), 12
¶ 4(a)(ii)]. And his Affidavit specifically refrains from discussing involuntary post-
discharge treatment in detail, noting only that involuntary commitment would "depend[]
on the outpatient program, setting, and relevant involuntary mental health and
alcohol/substance abuse provisions in Colorado law." [Doc. 180-3 at 3–4]. Because Dr.
Misch has not opined as to the probability that Mr. Maes would have voluntarily or
involuntarily received outpatient or residential treatment, he cannot bridge the "analytical
gap" to his overall conclusion that Mr. Maes would "more likely than not" have received
such treatment. *See Lane*, 2024 WL 1200074, at *8 (excluding insufficiently explained
expert opinion that was "connected to existing data only by the *ipse dixit* of the expert"
(quotation omitted)); *accord Gen. Elec. Co.*, 522 U.S. at 146.

Because Plaintiffs advance no other relevant arguments[2] beyond their conclusory reliance on Dr. Misch's Affidavit, the Court concludes that they have failed to meet their burden of showing that Dr. Misch's opinion is sufficiently grounded in reliable methodology under Rule 702. *See Crabbe*, 556 F. Supp. 2d at 1220–21. Accordingly, the Court excludes the narrow portion of Dr. Misch's testimony challenged by Defendants' First Motion to Exclude. While Dr. Misch may testify as to the recommended post-discharge treatments for Mr. Maes, including the *possibility* of voluntary or involuntary placement in certain programs, he may not state that it is probable or "more likely than not" that Mr. Maes would have received a particular treatment after his discharge from psychiatric hospitalization. Defendants' First Motion to Exclude is respectfully **GRANTED**.

### B.    Defendants' Second Motion to Exclude

Defendants' Second Motion to Exclude argues that Dr. Kiekbusch, Plaintiffs' jail practices expert, is unqualified to offer two opinions in his report. First, Defendants argue that Dr. Kiekbusch gave a medical opinion by stating that proper supervision of Mr. Maes was "crucial" because, during the early hours of the midnight shift on November 17, 2019, Mr. Maes "still may have been responsive to rescue and resuscitation efforts." [Doc. 171 at 3; Doc. 171-1 at 8 ¶ 6(c)(3)]; *see also* [Doc. 171-1 at 7 ¶ 6(c), 9 ¶ A]. Second, Defendants contend that Dr. Kiekbusch lacks the expertise in municipal finances necessary to opine that SCJ's single-officer staffing on the midnight shift is "[c]onceivably

---

[2] Plaintiffs' citation to the overall standard of proof in Colorado civil actions, *see* [Doc. 180 at 4], is unrelated to the requirements for admissibility under Rule 702. Regardless, Rule 702 does not require that an expert "know" their conclusions are certain so long as his or her conclusions are reasonably accurate. *Dodge*, 328 F.3d at 1222.

. . . attributable to a shortage of jail staff," which in turn could be "attributable to the [County] Commissioners' unresponsiveness" to funding concerns. [Doc. 171 at 3–4; Doc. 171-1 at 9–10].

Federal Rule of Evidence 702 requires an expert to be qualified by "knowledge, skill, experience, training, or education."  However, an expert "should not be required to satisfy an overly narrow test of his own qualifications."  *Gardner v. Gen. Motors Corp.*, 507 F.2d 525, 528 (10th Cir. 1974).[3]  While an expert's testimony cannot exceed the scope of his expertise, specialization in the precise issue at hand is not required.  *Cook*, 580 F. Supp. 2d at 1084.  The Tenth Circuit has held that "as long as an expert stays within the reasonable confines of his subject area . . . a lack of specialization does not affect the admissibility of the expert opinion, but only its weight."  *See Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 970 (10th Cir. 2001) (cleaned up).

### 1.    Statements Regarding Responsiveness to Resuscitation

With respect to Dr. Kiekbusch's opinions regarding possible resuscitation, the Court agrees that Dr. Kiekbusch is not qualified to give expert medical opinions.  [Doc. 171 at 4].  *See Cook*, 580 F. Supp. 2d at 1084 (recognizing that expert's testimony must be "within the scope of his established expertise").  However, the Court does not find that the statements at issue stray beyond the scope of Dr. Kiekbusch's expertise.  Dr. Kiekbusch's Affidavit expressly states that he "do[es] not have any personal opinions on

---

[3] While *Gardner* predates *Daubert*, courts within the Tenth Circuit continue to recognize this admonition against construing an expert's qualifications in an excessively narrow manner.  *See Heer v. Costco Wholesale Corp.*, No. 12-cv-01059-RB-KBM, 2014 WL 11621683, at *3 & n.5 (D.N.M. Jan. 13, 2014).  *Daubert* itself emphasizes the "liberal thrust" of the Federal Rules of Evidence and their "general approach of relaxing the traditional barriers to opinion testimony."  509 U.S. at 588 (quotations omitted).

Mr. Maes' likely time of death." [Doc. 181-3 at 2 ¶ 5(a)]. Instead, Dr. Kiekbusch prepared his report in reliance on the medical examiner's determination that Mr. Maes's time of death was uncertain. [*Id.* at 2 ¶¶ 5(c)–(e)].

The statements challenged by Defendants reflect this uncertainty. Dr. Kiekbusch only acknowledges that, because the time of death is uncertain, the period of possible resuscitation—if any—is also uncertain. *See* [Doc. 171-1 at 7 ¶ 6(c) (stating that "though it was not likely, [Mr.] Maes may still have been alive and responsive to resuscitation efforts" during the "initial hours" of the overnight shift)]. And reading these statements in context, the thrust of Dr. Kiekbusch's opinion is not to define the times at which resuscitation was possible, but to state that certain actions or decisions by Defendants prevented them from attempting to resuscitate Mr. Maes during any period where resuscitation was "remotely possible." [*Id.* at 7 ¶ 6]. Dr. Kiekbusch's Affidavit distills his conclusion as: "If [Mr.] Maes could have been resuscitated when these failures [by Defendants] occurred, they contributed directly to his death." [Doc. 181-3 at 2 ¶ 5(g)]. The Court finds that Dr. Kiekbusch does not attempt to "offer medical opinions on when or if Mr. Maes would have been responsive to resuscitation efforts," [Doc. 185 at 2], and therefore stays within the reasonable confines of his expertise in jail practices, *see* [Doc. 171-1 at 1].

In their Reply, Defendants focus specifically on Dr. Kiekbusch's use of the word "crucial," arguing that he improperly attempts to identify a "'crucial' window for when resuscitation efforts might have proved useful." [Doc. 185 at 3]; *see also* [Doc. 171-1 at 7 ¶ 6(c)]. In reviewing the record before it, the Court respectfully disagrees. Dr. Kiekbusch's report uses the word "crucial" in opining that certain SCJ practices rendered

the overnight shift deputy unable to monitor Mr. Maes.  *See* [Doc. 171-1 at 7 ¶ 6(c)].  Dr. Kiekbusch found that "[t]his inability [to monitor] was especially crucial during the initial hours of [the overnight shift] when, though it was not likely, [Mr.] Maes may still have been alive and responsive to resuscitation efforts."  [*Id.*].  Accounting for the context of Dr. Kiekbusch's report, the Court finds that Dr. Kiekbusch uses the word "crucial" to refer to the SCJ practices he criticizes as preventing jail staff from attempting to resuscitate Mr. Maes while he might have still been responsive.  The Court perceives this statement as an opinion regarding SCJ's practices for suicidal inmates—the subject of Dr. Kiekbusch's expertise—rather than a medical opinion attempting to delineate to any degree of certainty the times when Mr. Maes could have been resuscitated.  Defendants' Second Motion to Exclude is therefore **DENIED** with respect to Dr. Kiekbusch's statements regarding possible resuscitation.

### 2.    Statements Regarding Funding at SCJ

Defendants next challenge Dr. Kiekbusch's assertion that certain policies at SCJ—which he contends played a role in Mr. Maes's death—are attributable to the County Defendants' "unresponsiveness" to funding concerns.  [Doc. 171 at 5; Doc. 171-1 at 10]. Defendants contend that Dr. Kiekbusch has demonstrated no expertise in "municipal finances and budgetary decisions" and is therefore unqualified to testify as to the County Defendants' budget practices.   [Doc. 171 at 5].   Defendants further argue that Dr. Kiekbusch's conclusion that funding shortages contributed to Mr. Maes's death is "devoid of any expert analysis."  [*Id.* at 6; Doc. 185 at 4].  Plaintiffs counter that Dr. Kiekbusch's opinions as to the County Defendants' funding decisions are "based on his education,

training, and experience" as well as "publicly available minute notes and newspaper accounts [from County Commissioners' meetings]."  [Doc. 181 at 5].

The Court finds that Dr. Kiekbusch has remained within the reasonable confines of his expertise in jail management and administration.  *See* [Doc. 171-1 at 1].  Contrary to Defendants' assertions, the challenged portion of Dr. Kiekbusch's report does not purport to analyze the municipal finances of Saguache County.  Nor does he undertake an accounting of SCJ's budget or expenses.  Instead, Dr. Kiekbusch observes that individuals with knowledge of SCJ's operations—including Defendants Wilson and Warwick—have expressed that a lack of resources led to staffing shortages and other issues.  [*Id.* at 9–10; Doc. 181-3 at 3–4 ¶ 6(c)(ii)].  From this information, Dr. Kiekbusch offers expert opinions on the effect of that lack of funding at SCJ.  [Doc. 171-1 at 9–10].  This general testimony as to the County Defendants' funding of SCJ, and the specific implications of that funding on management practices at SCJ, falls within the "reasonable confines" of Dr. Kiekbusch's expertise in jail administration.  *See Heer v. Costco Wholesale Corp.*, No. 12-cv-01059-RB-KBM, 2014 WL 11621683, at *3 & n.4 (D.N.M. Jan. 13, 2014) (declining to exclude engineer witness from testifying on failure of step ladder where testimony consisted of "generalities" based on the witness's "basic understanding" of ladder design).  Defendants may challenge the weight of such opinion testimony through their cross-examination of Dr. Kiekbusch.

Defendants' other arguments also cut to the weight of Dr. Kiekbusch's testimony, not its admissibility.  Dr. Kiekbusch may not be specialized in jail finances, but *Ralston* and its progeny establish that an expert may testify on matters not precisely within his specialization.  275 F.3d at 970; *see also Cruz v. City & Cnty. of Denver*, No. 21-cv-03388-

KLM, 2023 WL 4418259, at *5 (D. Colo. July 7, 2023) ("The trial court should not exclude

expert testimony simply because the court feels that the proffered witness is not the most

qualified or does not have the specialization considered most appropriate by the court."

(quotation omitted)).    And while Defendants fault Dr. Kiekbusch's reliance on meeting

minutes containing statements informing the Board of County Commissioners that SCJ

was understaffed due to a lack of funding, [Doc. 171 at 6], Dr. Kiekbusch is permitted to

rely on information outside his own personal knowledge in formulating his opinions, Fed.

R. Evid. 703.    Because the Court finds that the statements challenged by Defendants

remain within the scope of Dr. Kiekbusch's expertise, Defendants' Second Motion to

Exclude is respectfully **DENIED**.

C.    **Plaintiffs' Motion to Exclude**

Plaintiffs raise a host of arguments against Defendants' psychiatric expert, Dr.

Jonathan Ritvo, for his conclusion that:

> Having descended so far into alcoholism and suicidality, it is my opinion that
> had Jackson [Maes] lived past 11/16/19 his risk of death from suicide or
> accident would remain high as long as he continued to drink and that his
> prognosis for recovery from alcoholism and stable abstinence, particularly
> within the next year, was poor.

[Doc. 172-1 at 10]; *see generally* [Doc. 172].    Plaintiffs also challenge Dr. Ritvo's opinion

that Mr. Maes's alcoholism and low chance of recovery had "considerably diminished" Mr.

Maes's life expectancy.    [Doc. 172 at 7, 9; Doc. 172-1 at 12 & n.1].    Plaintiffs characterize

these opinions as an attempt at "clairvoyance," [Doc. 172 at 5], and attack it on nearly

every possible avenue under Rule 702, [*id.* at 4].    They also argue that, under Rule 403,

the opinion is substantially more prejudicial than probative and should be excluded.    [*Id.*

at 10].    The Court addresses these arguments in turn.

### 1.    Dr. Ritvo's Qualifications

Plaintiffs argue that Dr. Ritvo is unqualified to offer a prognosis of Mr. Maes's future mental health and risk of death.  [*Id.* at 5].  They contend that no amount of qualifications would suffice to offer Dr. Ritvo's opinion because "no one . . . can predict the future" and death was not a "foregone conclusion" for Mr. Maes.  [*Id.*].  Defendants respond that Dr. Ritvo's qualifications as a psychiatrist are undisputed, and provide a "clear basis" for the opinions in his report.  [Doc. 179 at 7–8].

The Court respectfully agrees with Defendants on this point.  Courts permit medical experts to provide opinions on an individual's psychiatric prognosis or likelihood of recovery.  *Flores*, 2023 WL 7673407, at *2; *Wichterman v. City of Phila.*, No. 2:16-cv-05796-JMY, 2019 WL 2568340, at *8 (E.D. Pa. June 20, 2019) (finding expert in addiction medicine to be qualified to opine on decedent's likelihood of recovery had he survived overdose).  Dr. Ritvo's testimony on Mr. Maes's psychiatric prognosis is squarely within the confines of Dr. Ritvo's established expertise as a psychiatrist.  *See Ralston*, 275 F.3d at 970.  Plaintiffs' central argument—that Dr. Ritvo's testimony strays from permissible psychiatric prognosis to inadmissible speculation—is more a *Daubert* reliability challenge than an attack on Dr. Ritvo's qualifications.  Accordingly, the Court finds that Dr. Ritvo is qualified to offer psychiatric opinions on Mr. Maes's future mental health.

### 2.    Reliability under *Daubert*

Plaintiffs argue that Dr. Ritvo's opinion is based on insufficient facts and unreliable methods.  [Doc. 172 at 5–9].  These arguments relate to different prongs of Rule 702.  For an expert's testimony to be admissible, Rule 702(b) requires that his or her opinions must be "based on sufficient facts and data."  Under Rule 702(c), the question is whether

"the testimony is the product of reliable principles and methods." *See also Daubert*, 509 U.S. at 593–94 (enumerating non-exclusive factors for reliability determination). Thus, the proponent of an expert opinion "must show that the method employed by the expert in reaching the conclusion is scientifically sound and that the opinion is based on facts which satisfy Rule 702's reliability requirements." *Dodge*, 328 F.3d at 1222.

### i.    Sufficient Facts and Data

Plaintiffs argue that Dr. Ritvo's analysis fails under Rule 702(a) because he did not consider "all available evidence and information." [Doc. 172 at 5]. They contend that Dr. Ritvo omits "positive developments" in Mr. Maes's life that might improve his prognosis, [*id.* at 5–6], and fails to account for other sources of data, including interviews with Mr. Maes's family and relevant academic studies, [*id.*]. Plaintiffs also assert that, during deposition, Dr. Ritvo conceded that he lacks evidence to state some of his intermediate findings "to a reasonable degree of medical certainty." [*Id.* at 6–7]. Defendants counter that the more than fifty sources listed in Dr. Ritvo's report sufficiently support his opinion, and that "the sufficiency of a factual basis to support an expert's opinion goes to its weight, and not its admissibility." [Doc. 179 at 8 (citations omitted)].

Neither Party quite captures the applicable standard under Rule 702. Defendants' position—that concerns about the sufficiency of an expert opinion's factual basis do not affect its admissibility—ignores Rule 702(b) and case law. *See, e.g.*, *Crabbe*, 556 F. Supp. 2d at 1223 (discussing the proponent's obligation to demonstrate that an expert witness gathered "sufficient facts and data" to formulate the proffered opinion). Conversely, Plaintiffs' suggestion that Dr. Ritvo must take account of "all available evidence and information" is overly stringent. Rule 702(b) requires that the facts

28

underlying an expert opinion be "sufficient," not exhaustive.  The factual basis for an opinion need not result in "absolute certainty" so long as it "enable[s] the expert to express a reasonably accurate conclusion."  *Dodge*, 328 F.3d at 1222 (cleaned up).  An expert's reliance on disputed facts in reaching a conclusion "does not render the expert's opinion unreliable under this test."  *Cook*, 580 F. Supp. 2d at 1085 (citing Fed. R. Evid. 702 advisory committee's note on 2000 amendment).  This analysis is quantitative rather than qualitative.  Fed. R. Evid. 702 advisory committee's note on 2000 amendment; *see also Crabbe*, 556 F. Supp. 2d at 1223 ("[T]he inquiry examines only whether the witness obtained the amount of data that the methodology itself demands.").

The Court finds that Dr. Ritvo relied on sufficient facts in reaching his opinions.  As Defendants point out, Dr. Ritvo provides a comprehensive list of materials he used to prepare his report.  [Doc. 172-1 at 1–3; Doc. 179 at 8].  Those materials include Mr. Maes's health records, communications with his mother and close friends, and statements from his mother and ex-girlfriend.  [Doc. 172-1 at 1–3].  This information enabled Dr. Ritvo to chart Mr. Maes's mental health and "developmental history" from childhood to adulthood.  [*Id.* at 3–10].  While Plaintiffs have identified relevant facts and data that might have been helpful to Dr. Ritvo, his omission of that information affects the weight of his testimony, not its admissibility.  *See Shawnee Mission Plaza, LLC v. Noland*, No. 5:16-cv-00035-W, 2016 WL 7637685, at *5 (W.D. Okla. Oct. 26, 2016) ("That other evidence, even contradictory evidence, exists does not warrant exclusion[.]"); *Gomez v. Martin Marietta Corp.*, 50 F.3d 1511, 1519 (holding that weaknesses in expert's otherwise sufficient data affected weight rather than admissibility).  Thus, the materials considered by Dr. Ritvo are sufficient under Rule 702(a).

ii.    **Reliable Principles and Methods**

Plaintiffs next argue that Dr. Ritvo employs an unreliable methodology to assess Mr. Maes's mental health profile.  Dr. Ritvo does not identify any specific methodology in his report but states that, in analyzing from the materials he reviewed, his opinions are "based on [his] training, knowledge, and experience."  [Doc. 172-1 at 1].  Defendants contend that this experience-based approach, as applied to certain "factors" in Mr. Maes's mental health profile, is sufficiently reliable.  [Doc. 179 at 9–10].

For an expert opinion to be admissible, the underlying methodology must be "reliable."  *Daubert*, 509 U.S. at 590.  "Assessing the reliability of a methodology requires the Court to consider whether that methodology is 'scientifically valid.'"  *Crabbe*, 556 F. Supp. 2d at 1222 (quoting *Hollander v. Sandoz Pharms. Corp.*, 289 F.3d 1193, 1204 (10th Cir. 2002)).  *Daubert* prescribed four nonexclusive factors for evaluating reliability:

> (1) whether the opinion at issue is susceptible to testing and has been subjected to such testing; (2) whether the opinion has been subjected to peer review; (3) whether there is a known or potential rate of error associated with the methodology used and whether there are standards controlling the technique's operation; and (4) whether the theory has been accepted in the scientific community.

*Dodge*, 328 F.3d at 1222 (citing *Daubert*, 509 U.S. at 593–94).

Rule 702 and *Daubert* do not foreclose an expert from relying on experience— alone or in combination with training or knowledge—as a basis for an expert opinion.  Fed. R. Evid. 702 advisory committee's note on 2000 amendment.  But "[i]f the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts."  *Id.*; *see also Kumho*, 526 U.S. at 150 (observing that "the relevant reliability concerns may focus upon personal

knowledge or experience").  An expert must provide a fulsome explanation of how the expert applied his or her experience or knowledge to the facts at hand because "[e]xperience is not a methodology.  Methodology is the process by which the expert relates his experience to the facts at hand in order to reach an expert opinion."  *Troudt v. Oracle Corp.*, 369 F. Supp. 3d 1134, 1139 (D. Colo. 2019) (quotation omitted).  Thus, while the reliability analysis focuses on an expert's methods rather than his conclusions, a court may find that an opinion is inadmissible if the methodology leaves "too great an analytical gap between the data and the opinion proffered."  *Gen. Elec. Co.*, 522 U.S. at 146.

Here, Dr. Ritvo's report does not precisely describe how his application of his experience to Mr. Maes's mental health profile was reliable.  However, Dr. Ritvo identifies five "factors" using his experience to evaluate Mr. Maes's mental health at the time of his death, as well as Mr. Maes's future mental health.  [Doc. 172-1 at 10–12].  Those factors include:  (1) Mr. Maes's lack of "motivation to seek help for alcoholism"; (2) the low probability that a mental health evaluation would lead to successful treatment; (3) the "losses" that Mr. Maes had suffered as a result of his alcoholism; (4) the scarcity of "positive prognostic factor[s]"; and (5) Mr. Maes's "impaired ability to trust and develop connection[s]" that could support his recovery.  [*Id.*].  Dr. Ritvo states that these factors permit him to conclude that, had Mr. Maes survived, he would have faced a high risk of death from suicide or accident, a poor chance of recovering from alcoholism, and a considerably diminished life expectancy.  [*Id.*].  The Court addresses whether Dr. Ritvo's methodology is sufficiently reliable to support each of these opinions.

*Mr. Maes's Heightened Risk*.  Dr. Ritvo first concludes that Mr. Maes would have faced a heightened risk of death from suicide or accident as long as he continued to drink. Although Dr. Ritvo provides only a sparse explanation of his methods, the Court finds that Dr. Ritvo's experience-based methodology is sufficiently reliable to reach this opinion. Testimony as to whether, at the time of his death, Mr. Maes exhibited certain characteristics that placed him at risk of suicide is the sort of diagnostic assessment that a psychiatrist of Dr. Ritvo's training and experience could reliably perform.  *See Fanning v. Sitton Motor Lines, Inc.*, No. 2:08-cv-02464-CM-DJW, 2010 WL 4261476, at *7, 10 (D. Kan. Mar. 10, 2010) (permitting qualified psychiatrist who did not specify her methodology to testify on the "characteristics of suicidal individuals, and whether the decedent exhibited such characteristics"); *Richard v. Hinshaw*, No. 6:09-cv-01278-MLB, 2013 WL 6632122, at *1–2 (D. Kan. Dec. 17, 2013) (permitting testimony by psychiatrists who relied on training and experience to assess effect of jail environment on deceased inmate's mental health based on inmate's records).  The Court finds that Dr. Ritvo's use of his experience as a methodology is reliable with respect to this first opinion.

*Mr. Maes's Likelihood of Recovery.*  In the second opinion at issue, Dr. Ritvo shifts from evaluating Mr. Maes's current psychiatric risks to predicting his future likelihood of recovery.  The Court does not disagree that the factors Dr. Ritvo identifies may be relevant to Mr. Maes's psychiatric prognosis.  But Dr. Ritvo provides no underlying methodology for how and why these "factors" enable him to forecast Mr. Maes's likelihood of recovery.  Dr. Ritvo's asserts that the specified factors gave a Mr. Maes a chance of recovery from alcoholism within one year that was "significantly less" than the average one-year recovery rate of two percent.  [Doc. 172-1 at 10].  Yet Dr. Ritvo makes no

comparison or analysis between Mr. Maes's characteristics and the findings of the study that distilled the two percent recovery rate. *See generally* [*id.*]. Difficult as Mr. Maes's circumstances may have been, they could be more or less difficult than those of the "average" alcoholic. And as Plaintiffs point out, Mr. Maes had traits that may have improved his likelihood of recovery. [Doc. 172 at 6]. Instead of setting forth a reliable method of analysis to balance these traits, Dr. Ritvo cites the two-percent average, lists some obstacles to Mr. Maes's recovery, and invokes his experience to plug the methodological gap. That is insufficient under *Daubert* and Rule 702, which require that an expert's conclusions be derived from the "methods and procedures of science" rather than "subjective belief or unsupported speculation." *Daubert*, 509 U.S. at 590; *see also Bevan v. Valencia*, No. 15-cv-00073-KG-SCY, 2018 WL 3187356, at *2, 4 (D.N.M. June 28, 2018) (excluding psychiatrist from testifying that decedent "would have had a poor prognosis, had she lived" where psychiatrist identified no "reliable methodology" for using experience and knowledge to review decedent's personal history and medical records).

The *Daubert* factors similarly weigh in favor of excluding Dr. Ritvo's estimation of Mr. Maes's chances of recovery. Relevant to the second and third *Daubert* factors, neither Dr. Ritvo nor Defendants contend that the overall analysis used or factors identified are peer reviewed or subject to professional standards in the field of psychiatry. Nor is there any indication that the type of analysis undertaken by Dr. Ritvo is "generally accepted" for psychiatrists conducting a similar inquiry. While Defendants suggest that Dr. Ritvo's opinion is ill-suited to the *Daubert* factors and should instead be evaluated on "standard principles" in his field, [Doc. 179 at 9], they never explain what those principles would be or how this opinion complies with any standard principles of psychiatry. This

renders Dr. Ritvo's second opinion distinguishable from cases where courts have permitted psychiatric testimony based on identified methods that are standard to the field. *See Fanning*, 2010 WL 4261476, at *8–9 (permitting expert testimony that resembled a "psychiatric autopsy" in assessing whether an individual "exhibited certain suicidal characteristics or symptoms"); *Draughon v. United States*, No. 2:14-cv-02264-JAR-GLR, 2017 WL 3492313, at *5–6 (D. Kan. Aug. 15, 2017) (finding psychiatrist's testimony combining professional experience with guidelines used by Department of Veteran's Affairs was reliably based on "knowledge and experience of psychiatry profession"); *Jarvis v. McLauglin*, No. 20-cv-02028-CNS-GPG, 2022 WL 4377134, at *2 (D. Colo. Sept. 22, 2022) (permitting psychiatric testimony based on use of scientific methodology called "shift analysis"). Without any identified methodology or standard principles to evaluate, the Court cannot find that Dr. Ritvo's assessment of Mr. Maes's likelihood of recovery is reliable. *See Harriman v. Smart*, No. 22-cv-01883-SKC, 2024 WL 3900262, at *3 (D. Colo. Aug. 22, 2024) ("Proper exercise of a court's gatekeeping function does not allow a court to simply take the expert at their word.").

Accordingly, the Court reaches for Dr. Ritvo a similar conclusion to its decision as to Dr. Misch. *See supra* Part II.A. Dr. Ritvo may identify *possible* obstacles to Mr. Maes's recovery, consistent with his first opinion on the heightened risk that Mr. Maes would have faced upon a hypothetical release from SCJ. Dr. Ritvo may not, however, attempt to make a probabilistic determination of Mr. Maes's future prognosis of recovery or abstinence. Nor may he frame his opinions by comparing Mr. Maes to an "average" alcoholic. Plaintiffs' Motion to Exclude is therefore **GRANTED in part** and **DENIED in part** with respect to this second opinion.

*Mr. Maes's Reduced Life Expectancy.* Dr. Ritvo's conclusion that Mr. Maes's life expectancy would have been reduced by his alcoholism is similarly unreliable. As support, Dr. Ritvo provides a footnote citation to a study measuring the effects of alcoholism on life expectancy in Scandinavia. [Doc. 172-1 at 12 n.1]. But to his credit, Dr. Ritvo admits that the circumstances of the subjects in the Scandinavian study are distinct from those of Mr. Maes's, which undermines the reliability of his conclusion. [*Id.*]; *see also Gen. Elec. Co.*, 522 U.S. at 145–147 (affirming district court's finding that witness's citation to four studies distinguishable from facts at issue was an insufficient basis for expert testimony). And Dr. Ritvo further admits that estimations of Mr. Maes's life expectancy require actuarial expertise beyond his expertise in psychiatry. [Doc. 172-1 at 12 n.1]. The Court does not doubt that Dr. Ritvo has reviewed literature finding that alcoholism reduces life expectancy. However, it cannot conclude that Dr. Ritvo's citation to a single study outside the scope of his expertise permits him to offer a reliable opinion on Mr. Maes's life expectancy. *See Hart v. Corr. Corp. of Am.*, No. 2:11-cv-00267-MCA-WPL, 2014 WL 12670944, at *4 (D.N.M. May 6, 2014) (excluding physician's conclusion that decedent's diabetes would have reduced his life expectancy by eight to ten years where physician recited actuarial literature calculating life expectancy but had no actuarial expertise and relied only on her medical "experience and training"); *cf. Ralston*, 275 F.3d at 970 (recognizing that expert testimony beyond the "reasonable confines" of the witness's subject area is inadmissible).

For these reasons, the Court concludes that Defendants have not met their burden to demonstrate that Dr. Ritvo's third opinion satisfies the requirements of Rule 702. *See Crabbe*, 556 F. Supp. 2d at 1220. Plaintiffs' Motion to Exclude is thus **GRANTED** with

respect to Dr. Ritvo's opinion on Mr. Maes's reduced life expectancy.  For Dr. Ritvo's first opinion—that Mr. Maes would have faced a high risk of death from suicide or accident as long as his alcoholism continued—the Court proceeds to the question of relevance and the Parties' arguments under Rule 403.

### 3.    Relevance

Plaintiffs contend that Dr. Ritvo's report should be excluded as irrelevant.  They argue that his opinions "serve only to stain the character of a dead man" rather than "help the jury understand the evidence or . . . determine a fact in issue."  [Doc. 172 at 10]. Defendants respond that Dr. Ritvo's testimony is relevant to rebut Dr. Misch's testimony and to assist in determining damages.  [Doc. 179 at 11–12].

An expert's testimony, even if reliable, must also be relevant.  *Daubert*, 509 U.S. at 591.  Rule 702(a) requires that the expert's testimony "help the trier of fact to understand the evidence or to determine a fact in issue."  *Daubert* and its progeny have construed Rule 702(a)'s relevance inquiry as one of "helpfulness" or "fit."  *Daubert*, 509 U.S. at 591.  "Even if an expert's proffered evidence is scientifically valid and follows appropriately reliable methodologies, it might not have sufficient bearing on the issue at hand to warrant a determination that it has relevant 'fit.'"  *Bitler*, 400 F.3d at 1234.

The Court agrees with Defendants that Dr. Ritvo's remaining opinion is relevant for purposes of Rule 702(a).  As explained above, Dr. Ritvo's opinion as to Mr. Maes's heightened risk—which may encompass the factors that could have limited Mr. Maes's ability to seek treatment—counterbalances Dr. Misch's opinion as to Mr. Maes's possible mental health treatments.  Moreover, Dr. Ritvo's opinion relates to the hedonic damages sought by Plaintiffs for Mr. Maes's loss of life and loss of enjoyment of life.  *See generally*

[Doc. 187 at 11–12]. Courts within the Tenth Circuit routinely permit expert testimony relevant to hedonic damages, so long as the testimony addresses the qualitative loss of life rather than attempting to quantify the value of the lost life. *See, e.g.*, *Smith v. Ingersoll-Rand Co.*, 214 F.3d 1235, 1245–46 (10th Cir. 2000) (affirming district court's admission of expert testimony explaining hedonic damages and exclusion of testimony quantifying hedonic damages); *Est. of Melvin ex rel. Melvin v. City of Colo. Springs*, No. 20-cv-00991-CMA-MDB, 2024 WL 2958950, at *4–5 (D. Colo. June 12, 2024) (excluding expert testimony insofar as it attempted to quantify hedonic damages). Plaintiffs' citation to *Bevan v. Valencia* is unavailing, [Doc. 183 at 6–7 (citing 2018 WL 3187356, at *6)], because Dr. Ritvo's remaining opinion goes beyond merely identifying Mr. Maes's "positive and negative" life experiences and instead synthesizes a psychiatric assessment of Mr. Maes's alcoholism and suicide risk. The Court thus concludes that Dr. Ritvo's opinion as to Mr. Maes's heightened risk would be helpful to the jury and meets the requirements of Rule 702. The Court turns to Plaintiffs' arguments under Rule 403.

### 4. Rule 403

Plaintiffs argue that Dr. Ritvo's testimony should be excluded as unduly prejudicial under Rule 403. [Doc. 172 at 10]. Rule 403 of the Federal Rules of Evidence provides that a court "may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Here, Dr. Ritvo's testimony is relevant and probative for the reasons explained above. Plaintiffs have placed Mr. Maes's mental health at issue by seeking damages for Mr. Maes's loss of enjoyment of life. They now seek to prevent

Defendants from offering testimony countervailing those damages by contending that Dr. Ritvo's report describes "embarrassing events" in Mr. Maes's life that carry "significant stigma." [Doc. 172 at 10]. The Court agrees that Dr. Ritvo's report contains a comprehensive review of Mr. Maes's mental health profile, some of which includes sensitive information. But Plaintiffs never explain which portions of the report would inflict the complained-of stigma, nor do they address how any prejudice caused to Mr. Maes would significantly outweigh the probative value of Dr. Ritvo's testimony. This cursory argument fails to satisfy Rule 403. Accordingly, Plaintiffs' Motion to Exclude is **DENIED** as to Dr. Ritvo's opinion that Mr. Maes would have faced a heightened risk of death as long as his alcoholism continued.

## III.  Show Cause Order

The Show Cause Order directs Plaintiffs to show cause as to why Ms. Lieberenz should not be dismissed from this action in her individual capacity. [Doc. 187 at 13]. The Order arose from the Court's determinations that (1) Ms. Lieberenz could not assert § 1983 claims in her individual capacity, [*id.* at 7–8]; and (2) Plaintiffs' § 1983 claims did not "implicitly" raise claims under the Colorado Wrongful Death Act, Colo. Rev. Stat. §§ 13-21-201 to -204 (2024), [Doc. 187 at 8–9]. The Court therefore granted summary judgment against Ms. Lieberenz to the extent that Counts One through Ten—the § 1983 claims—"assert any cause of action or damages suffered by Ms. Lieberenz as an individual." [*Id.* at 9]. However, because Count Eleven—the state law claim—was not at issue, the Court declined to decide whether Ms. Lieberenz could assert Count Eleven in her individual capacity. [*Id.* at 13]. The Court instead issued the instant Show Cause

Order and requested additional briefing on this question. [*Id.* at 13–14]. Both Parties have responded, [Doc. 188; Doc. 191], and the issue is ripe for disposition.

### A.    Ms. Lieberenz's Individual Capacity Claims

Because Ms. Lieberenz cannot assert any § 1983 claims as an individual, the remaining question is whether she may bring the state law claim in Count Eleven in her individual capacity. Count Eleven asserts a claim for negligent operation of a jail under the Colorado Governmental Immunity Act ("CGIA"), Colo. Rev. Stat. § 24-10-106(1)(b) (2024). [Doc. 1 at ¶¶ 204–208]. Plaintiffs, however, argue that the CGIA claim also raises a claim under Colorado's wrongful death statute, Colo. Rev. Stat. § 13-21-201 (2024). They contend that Count Eleven has always implicitly contained a wrongful death claim because § 13-21-201 grants Ms. Lieberenz standing as an individual to sue on Mr. Maes's CGIA tort claim. [Doc. 188 at 2]. Supporting this contention is Plaintiffs' belief that "the Wrongful Death Act creates no causes of action; it only expands the class of the parties with standing to sue on them." [*Id.*].

The Court respectfully finds that Plaintiffs have misstated the relationship between wrongful death claims and other tort claims. Contrary to Plaintiffs' assertion, the Wrongful Death Act creates its own cause of action. *See* § 13-21-201(1) (granting the right to "sue[] for and recover[]" damages for a person's wrongful death). While § 13-21-201 vests certain individuals with "the right to bring an action pursuant to this section," *e.g.*, § 13-21-201(1)(a)(IV), it does not grant those individuals standing to sue on other causes of action. Instead, standing to sue on a tort claim accrued by a deceased individual—such as Plaintiffs' CGIA claim—is conferred by Colorado's survival statute, Colo. Rev. Stat. § 13-20-101 (2024). That provision expressly states that survival actions may be brought

by "the personal representative of the deceased."  *Id.* § 13-20-101(2); *see also Reighley v. Int'l Playtex, Inc.*, 604 F. Supp. 1078, 1080 (D. Colo. 1985) ("Because any recovery under a survival action inures to the estate and is independent of the limits of a wrongful death action, only the personal representative of the decedent may bring such a suit." (citations omitted)).

Given these differences, the Court finds no support for Plaintiffs' position that their CGIA claim necessarily also raises a wrongful death claim.  Colorado law plainly distinguishes between wrongful death claims and survival actions.  *See* § 13-20-101(1) ("[A survival] action under this section shall not preclude an action for wrongful death."); *see also, e.g.*, *Espinoza v. O'Dell*, 633 P.2d 455, 462–63 (Colo. 1981) (recognizing survival actions and wrongful death claims as "two methods of recovery" available when a person dies, and distinguishing the two based on which party may assert the claim).  The article that Plaintiffs' counsel purportedly relied upon, [Doc. 188-2 at ¶ 6 & n.1], expressly clarifies that Colorado's wrongful death statute "created a new cause of action" that "should not be confused with Colorado's survival statute," Anthony J. Viorst, *The Colorado Wrongful Death Act*, 40 Colo. Law. 63, 64 (2011).  And in a case cited by Plaintiffs, *Steedle v. Sereff*, the Colorado Supreme Court declined to consider a survival action where the plaintiffs had pled and appealed only a wrongful death claim.  167 P.3d 135, 139 n.7 (Colo. 2007) (en banc) ("[W]e note that neither the [plaintiffs'] complaint nor their amended complaint alleged a survival action.").

Having concluded that Count Eleven does not implicitly raise a wrongful death claim, the Court again declines to read such a claim into Plaintiffs' complaint.  *See* [Doc. 187 at 8–9].  Permitting Plaintiffs to use one claim as a Trojan horse for a separate, unpled

claim and then reveal the implicit claim after summary judgment would raise serious concerns under Rule 8. Rule 8 requires, inter alia, that a complaint include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). This requirement is intended to "give the defendant fair notice of what the claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (cleaned up). As Plaintiffs admit and the Court observed previously, the Complaint does not even use the words "wrongful death," much less allege a claim under Colorado's Wrongful Death Act. [Doc. 187 at 9; Doc. 188 at 3 ("Ms. Lieberenz's counsel did not specifically mention the Wrongful Death Act in the Complaint at all, in relation to any of the underlying tort claims, state or federal.")]. The fact that Defendants' counsel may have deduced that Plaintiffs intended to assert a wrongful death claim, [Doc. 188 at 2–3], does not exempt the Complaint from compliance with Rule 8. And because Plaintiffs have been represented by counsel throughout this litigation, they are not entitled to a liberal reading of their claims. *See* [Doc. 187 at 9 (citing *Mann v. Boatright*, 477 F.3d 1140, 1148 n.4 (10th Cir. 2007))]. While the Court does not doubt that Plaintiffs' counsel acted in good faith, it will not "read state law claims into complaints where they are not pleaded." [*Id.* at 9].

### B.    Request for Leave to Amend

Plaintiffs alternatively request leave to amend their complaint to add a wrongful death claim ("Request to Amend"). *See* [Doc. 188 at 3–9]. The Court agrees with Defendants that this request violates Local Rule 7.1(d), which states that "[a] motion shall not be included in a response or reply to the original motion. A motion shall be filed as a separate document." D.C.COLO.LCivR 7.1(d); [Doc. 191 at 2]. The Court need not

consider this improper request.  *See, e.g.*, *Xerox Corp. v. Colt Print Servs., Inc.*, No. 17-cv-01471-CMA-MEH, 2018 WL 4372722, at *11 (D. Colo. May 9, 2018) (declining to consider improper request for leave to amend made in response brief), *report and recommendation adopted*, 2018 WL 4368613 (D. Colo. June 5, 2018).  However, even if Plaintiffs had correctly filed a motion for leave to amend, it would fail to meet the requirements for amendment.

The deadline for amendment of pleadings set by the Scheduling Order expired on August 15, 2021.  [Doc. 54 at 12].  Because Plaintiffs made their Request to Amend after this deadline, the Court considers the Request pursuant to a two-step inquiry.  First, the Court reviews whether Plaintiffs demonstrated good cause for amendment pursuant to Rule 16(b) of the Federal Rules of Civil Procedure.  *See Gorsuch, Ltd., B.C. v. Wells Fargo Nat'l Bank Ass'n*, 771 F.3d 1230, 1242 (10th Cir. 2014).  Next, if Plaintiffs satisfy Rule 16(b), the Court weighs whether the amendment should be allowed pursuant to Rule 15(a).  *Id.*

Rule 16(b) provides that a scheduling order "may be modified only for good cause and with the judge's consent."  Fed. R. Civ. P. 16(b)(4).  "In practice, this standard requires the movant to show the 'scheduling deadlines cannot be met despite [the movant's] diligent efforts.'"  *Gorsuch*, 771 F.3d at 1240 (quoting *Pumpco, Inc. v. Schenker Int'l, Inc.*, 204 F.R.D. 667, 668 (D. Colo. 2001) (alterations in original)).  This burden is satisfied, for example, when a party learns of new information through discovery, or when the governing law has changed.  *Id.*  "Rule 16(b) does not focus on the bad faith of the movant, or the prejudice to the opposing party.  Rather, it focuses on the diligence of the party seeking leave to modify the scheduling order to permit the proposed amendment."  *Colo.*

*Visionary Acad. v. Medtronic, Inc.*, 194 F.R.D. 684, 687 (D. Colo. 2000) (quotation omitted). The party seeking an extension is normally expected to show at least good faith on its part and some reasonable basis for not meeting the deadline. *Deghand v. Wal-Mart Stores, Inc.*, 904 F. Supp. 1218, 1221 (D. Kan. 1995). "If the plaintiff[s] knew of the underlying conduct but simply failed to raise [the new] claims, however, the claims are barred." *Gorsuch*, 771 F.3d at 1240.

Plaintiffs argue that *Minter v. Prime Equipment Co.*, 451 F.3d 1196 (10th Cir. 2006), should guide this Court's determination of good cause, [Doc. 188 at 4–5]. There, the Tenth Circuit noted in dictum that a party's belief that its new claim was "fairly encompassed" by its existing pleadings constituted a "colorable argument" for good cause. *Minter*, 451 F.3d at 1207. Plaintiffs ask the Court to adopt this dictum and find that Plaintiffs have shown good cause to amend because they believed their CGIA claim "fairly encompassed" a wrongful death claim. [Doc. 188 at 4–5]. However, the *Minter* court based its finding of good cause on the fact that the defendant had waited until after discovery to "chang[e] its position regarding a key fact in the case." 451 F.3d at 1207. Because the motion to amend in *Minter* was prompted by the opposing party's dilatoriness, the court distinguished that case from instances where the "plaintiff was aware of all the information on which his proposed amended complaint was based prior to filing the original complaint." *Id.* (quotation omitted).

Here, Defendants had no role in Plaintiffs' delay in seeking amendment. Plaintiffs suggest that Defendants should have attempted to "clarify" why Ms. Lieberenz sought damages in her individual capacity without alleging a wrongful death claim. [Doc. 188 at 6]. But in adversarial litigation, Defendants are not responsible for alerting Plaintiffs to

43

deficiencies in Plaintiffs' own pleading.  Even if *Minter*'s "fairly encompassed" language were a binding holding, the Court is skeptical that it would allow an amendment that seeks to add a new claim.  *See Century Sur. Co. v. Smith*, No. 14-cv-00947-RM–MJW, 2015 WL 2129684, at *5 (D. Colo. May 4, 2015) (permitting amendment that "flesh[ed] out a theory that [plaintiff] reasonably believed to be pleaded" in its complaint but rejecting amendment that "would add a new legal theory to the case" (citing *Minter*, 451 F.3d at 1207)).  And as Defendants point out, the "good cause" inquiry focuses on whether the party requesting amendment made "diligent efforts" to comply with the original deadline. *Gorsuch*, 771 F.3d at 1240; [Doc. 191 at 7].

The Court therefore agrees with Defendants that this is a case where Plaintiffs knew of the underlying conduct but failed to include the relevant claim in their pleading. [Doc. 191 at 6].  Plaintiffs' counsel admits that he "always intended to bring claims pursuant to the Colorado Wrongful Death Act," [Doc. 188-2 at ¶ 11], but did not include a wrongful death claim in the Complaint, *see generally* [Doc. 1].  Such an oversight falls short of the diligence required by the good cause standard and thus bars amendment. *See, e.g.*, *Gorsuch*, 771 F.3d at 1240.  The fact that Plaintiffs' counsel's mistake of law caused their delay in seeking to plead a wrongful death claim does not change the outcome.  *See Tesone v. Empire Mktg. Strategies*, 942 F.3d 979, 990–91 (10th Cir. 2019) (affirming denial of leave to amend where plaintiff attributed delay to her attorney's lack of knowledge but admitted that she previously knew of facts underlying amendment and could provide no "adequate explanation[]" for the delay); *In re Kirkland*, 86 F.3d 172, 175 (10th Cir. 1996) (recognizing that "simple inadvertence or mistake of counsel . . . usually does not suffice" to show good cause (quotation omitted)); *Four Winds Behav. Health v.*

*United States*, No. 19-cv-00212-SCY-LF, 2021 WL 2821094, at *14 (D.N.M. July 7, 2021) ("[A] mistake of law by counsel is not good cause." (citation omitted)).   The Court respectfully concludes that Plaintiffs have failed to demonstrate good cause under Rule 16(b).

Having found that Plaintiffs fail to satisfy Rule 16(b), the Court need not address the Rule 15 standards for leave to amend.   *See, e.g.*, *Gorsuch*, 771 F.3d at 1242 (declining to reach Rule 15 issue where movants lacked good cause under Rule 16 to amend after scheduling order deadline).   Accordingly, Plaintiffs' Request to Amend is respectfully **DENIED**.   Because the Court finds that Ms. Lieberenz does not assert any claims in her individual capacity and may not amend her pleadings to do so, Count Eleven is **DISMISSED** insofar as it asserts any cause of action or damages suffered by Ms. Lieberenz as an individual.[4]   Ms. Lieberenz is **DISMISSED** from this action in her individual capacity.

## CONCLUSION

For the reasons stated herein, **IT IS ORDERED** that:

(1)    Defendants' Motion to Strike Untimely Affidavits of Plaintiffs' Expert Witnesses [Doc. 186] is **GRANTED in part** and **DENIED in part**;

(2)    County Defendants' Rule 702 Motion to Exclude One Opinion of Plaintiffs' Psychiatric Expert [Doc. 170] is **GRANTED;**

---

[4] The Court resolves its Show Cause Order without considering the communications disclosed in the Declaration submitted by Plaintiffs' counsel.   *See* [Doc. 188-2 at ¶ 10]. The Court therefore does not reach Defendants' argument that this disclosure is an improper partial waiver of the attorney-client privilege and work product protection.   [Doc. 191 at 10–11].

(3)     County Defendants' Rule 702 Motion to Exclude Two Opinions of Plaintiffs'
         Jail Practices Expert [Doc. 171] is **DENIED**;

(4)     Plaintiffs' *Daubert* Motion to Exclude Testimony from Defendants' Expert
         Jonathan Ritvo, MD [Doc. 172] is **GRANTED in part** and **DENIED in part**;

(5)     Pursuant to the Court's Show Cause Order, Plaintiff Sarah Lieberenz is
         **DISMISSED** from this action in her individual capacity.  Count Eleven is
         **DISMISSED** insofar as it asserts any cause of action or damages suffered
         by Ms. Lieberenz as an individual.

DATED:  January 6, 2025                         BY THE COURT:

                                                _____
                                                Nina Y. Wang
                                                United States District Judge

46