# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Civil Action No. 1:21-cv-00628-NYW-NRN

SARAH LIEBERENZ, as Personal
Representative of THE ESTATE OF JACKSON MAES,
deceased,

    Plaintiff,

v.

BOARD OF COUNTY COMMISSIONERS OF THE COUNTY OF SAGUACHE,
COLORADO, in its official capacity;
SAGUACHE COUNTY SHERIFF'S OFFICE, a governmental entity;
DAN WARWICK, SHERIFF OF SAGUACHE COUNTY, in his official capacity;
KENNETH WILSON, in his individual capacity;
ELKE WELLS, in her individual capacity;
MIGUEL MACIAS, in his individual capacity; and
SHELBY SHIELDS, in her individual capacity,

    Defendants.

---

## Plaintiff's Motion for Attorneys' Fees and Prejudgment Interest

---

Plaintiff, Sarah Lieberenz, as Personal Representative of the Estate of Jackson Maes, deceased ("Ms. Lieberenz"), moves the Court for an order awarding reasonable attorneys' fees and an order assessing prejudgment interest from the date of Jackson's death until the entry of judgment:

### Certificate of Conferral

Counsel for Plaintiff conferred with counsel for the defendants. Counsel for the County Defendants oppose this motion, and Counsel for Defendant Macias takes no position.

**PROCEDURAL HISTORY**

In a recent 8-day trial before this Court, Ms. Lieberenz successfully proved that Defendants Wilson and Warwick were deliberately indifferent to a substantial risk that her son, Jackson Maes, would die by suicide in the Saguache County Jail. Ms. Lieberenz successfully proved that this deliberate indifference was a cause of Mr. Maes' death. Finally, Ms. Lieberenz successfully proved that the monetary value of what Mr. Maes lost when he died was $4 million. The Court entered judgment, and no appeal has yet been taken.

**ATTORNEYS' FEES**

**A. Ms. Lieberenz is Entitled to an Award of Reasonable Attorneys' Fees Under 42. U.S.C. § 1988.**

To encourage private enforcement of our nation's civil rights laws, Congress enacted 42 U.S.C. § 1988 to empower federal district courts in civil rights cases to award the prevailing parties their fees and expenses. Section 1988 provides that a prevailing party may recover "a reasonable attorney's fee as part of the costs." 42 U.S.C. § 1988(b) (2000). A "reasonable" fee is one "that is sufficient to induce a capable attorney to undertake the representation of a meritorious civil rights case." *Perdue v. Kenny A.*, 130 S. Ct. 1662, 1672 (2010); *see also Blum v. Stenson*, 465 U.S. 886, 897 (1984) ("[A] reasonable attorney's fee is one that is adequate to attract competent counsel, but that does not produce windfalls to attorneys" (ellipsis, brackets and internal quotation marks omitted)).

When Congress enacted this cornerstone of federal public policy governing the enforcement of the nation's civil rights laws, nothing less than the ability of American

citizens to enforce their civil and constitutional rights was at stake. Thus, Senate Report No. 94-1011 observed:

> If private citizens are to be able to assert their civil rights, and if those who violate the Nation's fundamental laws are not to proceed with impunity, then citizens must have the opportunity to recover what it costs them to vindicate these rights in court . . . . If the cost of private enforcement becomes too great, there will be no private enforcement. If our civil rights laws are not to become mere hollow pronouncements which the average citizen cannot enforce, we must maintain the traditionally effective remedy of fee shifting in these cases.

S. Rep. No. 94-1011, at 2-3 (1976), reprinted in 1976 U.S.C.C.A.N. 5908, 5910.

Congress recognized that § 1988 embodied a critical public policy choice: avoiding the creation of a substantial federal bureaucracy by delegating the work of civil rights enforcement to the private bar. *Id*.; *see also Phelps v. Hamilton*, 120 F.3d 1126, 1131 (10th Cir. 1997) ("In enacting § 1988, Congress pointed out that '[a]ll of these civil rights laws depend heavily upon private enforcement, and fee awards have proved an essential remedy if private citizens are to have a meaningful opportunity to vindicate the important Congressional policies which these laws contain.'" (quoting S. Rep. No. 94-1011, at 2-3 (1976), reprinted in 1976 U.S.C.C.A.N. 5908, 5910)). To induce the necessary private initiative, Congress specified that the work and investment required of private lawyers to undertake this public responsibility should be compensated "by the same standards which prevail in other types of equally complex Federal litigation, such as antitrust cases, and not be reduced because the rights involved may be nonpecuniary in nature." S. Rep. No. 94-1011, at 6 (1976), reprinted in 1976 U.S.C.C.A.N. 5908, 5913. To effectuate this decision, Congress "instructed the courts to use the broadest and most effective remedies available to achieve the goals of our civil rights laws." *Id*. at 3, 5910-11.

3

The power to award attorneys' fees is discretionary with the Court, but under Tenth Circuit jurisprudence, "that discretion is narrow once a civil rights plaintiff demonstrates that he is a 'prevailing party.'" *Robinson v. City of Edmond*, 160 F.3d 1275, 1280 (10th Cir. 1998); *see also Phelps*, 120 F.3d at 1129. Here, Ms. Lieberenz is the "prevailing party" by virtue of a jury verdict finding that Defendants Wilson and Warwick violated Mr. Maes' constitutional rights. The only issue here is the amount of the fee to be awarded.

### B. Section 1988 Attorneys' Fees are Recoverable in the Tenth Circuit Using the Lodestar Approach

The United States Supreme Court has held that the lodestar approach is the preferred method to use when determining an award of attorneys' fees under § 1988. *See Perdue*, 130 S. Ct. at 1672. Under the lodestar method, the court multiplies a reasonable hourly rate by the number of hours reasonably expended on the case by counsel. *See Bell v. Bd. of Cnty. Comm'rs of Jefferson Cnty.*, 451 F.3d 1097, 1101 (10th Cir. 2006).

In *Perdue*, the Supreme Court held that the lodestar method "yields a fee that is presumptively sufficient" to encourage attorneys to take on civil rights cases and this presumption is a "strong" one. *Perdue*, 130 S. Ct. at 1673. The Tenth Circuit has likewise adopted the "lodestar" approach for determining attorneys' fees under § 1988. *See, e.g.*, *Bell*, 451 F.3d at 1101 n.3 ("Courts determine what is a reasonable fee by first figuring a 'lodestar' amount and then adjusting that figure based on facts specific to the case."); *Dill v. City of Edmond*, 72 F. App'x 753, 757 (10th Cir. 2003) ("To determine the reasonableness of a fee request, a court must begin by calculating the so-called 'lodestar amount' of a fee, and a claimant is entitled to the presumption that this lodestar amount reflects a 'reasonable' fee." (quoting *Robinson*, 160 F.3d at 1281)); *Phelps*, 120 F.3d at

4

1131 ("A court will generally determine what fee is reasonable by first calculating the lodestar . . . .").

### 1. Counsel's Time Should be Valued at the Prevailing Rates for Attorneys of Comparable Experience, Expertise, and Skill in the Region.

The lodestar approach generally looks to "the prevailing market rates in the relevant community." *Perdue*, 130 S. Ct. at 1672 (quoting *Blum*, 465 U.S. at 895). Fees claimed for Bryan & Terrill, Dormer Harpring, and Mss. Brylo and LaRue are based on hourly rates typically paid to them and professionals like them. (Exs. 1, 1H, 2, and 3, Declarations of Bryan, Killmer, Dormer, and Harris, respectively).

Further, the Tenth Circuit has recognized the disparity between the markets in which counsel for Plaintiff and Defendant work in the specific context of civil rights litigation:

> Plaintiffs' and defendants' civil rights work, however, are markedly dissimilar. Attorneys in defendants' civil rights cases are typically paid regardless of their success in a case and receive payment on a shorter billing cycle. Moreover, defendants' attorneys are sometimes guaranteed a certain amount of work from insurance pools. As one district court pointed out, "Defendants' attempt to impose the insurance pool rate on attorneys who perform plaintiff's civil rights work ignores these benefits — benefits which attorneys who perform plaintiff's civil rights work do not enjoy."

*See Malloy v. Monahan*, 73 F.3d 1012, 1018-19 (10th Cir. 1996) (internal citation omitted). Plaintiff's counsel, by contrast, represented Plaintiff through a contingent fee, and in the case of Ms. Ram and her team, without any charge or contingency fee, relying exclusively on the right to petition for fees in the event of success. (Ex. 4, Declaration of Ms. Rao).

In setting the hourly rate, the Court must determine what lawyers of comparable skill, experience and expertise practicing in the area in which the litigation occurs would charge for their time. *See Ramos v. Lamm*, 713 F.2d 546, 555 (10th Cir. 1983). The

5

objective of this analysis is to arrive at a prevailing market rate for counsel's services. A reasonable fee in civil rights cases is calculated according to prevailing market rates. *Blum v. Stenson*, 465 U.S. 886, 895 (1984). In setting an hourly rate, a court should establish, from information provided to it and from its own analysis of the level of performance and skills of each lawyer in private firms. *Ramos*, 713 F.2d at 555. For over twenty years, the rule in the Tenth Circuit has been that current hourly rates, rather than adjusted historic rates, should be used to compensate for delays in payment. *Id*.

In setting his reasonable hourly rates, Mr. Bryan submitted a Declaration outlining his experience litigating civil rights claims, along with prior orders awarding fees and setting an hourly rate for work performed in the Oklahoma marketplace. Appreciating that Oklahoma and Colorado are materially different marketplaces, Mr. Bryan also submitted an affidavit from Darold Killmer, a local Denver-based civil rights attorney and expert on attorney fees in the local market. (Ex. 1 H).

For Dormer Harpring's rates, Mr. Dormer applied the firm's usual rates, which were developed based on reviews of decisions, among other things. (Ex. 2). These rates are based on the firm's partners' knowledge of the Denver region market for their services, and they are the rates actually paid by the firm's hourly clients. Mr. Dormer requested further review of these rates by Michael Harris, Esq., an attorney with a broad range of experience to allow him to comment on the reasonable rates for trial firms like Dormer Harpring. (Ex. 3).

For the MacArthur Justice Center's rates, Ms. Rao did extensive research of fee awards in the relevant region. (Ex. 4). However, it is worth noting that all of the MacArthur Justice Center's attorneys and staff have a national practice and the academic credentials to justify a higher hourly rate than would be typical in Denver.

For the rates of jury consultants Jessica Brylo and Jennifer LaRue, Dormer Harpring has reported the fees actually paid to them by the firm without any markup. (Ex. 2). Other cases also inform a reasonable hourly rate, and the attached declarations cite multiple of these.

A further consideration for the Court is the relative expertise of counsel in a particular field of litigation. As the Tenth Circuit has stated, "[t]he hourly rate should be based on the lawyers' skill and experience in civil rights or analogous litigation. Lawyers working outside their fields of expertise may deserve an hourly fee lower than their normal billing rate because of their lack of experience in the civil rights field." *Ramos*, 713 F.3d at 555. The corollary is equally true, *i.e.*, lawyers working within a field of expertise may deserve an hourly fee higher than their normal billing rate in other fields. *Bishop v. Smith*, 112 F. Supp. 3d 1231, 1252 (N.D. Okla. 2015) (justifying hourly rate in part because attorney's "expertise . . . rendered him uniquely qualified"). In this case, all counsel have devoted the majority of their practice to litigating claims in the civil rights field or in complex personal injury trials, and Ms. Ram has devoted the majority of her practice specifically to civil rights appeals. (Exs. 1, 2, 4). The expertise of Plaintiff's counsel in the field of civil rights litigation is one factor the Court should consider in setting a reasonable fee. And in light of the decreasing frequency of civil trials of this complexity, so too should the expertise of counsel in preparing to try particularly complex civil injury cases.

7

Finally, "an enhancement may be appropriate" where "the litigation is exceptionally protracted." *Perdue*, 130 S. Ct. at 1674. Here, litigation spanned more than four years, including about a year and a half on interlocutory appeal (Docs. 208, 228.). The time required for this case to reach a verdict was therefore much longer than the typical civil case. *Perdue*, 130 S. Ct. at 1675 (noting "an enhancement may be appropriate" where there is "unanticipated delay").

Similarly, an enhancement would be consistent with the main purpose of Section 1988: to encourage competent counsel to accept meritorious cases despite the significant work required. To be sure, enhancements for risk of loss alone are not an appropriate basis to apply an enhancement because this would encourage *more* litigation of *less* meritorious claims. *City of Burlington v. Dague*, 505 U.S. 557, 567 (1992). But the degree of risk is not the same as the value risked. Even if the likelihood of winning a civil rights case is the same as the likelihood of winning a simpler tort case, evaluating attorneys know they will be required to risk far more of their time in the civil rights case. Civil rights cases are more procedurally complicated, even when highly meritorious. Counsel are less likely to accept a 20% risk of nonpayment on 2,000 hours of their time after 5 years of delay in a civil rights case than they are to accept a 20% risk of nonpayment on 500 hours of work and only about a year of delay in a trucking crash case. An enhancement multiplier should at least put cases like these on par with other kinds of tort cases, and the multiplier required to do that in this case is about 1.6x. (Ex. 2).

8

Based on the provided expert declarations, the complex nature of federal civil rights litigation, the relative experience and expertise of Plaintiff's counsel, and the delay in bringing the case to trial, the proposed reasonably hourly rates range from $300-$650 for attorneys and jury consultants and $100-$250 for staff. The specific rates, before any 1.6x multiplier, are set forth in the attached declarations. They are not repeated here for the sake of brevity. A 1.6x enhancement of these numbers would result in rates that would be readily attainable by all timekeepers who worked on this case if they were to work on different types of tort cases. (Ex. 2).

> **2. Plaintiff's Counsel, in the Exercise of Sound Billing Judgment and Proper Case Management and Oversight, have Earned a Lodestar Recovery of $3,168,280.00 in Attorneys' Fees.**

"The burden of proving the claimed number of hours and rate is on the applicant, but once 'the applicant . . . has carried his burden of showing that the claimed rate and number of hours are reasonable, the resulting product is presumed to be the reasonable fee contemplated by § 1988.'" *Malloy*, 73 F. 3d at 1018 (quoting *Blum*, 465 U.S. at 897).

Applying the above legal principles from the Tenth Circuit, Plaintiff submits that the proper measure of the lodestar fee in this case for the 1,060.40 hours rendered by Mr. Bryan is $1,102,816.00, which represents 1.6 times the number set forth in the Declaration of Mr. Bryan. (Ex. 1). The rate for Mr. Bryan's time is within the market rate charged by lawyers in Denver, CO, with similar credentials, expertise and experience. Plaintiff submits that the proper measure of the lodestar fee in this case for the 2,638.70 hours rendered by the attorneys and staff at Dormer Harpring, LLC, is $1,753,218.40 which represents 1.6 times the number set forth in the Declaration of Mr. Dormer. (Ex. 2). Dormer Harpring's rates are within the market rates charged by lawyers and staff in

9

Denver, CO, with similar credentials. Plaintiff submits that the proper measure of the lodestar fee in this case for the 442.79 hours rendered by the attorneys and staff at MacArthur Justice Center is $259,396.80, which represents 1.6 times the number set forth in the Declaration of Ms. Rao. (Ex. 4). The rates for Ms. Ram's and her colleagues' time are within the market rate charged by lawyers and staff in Denver, CO, with similar credentials, expertise and experience. Finally, Plaintiff submits that the proper measure of the lodestar fee in this case for the 40.14 hours rendered by attorney and jury consultant Jessica Brylo, and her colleague Jennifer LaRue, is $52,848.80, which represents 1.6 times the number set for the in the Declaration of Mr. Dormer. (Ex. 2). The rate for Ms. Brylo's and Ms. LaRue's time is within the market rate charged by jury consultant attorneys and their team members in Denver, CO, with similar credentials, expertise and experience.

The 4,182.03 hours for which compensation is sought represents the time devoted by the trial team and their staff to ensure reasonable efficiency and non-duplication of effort. Under Tenth Circuit precedent, collaboration by a number of attorneys on a single set of core facts is presumptively reasonable. *See*, *e.g.*, *Lockard v. Pizza Hut, Inc.*, 162 F.3d 1062, 1077 (10th Cir. 1998) ("[T]ime spent by two attorneys on the same general task is not . . . per se duplicative. Careful preparation often requires collaboration and rehearsal. . . ."). (*See also*, Declaration of Mr. Harris, Ex. 3 explaining the concept of an "all hands on deck" trial preparation situation). Moreover, counsel has already exercised billing judgment by excluding all paralegal hours incurred by Bryan & Terrill, all or most of the hours of multiple Dormer Harpring employees who helped advise the team on

preparation of the case for trial, and all hours spent by MacArthur attorneys who aided in practice sessions. (Exs. 1, 2, and 4).

## PREJUDGMENT INTEREST

### A. In the Tenth Circuit, Prejudgment Interest is Discretionary but Ordinarily Awarded.

The Tenth Circuit has provided a two-part test by which trial courts are to determine whether to award prejudgment interest:

> The award of prejudgment interest under federal law is to compensate the wronged party for being deprived of the monetary value of his loss from the time of the loss to the payment of judgment. Although **prejudgment interest is ordinarily awarded in a federal case**, it is not recoverable as a matter of right. Rather, such an award is governed by a two-step analysis. **First**, the trial court must determine **whether an award of prejudgment interest would serve to compensate the injured party**. **Second**, when an award would serve a compensatory function, the court must still determine **whether the equities would preclude the award** of prejudgment interest.

*Zuchel v. City and County of Denver, Colorado*, 997 F.2d 730, 746 (10th Cir.1993) (emphasis added) (citing *Eastman Kodak Co. v. Westway Motor Freight, Inc.*, 949 F.2d 317, 321 (10th Cir.1991) (internal citations omitted).

### B. While There Remains Debate About Whether to Award Prejudgment Interest on Noneconomic Damages, the More Persuasive Precedent Suggests that the Court Should

There is admittedly a concerning trend among trial courts in this District to apply a bright line rule against awarding prejudgment interest on noneconomic damages. The courts following this trend largely quote heavily from two cases: *Clawson v. Mountain Coal Co., LLC.,* 01-CV-02199-MSK-MEH, 2007 WL 201253 (D. Colo., Jan. 24, 2007); and *White v. Wycoff*, 13-CV-01761-CMA-MJW, 2016 WL 9632932 (D. Colo., Jul. 7, 2016).

11

First, *Clawson* and *White* are distinguishable here because this claim was not brought by a living person. The true party in interest in this case is an entity (the Estate). An Estate cannot suffer non-economic damages at any time—certainly not in the future. Rather, the Estate had a right to sue to recover the monetary value of everything lost when Jackson Maes died. And it is undisputed that the Estate's claim accrued the moment Mr. Maes died. But the Estate has not been able to disburse its assets to Mr. Maes' sole heir simply because the real monetary value of that claim was not paid until last week (and still has not been paid in full). (*See* Ex. 5, Orders of Probate Court.) This delay in payment caused the Estate—and Ms. Lieberenz by extension (as an heir)—real, tangible, loss of investment on the $4 million value of the claim that accrued on November 16th or 17th, 2019. As shown in the Declaration of Susan Gleason, these actual losses are significant. (Ex. 6).

Second, *Clawson* and *White* rest on an unsound interpretation of the underlying legal concepts. The court in *Clawson* did not cite the applicable standard imposed by the 10th Circuit under *Zuchel* and instead refused to award interest on the theory that "one cannot invest one's unhurt feelings…" (p. 14). The problem with this logic is that the law immediately provided Mr. Clawson with a right to <u>money</u> in exchange for his "unhurt feelings" when his claim accrued, just as surely as it provided him with a right to money in exchange for lost wages or medical bills (past or future). The money owed for non-economic damages is just as investible as the money owed for economic damages. And however "preposterous" the *Clawson* court might have found the "notion that one's suffering could, at the time, have been used as an investment vehicle," (*id.*) this notion is far from preposterous to economists (or, indeed, anyone who has ever agreed to suffer,

12

to any degree, at work <u>in exchange for investible hard currency</u>). (*See also*, *e.g.*, Ex. 7, Bowles, T., and Lewis, C., "Prejudgment Interest: Issues and Case Studies.") In reality, the *Clawson* court's analysis better expresses the court's own prejudice against the value of non-economic damages than it expresses a valid legal or economic distinction between money owed for non-economic losses and money owed for economic losses.

Unfortunately, *Clawson* began to gain traction in this District in *White*. The *White* court cited to *Clawson*, among others, then provided the following analysis:

> Prejudgment interest is designed to compensate a plaintiff for the monetary value of his loss from the time of the injury until the payment of judgment. Put differently, the doctrine of prejudgment interest recognizes the time value of money, and compensates for lost value that would have otherwise accrued had the plaintiff been able to invest or gather interest on monies that were lost as a result of his injury.

*White*, *supra.*, at 2. But the "[p]ut differently" part of this analysis, like *Clawson*, misconstrues the law of both non-economic damages and claim accrual. The words "monetary value of [a plaintiff's] loss" include no limitation or exception carving out the non-economic parts of the loss, or the unliquidated parts, or any other parts. The "monetary value of a loss" includes the monetary value placed by a jury on non-economic damages. So, when the *White* court puts that concept "differently," it actually attempts to amend the law to place non-economic damages on different footing than economic damages. The mistake happens in only the final few words: "monetary value of his [entire] loss" becomes, in the *White* court's analysis, "monies that were lost as a result of his injury." But there's no pecuniary loss requirement in the federal prejudgment interest law.

The trend created by *Clawson* and *White* should not be surprising. One law review article put the underlying problem as follows:

13

> The above cases in which the courts denied prejudgment interest illustrate the complete lack of guidelines for the judicial exercise of discretion according to considerations of justice. In most cases, a defendant could successfully preclude an award of interest by demonstrating an unliquidated amount of damages or a good faith defense to the suit. Even though interest is necessary for full compensation, in none of those cases would plaintiffs have any assurance that they would recover prejudgment interest.

Anthony E. Rothschild, *Prejudgment Interest: Survey and Suggestion*, 77 Nw. U. L. Rev. 192.

A much better analysis was done by the District of Nevada in *Murphy v. City of Elko*, 976 F.Supp. 1359, 1363-64 (D. Nev., Oct. 6, 1997). It held as follows:

> First, any interest will run on the entire award, not just on that portion representing "loss of earnings." Some courts have only awarded interest on "liquidated" pecuniary losses, but Plaintiff's losses here—even her loss of earnings—are not truly liquidated. *E.g., Criswell,* 709 F.2d at 557. The jury had to resolve two factual disputes before awarding damages for loss of earnings: how much Plaintiff would have earned had she not been fired, and whether she mitigated her damages. Determining damages by resolving such factual disputes takes the damages in this case out of the category of "liquidated." True, loss of earnings is readily calculable, while "mental and emotional pain and suffering" is not, but damages are not necessarily liquidated merely by being readily calculable. **Moreover, Plaintiff probably suffered mental and emotional pain the same way she lost her earnings, one day at a time, each day subsequent to her termination, and this pain and suffering was just as real and just as much an injury as her loss of earnings. That is, non-pecuniary pain and suffering is just as much an "actual loss" (for which prejudgment interest is in order) as loss of earnings.** *Cf. id.* (characterizing "pecuniary" losses as "actual" and affirming an award of interest only on such pecuniary losses).

(Emphasis added). Notably, the *Murphy* court also accurately surveyed a multitude of other federal cases on the subject of prejudgment interest and considered the Tenth Circuit's standard as a part of its review.

### C. A Proper *Zuchel* Analysis Requires an Award of Prejudgment Interest in This Case

Applying the *Murphy* court's analysis would best uphold the applicable 10th Circuit legal standard under *Zuchel* in this case. First, a prejudgment interest award would be compensatory in nature and not duplicative of other damages. Mr. Maes died—and his claim to all of his damages accrued—in November of 2019. His Estate should have immediately received the monetary value of those claims. Even if that were not true, the jury in this case awarded a very specific round number for damages: $4 million. This number matches the four days Defendants alleged Mr. Maes had left to live, and it matches no other fact better. There can be no debate that Mr. Maes' Estate has been deprived of the jury-determined $4 million monetary value of its claims since the date of the injury or, at latest, four days after Mr. Maes died. And this Court, pursuant to its discretion, did not allow the jury to decide prejudgment interest. (Ex. 8, excerpt of rough trial transcript.) The jury was instead asked to determine the value of the damage that "was caused" to Mr. Maes—in past tense. *Cf. Murphy*, *supra.*, at 1364 (finding that jury instructions in the present tense could have implied that the jury should add prejudgment interest itself). Mr. Maes's $4 million of past damages have been withheld from the estate since 2019, and it has yet to receive fair compensation for the time value of that withholding.

Turning to the second prong under *Zuchel*, the equities strongly favor an award of prejudgment interest. The Defendants in this case (all of them, including those represented by separate counsel) were defended and indemnified by the same insurance carrier under a policy with a relevant indemnity limit of $10 million. (Ex. 9, Insurance Policy Declarations). Defendant's insurance company would receive a windfall worth millions of

dollars if it were allowed to avoid paying prejudgment interest on the damages that all (including non-economic damages) accrued in November of 2019. (Ex. 6). *See*, *e.g.*, *Kerr v. Charles F. Vatterott & Co.*, 184 F.3d 938, 946 (8th Cir. 1999) (prejudgment interest ensures the wrongdoer is not unjustly enriched for his wrongdoing by being able to "use the withheld benefits or retain interest earned on the funds during the time of the dispute.") To call the Estate's damages a windfall, on the other hand, would be to deny the legal and moral underpinnings of monetary damages awards for non-economic losses. *See*, *e.g.*, *Stroh Container Co. v. Delphi Indus., Inc.*, 783 F.2d 743, 752 (8th Cir. 1986) (stating that prejudgment compensates prevailing parties for the true costs of damages incurred, promotes settlement, and deters attempts to unfairly benefit from delays in litigation).

Finally, the nature of the cause of action itself is a consideration in deciding whether the award prejudgment interest. In *Frey v. Hotel Coleman*, 903 F.3d 671 (7th Cir. 2018), the court recognized the presumption in favor of awarding prejudgment interest "is particularly true in cases involving remedial statutes like Title VII where the goal is to make a plaintiff whole following violations of a federal statute." *Id*. at 682. Like Title VII, § 1983 is a remedial statute, and permitting prejudgment interest is consistent with the statute's purpose of making the Plaintiff whole.

The proper measure of prejudgment interest is set forth in Ms. Gleason's Declaration. (Ex. 6). As set forth in her Conclusion, the Estate lost an opportunity to invest the $4 million to which it became entitled in 2019. *Id.* The value of this lost opportunity is between $2.3 million and $3.5 million, with an option between the endpoints that would have yielded $2.9 million. *Id.* Ms. Lieberenz asks for the average of the three: $2,866,667. As things stand currently, approximately $2.87 million in investment returns unjustifiably

16

remain in Defendants' insurance carriers coffers, unjustly enriching the carrier even as it withholds a reasonable rate of return from the Estate.

## CONCLUSION

Plaintiff respectfully requests that the Court award attorneys' fees and prejudgment interest in the amounts requested herein.

RESPECTFULLY SUBMITTED at Denver, Colorado, this 9th day of May, 2025.

/s/ Sean Dormer
Sean M. Dormer, Colo. Atty. Reg. 44962
Timothy M. Garvey, Colo. Atty. Reg. 42668
Amy N. Rogers, Colo. Atty. Reg 49266
DORMER HARPRING, LLC
3457 Ringsby Court, Unit 110
Denver, CO  80216
Telephone: (303) 756-3812
Facsimile: (303) 477-7400
E-mail:   smd@denvertrial.com
          tmg@denvertrial.com
          anr@denvertrial.com
*Attorneys for Plaintiff*

/s/ J. Spencer Bryan
J. Spencer Bryan, Colo. Atty. Reg. 51933
Bryan & Terrill
333 West Hampden, Suite 420B
Englewood, CO 80110
Telephone: (720) 923-2333
Email:     jsbryan@bryanterrill.com
*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 9th day of May, 2025, a true and correct copy of the foregoing was served on the following, by electronic filing using the CM/ECF filing system which will send a copy to the following email addresses:

Nicholas C. Poppe, Esq.
Marni Nathan Kloster, Esq.
Nathan Dumm & Mayer P.C.
7900 E. Union Avenue, Suite 600
Denver, CO 80237
(303) 691-3737
npoppe@ndm-law.com
mkloster@ndm-law.com
*Attorneys for Defendants Board of County Commissioners of the County of Saguache; Saguache County Sheriff's Office; Dan Warwick; Kenneth Wilson; and Shelby Shields*

Andrew R. McLetchie, Esq.
Eden R. Rolland, Esq.
Rachel L. Bradley
Fowler, Schimberg, Flanagan & McLetchie, P.C.
350 Indiana Street, Suite 850
Golden, CO 80401
(303) 298-8603
A_mcletchie@fsf-law.com
E_rolland@fsf-law.com
R_Bradley@fsf-law.com
*Attorneys for Defendant Miguel Macias*

James D. Murdock, II, Esq.
John T. Osgood, Esq.
Taylor Anderson LLP
1670 Broadway, Suite 900
Denver, CO 80202
(303) 551-6660
jmurdock@talawfirm.com
josgood@talawfirm.com
*C-Counsel for Defendants Board of County Commissioners of the County of Saguache; Saguache County Sheriff's Office; Dan Warwick; Kenneth Wilson; and Shelby Shields*

                                            */s/ Brittany Freeman*
                                            Brittany Freeman, Paralegal