**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Nina Y. Wang**

Civil Action No. 21-cv-00628-NYW-NRN

SARAH LIEBERENZ, as personal representative of THE ESTATE OF JACKSON
MAES,

      Plaintiff,

v.

BOARD OF COUNTY COMMISSIONERS OF THE COUNTY OF SAGUACHE,
COLORADO, in its official capacity,
SAGUACHE COUNTY SHERIFF'S OFFICE,
DAN WARWICK, in his official capacity,
KENNETH WILSON, in his individual capacity, and
MIGUEL MACIAS, in his individual capacity.

      Defendants.

_____

**ORDER**
_____

This matter is before the Court on two post-trial motions:

(1)    Plaintiff's Motion for Attorneys' Fees and Prejudgment Interest ("Motion for

Attorneys' Fees") [Doc. 335, filed May 9, 2025];[1] and

(2)    Plaintiff's Motion for Review of Clerk's Taxation of Macias' Bill of Costs

("Motion for Review of Costs") (Doc. 345) [Doc. 346, filed August 4, 2025].

Upon review of the Motions, associated briefing, and the entire docket, this Court

finds that oral argument will not materially assist in the resolution of these matters.  For

_____

[1] Where the Court refers to the filings made in Electronic Case Files ("ECF") system in
this action, it uses the convention [Doc. _____].  When citing to docket entries in the
appellate case, the Court uses the convention [ECF No. ___].  In both instances, the
Court references the page number assigned by the ECF system.

the reasons set forth below, Plaintiff's Motion for Attorneys' Fees is **GRANTED in part** and **DENIED in part**, and Plaintiff's Motion for Review of Costs is **DENIED**.

## BACKGROUND

The factual background of this case has been previously discussed in detail by both this Court and the United States Court of Appeals for the Tenth Circuit ("Tenth Circuit"), *see, e.g.*, [Doc. 187; Doc. 207; Doc. 225], and accordingly, it is discussed only sparingly here.  On November 16, 2019, Jackson Maes ("Mr. Maes") was arrested for a warrant for failure to appear on traffic offense, and was transported to Saguache County Jail ("SCJ").  Upon arrival at SCJ, he was placed in Cell One.  Over the course of the evening, Defendants Kenneth Wilson ("Defendant Wilson") and Defendant Miguel Macias ("Defendant Macias") both interacted with Mr. Maes and heard Mr. Maes indicate that he was trying to kill himself.  At approximately 10:22 p.m., Mr. Maes committed suicide.

Plaintiff Sarah Lieberenz ("Plaintiff" or "the Estate"),[2] in her individual capacity and as personal representative of the Estate of Jackson Maes, initiated this action on March 3, 2021 against Defendants Wilson and Macias, as well as Defendants Board of County Commissioners ("the Board"); the Saguache County Sheriff's Office ("SCSO"), and Dan Warwick, in his official capacity as Sheriff of Saguache County ("Sheriff Warwick"); Elke Wells, in her individual capacity ("Ms. Wells"); and Shelby Shields, in her individual capacity ("Ms. Shields").  [Doc. 1].  In her Complaint, Ms. Lieberenz asserted eleven causes of action:  (1) Inadequate Physical Plant – Conditions of Confinement (42 U.S.C. § 1983) against the Board ("Count One"); (2) Inadequate Funding – Conditions of

---

[2] Consistent with its practice after its ruling that Ms. Lieberenz only proceeded in her capacity as personal representative of the Estate of Mr. Maes, the Court refers to Plaintiff as "Plaintiff" or "the Estate."  *See, e.g.*, [Doc. 207 at 1 n.1].

Confinement (42 U.S.C. § 1983) against the Board ("Count Two"); (3) Inadequate Supervision – Policy or Practice (42 U.S.C. § 1983) against Sheriff Warwick in his official capacity ("Count Three"); (4) Inadequate Training – Policy or Practice (42 U.S.C. § 1983) against Sheriff Warwick in his official capacity ("Count Four"); (5) Inadequate Staffing – Policy or Practice (42 U.S.C. § 1983) against Sheriff Warwick in his official capacity ("Count Five"); (6) Supervisory Liability (42 U.S.C. § 1983) against Defendant Wilson in his individual capacity ("Count Six"); (7) Individual Liability (42 U.S.C. § 1983) against Defendant Wilson in his individual capacity ("Count Seven"); (8) Individual Liability (42 U.S.C. § 1983) against Defendant Macias in his individual capacity ("Count Eight"); (9) Individual Liability (42 U.S.C. § 1983) against Defendant Wells in her individual capacity ("Count Nine"); (10) Individual Liability (42 U.S.C. § 1983) against Defendant Shields in her individual capacity ("Count Ten"); and (11) Negligent Supervision of a Jail (C.R.S. § 24-10-106(1)(b)) against the Board, the SCSO, and Sheriff Warwick ("Count Eleven"). *See* [*id.* at 25–35].

Defendants the Board, SCSO, Warwick, Shields, and Wilson ("County Defendants") filed an Answer on April 30, 2021. [Doc. 40]. Defendant Wells also filed an Answer that same day. [Doc. 41]. Defendant Macias filed his Answer on May 20, 2021. [Doc. 45]. On June 30, 2025, Defendant Macias filed a Motion for Partial Summary Judgment.[3] [Doc. 101]. The County Defendants and Defendant Wells respectively filed Motions for Summary Judgment. [Doc. 102; Doc. 104].

---

[3] The County Defendants and Defendant Wells also moved to join Defendant Macias's Motion for Partial Summary Judgment. [Doc. 103; Doc. 105].

The Court granted in part and denied in part Defendant Macias's Motion for Partial Summary Judgment.  [Doc. 187].  The Court held that Ms. Lieberenz could not bring any claims in her individual capacity pursuant to 42 U.S.C. § 1983, and therefore, granted summary judgment in favor of Defendant Macias, the County Defendants, and Defendant Wells on Counts One through Ten, insofar as they asserted any cause of action or damages suffered by Ms. Lieberenz as an individual.  [*Id.* at 9].  The Court further precluded any damages for loss of consortium to Ms. Lieberenz, as opposed to loss of consortium to Mr. Maes.  [*Id.* at 11].  But the Court declined to grant summary judgment in favor of Defendants for (1) funeral expenses; (2) Mr. Maes's mental pain, anguish, and emotional distress; (3) Mr. Maes's physical pain and suffering; (4) Mr. Maes's loss of enjoyment of life; and (5) Mr. Maes's loss of life. [*Id.* at 12–13].

The Court also granted in part and denied in part the County Defendants' Motion for Summary Judgment and granted Defendant Wells' Motion for Summary Judgment. [Doc. 207].  Specifically, the Court granted summary judgment in favor of the County Defendants on Counts One, Three, Five, Nine and Ten; on Count Four, insofar as Plaintiff raised theories of liability based on a lack of training regarding suicide contracts; physical, funding, and staffing decisions of the SCJ; and mental health clearance for intoxicated persons expressing acute suicidal ideation.  [*Id.* at 66].  But the Court denied summary judgment as to Count Two; Counts Six and Seven as to Defendant Wilson; and Count Four, insofar as Plaintiff raised theories of liability based on failure to train jail staff on elevating care and removing items that could be used to facilitate suicide.  [*Id.*].  The Court also granted Defendant Wells' Motion for Summary Judgment in its entirety.  [*Id.*].

Defendant Wilson appealed the Court's denial of qualified immunity, and the Estate cross-appealed on February 28, 2023, and March 14, 2023, respectively. [Doc. 208; Doc. 216]. After the Tenth Circuit affirmed the denial of summary judgment as to Defendant Wilson, and dismissed the Estate's cross-appeal on June 12, 2024, [Doc. 225; Doc. 228], the Court set the matter for trial, [Doc. 233]. Ultimately, Plaintiff dismissed Count Eleven for Negligent Jail Operations, [Doc. 266 at 5], and proceeded to trial on five claims: Count Two for deliberate indifference arising from inadequate funding against the Defendant Board; Count Four for deliberate indifference arising from inadequate training against Defendant Warwick in his official capacity; Count Six for supervisory liability against Defendant Wilson arising from his supervision of Defendant Macias; Count Seven for deliberate indifference against Defendant Wilson as an individual; and Count Eight for deliberate indifference against Defendant Macias as an individual.[4] [Doc. 329].

After a seven-day trial, the jury found in favor of Plaintiff on its claims of deliberate indifference against Defendant Wilson as an individual; deliberate indifference arising from inadequate training against Defendant Warwick in his official capacity; and deliberate indifference arising from inadequate funding against the Defendant Board. [*Id.*]. Final judgment entered on April 11, 2025. [Doc. 330].

On May 9, 2025, Plaintiff filed the instant Motion for Attorneys' Fees. [Doc. 335]. On July 30, 2025, the Clerk of the Court taxed costs in the amount of $15,409.82 against Plaintiff in favor of Defendant Macias. [Doc. 345]. Plaintiff's Motion for Review of Costs

---

[4] The Counts were renumbered and denominated Claims One through Five for the purpose of trial. *See* [Doc. 329].

followed on August 4, 2025.  [Doc. 346].  These Motions are fully briefed and ripe for determination.

## LEGAL STANDARDS

Section 1988 of Title 42 of the United States Code provides inter alia that "the court, in its discretion, may allow the prevailing party . . . a reasonable attorneys' fee as part of the costs," including in suits brought pursuant to 42 U.S.C. § 1983.  42 U.S.C. § 1988(b); *Fox v. Vice*, 563 U.S. 826, 832–33 (2011).  A prevailing plaintiff in a civil rights action should ordinarily recover attorney's fees—even if she is not successful on every claim.  *See Fox*, 563 U.S. at 834.  Nevertheless, the fee award should not reimburse the plaintiff for work unrelated to the grant of relief.  *Id.*  The burden of proof as to the reasonableness of attorney's fees, costs and expenses falls upon the Estate.  *See Guides, Ltd. v. Yarmouth Grp. Prop. Mgmt., Inc.*, 295 F.3d 1065, 1078 (10th Cir. 2002) (observing, in context of a fee request under 42 U.S.C. § 1988, that a claimant requesting attorney's fees has the burden to prove that the fee is reasonable).

To calculate the reasonable attorney's fee under § 1988, the Supreme Court has endorsed the lodestar methodology of multiplying the number of hours reasonably expended on the litigation by a reasonable hourly rate as "[t]he most useful starting point for determining the amount of a reasonable fee[.]"  *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983).  While there is a "strong presumption" that the lodestar figure is reasonable, in some instances, that presumption may be overcome if the lodestar does not adequately account for a factor that may properly be considered in determining a reasonable fee.  *Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 554 (2010).  In cases of exceptional

success, an enhanced award may be justified under § 1988.  *See Hensley*, 461 U.S. at 435.

As a general rule, the amount of an attorney's fees award is within the discretion of the Court.  *See, e.g., id.* at 433, 437.  "Courts need not identify and justify every hour allowed or disallowed, as doing so would run counter to the Supreme Court's warning that a request for attorney's fees should not result in a second major litigation."  *United States ex rel. Shepard v. Grand Junction Reg'l Airport Auth.*, No. 13-cv-00736-CMA-CBS, 2017 WL 11556405, at *2 (D. Colo. July 24, 2017) (quotation omitted).  In reviewing a fees request, this Court heeds the Supreme Court's admonition that "[t]he essential goal in shifting fees . . . is to do rough justice, not to achieve auditing perfection.  So trial courts may take into account their overall sense of a suit, and may use estimates in calculating and allocating an attorney's time."  *Fox*, 563 U.S. at 838.

## ANALYSIS

### I.    Motion for Attorney's Fees

#### A.    Reasonable Hours Expended

The Court begins its analysis with consideration of the "reasonable hours" component of the lodestar calculation.  The Estate seeks compensation for 1,060.4 hours of work performed by J. Spencer Bryan ("Mr. Bryan") of the law firm Bryan and Terrill Law, PLLC ("BT Law") and offers Mr. Bryan's Declaration in support.  [Doc. 335-1 at ¶ 25; Doc. 335-1 at 75–171].  It also seeks compensation for hours expended by attorneys and non-attorneys associated with the law firm of Dormer Harping ("DH") as follows:[5]

---

[5] The Court subsequently refers to each of these professionals by title and last name.  It has attempted to use the appropriate salutation but apologizes in advance if it inadvertently uses an incorrect one.

| Timekeeper | Title | Total Hours |
|---|---|---|
| Sean Dormer | Partner | 1137.60 |
| K.C. Harpring | Managing Partner | 6.00 |
| Amy Rogers | Associate | 319.70 |
| Tim Garvey | Associate (Team Lead) | 200.70 |
| Greg Bentley | Associate (Team Lead) | 17.00 |
| Jessica Mauser | Associate (Team Lead) | 8.60 |
| Blaire Bayliss | Associate | 31.00 |
| Erik Moya | Associate | 6.40 |
| Brittany Freeman | Litigation Paralegal | 326.80 |
| Marcie Emch | Lead Lit. Paralegal | 321.60 |
| Donivan Tarpley | Litigation Paralegal | 2.20 |
| Julie Altenhofen | Paralegal | 55.50 |
| Nancy Alvarez | Paralegal | 3.90 |
| David Garber | Paralegal | 4.00 |
| Ella Nelson | Legal Assistant | 193.80 |
| Carla Morales | Legal Assistant | 3.90 |

[Doc. 335-2 at 21].  Thus, DH attorneys claim an aggregate of 1,727 hours and non-attorneys claim an aggregate of 818.7 hours.  [*Id.*]; *see also infra* note 7.  And the Estate submitted the Declaration of Devi M. Rao ("Ms. Rao"), of the Roderick & Solange MacArthur Justice Center ("MJC"), in support of the instant Motion, seeking compensation for hours expended by MJC employees:

| MJC Employee | Number of Hours |
|---|---|
| Megha Ram | 148.02 |
| Ben Gunning | 245.04 |
| George Mills | 43.41 |
| Emily Clark | 6.31 |
| Total | |

[Doc. 335-4 at 8].  Thus, MJC claims an aggregate of 436.47 hours of attorney time and 6.31 hours of non-attorney time.  [*Id.*].

In evaluating whether the hours claimed by counsel are reasonable, the Court weighs factors such as "(1) whether the amount of time spent on a particular task appears

8

reasonable in light of the complexity of the case, the strategies pursued, and the responses necessitated by an opponent's maneuvering; (2) whether the amount of time spent is reasonable in relation to counsel's experience; and (3) whether the billing entries are sufficiently detailed, showing how much time was allotted to a specific task." *Franklin D. Azar & Assocs., P.C. v. Farmers Ins. Exch.*, No. 13-cv-00658-CMA-CBS, 2013 WL 5430779, at *1 (D. Colo. Sept. 26, 2013).

The County Defendants argue that Plaintiff's claimed fees reflect a significant number of duplicate, excessive, or unclear billing entries. [Doc. 342 at 11; Doc. 342-2; Doc. 342-4]. They further take issue with the practice of block billing, contending such practice "makes it nearly impossible to determine what portion of an attorney's time is compensable, particularly when it includes things that are not compensable or compensable at a reduced rate, such a travel time." [Doc. 342 at 11]. Upon review of the Motion for Attorney's Fees and the supporting documentation, as well as the entire docket, this Court finds it appropriate to consider each distinct organization's fees but observes that many of the deficiencies are shared across law firms.

### 1.    BT Law

The Court first considers the time entries provided by Mr. Bryan in support of the 1,060.4 hours, and observes that compiling raw totals of hours spent alone is insufficient, because the amount of time *actually* expended is not the same as the amount of time *reasonably* expended. *Ramos v. Lamm*, 713 F.2d 546, 553 (10th Cir. 1983), *overruled on other grounds by Pennsylvania v. Del. Valley Citizens' Council for Clean Air*, 483 U.S. 711 (1987). Instead, an attorney must exercise billing judgment in submitting a request for fees. "Where an attorney has failed to exercise billing judgment, the court may do so for

him by striking problematic entries or by reducing the hours requested by a percentage intended to substitute for the exercise of billing judgment." *Varley v. Midland Credit Mgmt., Inc.*, No. 11-cv-02807-REB-MJW, 2012 WL 2107969, at *2 (D. Colo. June 11, 2012).  In its review, the Court has considered each entry insofar as it was provided, and concludes that there are several categories of hours that aggregate to a significant number of hours that are not compensable as reasonable attorney's fees..   Each section reflects representative examples but is not intended to contain an exhaustive list.

 *Case Preparation Entries*.  There appear to be several subcategories of entries related to the preparation for the case, rather than the actual litigation of the action that are not recoverable.  For example, Mr. Bryan seeks reimbursement for the intake of the case, as well as for negotiating a co-counsel agreement and internal coordination with counsel, *see, e.g.*, [Doc. 335-1 at 75 (3/6/20 – 3/19/20 entries)], but provides no explanation or authority for the proposition that these types of activities are compensable under § 1988, *see Brown v. Gray*, 227 F.3d 1278, 1297 (10th Cir. 2000) (observing that determining whether certain fees are normally absorbed as part of law firm overhead involves a factual inquiry into the billing practices of law firms in the region who provide services to fee-paying clients).  Indeed, DH has not charged for most similar entries.  *See* [Doc. 335-2 at 33 (2/3/20 entry; 2/13/20 entry; 3/6/20 entry; 3/20/20 entry)].   Another example is Mr. Bryan appears to have assisted in the setting up of the Estate.  *See e.g.*, [Doc. 335-1 at 84 (1/14/21 entry ("EM from SB re: Estate setup decision for Maes complaint"), 85 (1/22/21 ("[p]reparing estate docs for Maes case"; 1/26/21 ("EM from SB re: Follow up on estate setup for Maes"), 2/2/21 ("EM from SB re: Finalizing estate docs for Maes case")].  While Mr. Bryan may properly bill the Estate for such prefatory work to

ensure that the claims are brought by the correct entity and/or individual, such fees are not properly passed on to the opposing party. Similarly, Mr. Bryan has claimed hours for communications regarding experts prior to their retention. *See, e.g.*, [*id.* at 93 (regarding Haynes), 104 (10/25/21 "RR backgrnd re Dr. Donald Misch re: psychiatric expert")]. In this Court's experience, such preparatory work should not be billed to clients, and "[h]ours that are not properly billed to one's *client* are not properly billed to one's *adversary* pursuant to statutory authority." *Ramos*, 713 F2d at 553 (quotation omitted).

**Engagement with Media**. In addition, this Court will not permit recovery of hours claimed for counsel's engagement with the media. *See* [Doc. 335-1 at 83 (documenting various calls with reporters; emailing co-counsel "re potential story ideas")]. While the Estate was certainly at liberty to discuss the underlying incident and the case with reporters, it is not incumbent upon—nor would it be reasonable to require—the County Defendants to now compensate Plaintiff for those hours. Such compensation is particularly unwarranted when the Estate has failed to demonstrate that such media contacts were necessary to the conduct of the actual litigation or even contributed, directly and substantially, to the attainment of the Estate's litigation goals. *Cf. Role Models Am., Inc. v. Brownlee,* 353 F.3d 962, 973 (D.C. Cir. 2004) ("[T]he government cannot be charged for time spent in discussions with the press."); *Watkins v. Fordice*, 7 F.3d 453, 458 (5th Cir. 1993) (finding no abuse of discretion when the district court precluded recovery of time attributed to press conferences); *Davis v. San Francisco,* 976 F.2d 1536, 1545 (9th Cir.1992), *vacated in part on other grounds,* 984 F.2d 345 (9th Cir.1993); *Thompson v. U.S. Dep't of Hous. & Urb. Dev.*, No. CIV.A. MGJ95309, 2001 WL 1636517, at *11 (D. Md. Dec. 12, 2001) (observing that excluding time for press conferences was

11

appropriate).   Indeed, Mr. Dormer has appropriately excluded entries associated with press releases in most instances.  *See* [Doc. 335-2 at 38, 139].

***Unclear Billing Entries****.*   This Court also concludes that many entries for Mr. Bryan are so cursory and/or unclear that the Court cannot adequately consider whether they are appropriate or not.  For instance, there are a series of entries that refer to "OOJ," which is undefined in either Mr. Bryan's Declaration or the billing entries themselves.[6] *See* [Doc. 335-1 at 95 (billing entries for 8/4/21, 8/5/21), 97 (billing entries for 8/17/21; 8/18/21].  Elsewhere, Mr. Bryan refers to a "list of 'to do' items," which is insufficient for this Court to determine whether such items stem from legal analysis or administrative tasks.  *See* [*id.* at 76 (3/27/20 entries)].   Some entries simply refer to e-mails to an unidentified "shea" about an undefined "incident"—which could refer to case development or, given where it is situated within the entries, could refer to communications with the media.  *See* [*id.* at 83 (10/22/20 and 10/26/20 entries)].   At other times, it is unclear whether the "investigator" to whom the entries refer is an investigator for the legal action, or one associated with news articles.  *See, e.g.*, [*id.* at 83–84].  And while some work done between the submission of the case to the jury and the return of the verdict may be compensable, charging multiple hours for simply waiting "on-call" for questions from the jury and the verdict, without any further description, is not.  *See* [Doc. 335-1 at 169 (4/8/25 and 4/9/25 entries)].  The Tenth Circuit has made clear that "[h]ours that an attorney would not properly bill to his or her client cannot reasonably be billed to the adverse party,

---

[6] To the extent that "OOJ" refers to an offer of judgment, there is no indication from the record or the Final Pretrial Order that any offer of judgment was tendered in that timeframe.  *See* [Doc. 266 at 12–13].  More importantly, this Court should not be required to guess in order to evaluate a party's request for attorney's fees.

making certain time presumptively unreasonable." *Case v. Unified Sch. Dist. No. 233*, 157 F.3d 1243, 1250 (10th Cir. 1998) (citing *Ramos*, 713 F.2d at 554). And like my colleague in the United States District Court for the Northern District of Oklahoma, this Court encourages BT Law to rethink their billing of repetitive .1 entries for tasks that do not appear would take six minutes. *See* [Doc. 335-1 at 47, 58–59].

*Inconsistent Billing Entries.* There are also some instances where Mr. Bryan's claimed hours are not consistent with other information on the docket, and there is not sufficient explanation to justify the additional time claimed. For instance, Mr. Bryan billed an hour of time for the July 1, 2021 Scheduling Conference minutes before the Honorable N. Reid Neureiter that lasted 28 minutes. *Compare* [Doc. 335-1 at 92 (7/1/21 entry)], *with* [Doc. 53]. Similarly, Mr. Bryan billed an hour of time for a telephonic status conference before Judge Neureiter that lasted seven minutes. *Compare* [Doc. 335-1 at 105 (11/10/21 entry)], *with* [Doc. 68]. Both of these conferences occurred telephonically, and there is no indication of other compensable work or even compensable travel associated with these conferences. And insofar as Mr. Bryan is billing for discussing travel or actual travel time, *see e.g.*, [Doc. 335-1 at 128 at (7/13/22 entry), 141 (3/8/23 entry)], "reasonable attorneys' fees do not include billing for time spent solely in transit," *see Auraria Student Hous. at the Regency, LLC v. Campus Vill. Apartments, LLC*, No. 10-cv-02516-WJM-KLM, 2016 WL 8458776, at *8 (D. Colo. Aug. 5, 2016), *vacated after merits appeal*, 2017 WL 345664 (D. Colo. Jan. 24, 2017), nor do they encompass the arrangement of such travel.

*Administrative Work.* It is well-settled that clerical and administrative tasks, such as reviewing and organizing documents or preparing for the filing Plaintiff's pleadings and

13

motions in this matter, performed by attorneys or others are generally not recoverable as attorneys' fees. *See, e.g., J & J Sports Prods., Inc. v. Rosales*, No. 07-cv-01110-RPM-MEH, 2008 WL 596104, at *7 (D. Colo. Jan. 30, 2008). Voluminous entries reflect such work: "EM from JA re: file access," [Doc. 335-1 at 76 (3/27/20 entries)], 85 (1/28/21 entry "EM from JMA re: Organizing docs for Maes case filing")], 124 (5/16/22 ("EM from SMD re: Preparing for court submission and reviewing documents"))]. And to the extent that Mr. Bryan is receiving and/or processing checks, [*id.* at 170 (4/30/25)], this is not reimbursable legal work. While each of these may only amount to minimal time, they are not permissible.

> ***Cross-Appeal***. BT Law's time entries also contain many entries dedicated to the cross-appeal that was filed by the Estate in this action. *See e.g.* [Doc. 335-1 at 141 (3/14/23 entries), 142 (3/15/23 entries)]. The Estate sought to cross-appeal the portion of this Court's February 3, 2023 Order granting qualified immunity to Defendants Wells and Shields, and this Court's January 6, 2023 Order denying Plaintiff's Motion for Sanctions. [Doc. 216]. It is well settled that, generally, federal courts of appeal have jurisdiction over all final decisions of district courts, which has been defined as a decision "by which a district court disassociates itself from the case." *Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100, 106 (2009) (quoting *Swint v. Chambers County Comm'n,* 514 U.S. 35, 42 (1995)). There is only a small category of collateral orders that, although they do not end the litigation, are appropriately deemed "final." *See id.* Decisions subject to interlocutory appeal must be (1) conclusive; (2) resolve important questions separate from the merits, and (3) effectively unreviewable on appeal from final judgment in the underlying action. *Id.* (citation omitted).

As an initial matter, the grant of qualified immunity is generally not subject to interlocutory appeal. The Estate implicitly acknowledges this jurisdictional issue by arguing that the Tenth Circuit had jurisdiction to hear the Estate's challenge to the Court's grant of qualified immunity to Defendants Shields and Wells based not on direct jurisdiction, but based on "pendent appellate jurisdiction." *See Lieberenz v. Wilson*, No. 23-1075, (10th Cir. Sept. 11, 2023), [ECF No. 41 at 11–14]. The Estate urged the Tenth Circuit to exercise pendent appellate jurisdiction because the issues of the Court's grant of qualified immunity for Defendants Shields and Wells were "inextricably intertwined" with those of Defendant Wilson. *Id.* "Pendent appellate jurisdiction is a matter of discretion, not of right." *Walter v. Morton*, 33 F.3d 1240, 1242 (10th Cir. 1994).

The Tenth Circuit declined to exercise pendent jurisdiction, holding that "[its] review of Captain Wilson's entitled to qualified immunity as an individual and as a supervisor does not require that we resolve Deputy Wells's or Ms. Shields's entitlement to qualified immunity." [Doc. 225 at 25]. As the Tenth Circuit pointed out, the factual distinctions between the conduct of the individual Defendants, i.e., "Captain Wilson, Deputy Wells, and Ms. Shields had different actions (or failed to act) in response to Mr. Maes's behavior," was critical to the qualified immunity analysis. [*Id.* at 25]. Indeed, Defendant Wells was not even within Defendant Wilson's chain of command. As for the Estate's appeal of the issue of this Court's denial of its Motion for Sanctions, such issue was withdrawn before briefing. *See Lieberenz v. Wilson*, [ECF No. 41 at 10 n.2].

While the Estate has the prerogative to consider and pursue a cross-appeal, this Court respectfully concludes that the fees associated with such cross-appeal are not appropriately shifted to the County Defendants pursuant to § 1988, because the cross-

15

appeal "cannot be deemed to have been expended in pursuit of the ultimate result achieved." *Hensley,* 461 U.S. at 435 (citation omitted).

Based on these considerations, this Court reduces the number of hours for BT Law by 25%, for a total of **795** hours as a base for its lodestar calculation.

### 2.    DH

Unfortunately, DH's time entries suffer from many of the same deficiencies as those from BT Law.  As an initial matter, this Court notes that the total amount claimed in the filing with the Court as the "Firm Total Actually Charged" of $1,095,761.50 does not match the "Firm Total Charged" of $1,077,161.50 reflected in the Excel spreadsheet provided to the Court at its request for the purpose of reconciliation.[7]  Plaintiff corrected itself by acknowledging this error on Reply.  [Doc. 343 at 8].

***Number of Timekeepers****.*  While the Plaintiff or counsel has the prerogative to engage multiple law firms or to have multiple timekeepers, this Court finds that in certain instances, the internal coordination tasks are inappropriately compensated.  For example, insofar as Ms. Altenhofen needed to add co-counsel information to the client matter, that type of coordination work is not appropriately billed to the client or reimbursed under § 1988.  *See* [Doc. 335-2 at 38 (2/23/21 entry)].  Furthermore, in some instances, the number of individuals performing substantially similar tasks is excessive.  For instance, it is unclear why Mr. Bryan and Mr. Dormer as seasoned attorneys were both required for

---

[7] The discrepancy appears to result from one instance of egregious overbilling.  DH includes an entry on January 28, 2021 for 93 hours for "procedures & forms for estate opening"—resulting in a whopping fee of $18,600.  [Doc. 335-2 at 37 (1/28/21 entry)].  In the Excel spreadsheet, the entry was deemed "deleted."  But it was not deleted in the actual filing to the Court, and the "Firm Total Charged" of $1,095,761.50 [Doc. 335-2 at 142; Doc. 335-2 at 21 ¶ 61] appears to include it.  As acknowledged on Reply, this charge of $18,600 would have been clearly unreasonable.  [Doc. 343 at 8–9].

the depositions of various witnesses, including Ms. Lieberenz and Ava Radigan. *See
e.g.,* [Doc. 335-1 at 110 (2/4/22 entry), 120 (4/7/22 entry); Doc. 335-2 at 63 (2/4/22 entry),
76 (4/7/22 entry)].    And although this Court does not doubt that Mr. Harpring's
contributions to this case were beneficial, it is also unclear why any of his hours, such as
his strategy session with Mr. Dormer, or observation of trial practice with Ms. Lieberenz,
are appropriately shifted to the County Defendants when Mr. Bryan was available for such
input.  [Doc. 335-2 at 127 (3/13/25 entry)].

**Unclear Billing Entries***.  This Court also concludes that many entries for DH are
sufficiently unclear that the Court cannot adequately consider whether they are
appropriate or not. *Flying J Inc. v. Comdata Network, Inc.*, 322 F. App'x 610, 617 (10th
Cir. 2009) (noting that while block billing is permitted, it is left to the district court's sound
discretion to determine the reasonableness of the fee).  For instance, on April 10, 2025,
Mr. Garvey billed 4.2 hours to "[r]eviewing and analyzing case and results; preparing
press release." [Doc. 335-2 at 139 (4/10/25 entry)].  While reviewing and analyzing case
and results might be appropriate, drafting a press release is not, as discussed above.
Similarly, like Mr. Bryan, the multiple DH attorneys and paralegals who billed entries for
"waiting" for the verdict—without more—are also not compensable.  *See* [*id.* at 139
(4/8/25 and 4/9/25 entries)].  Similarly, time for drafting an attorney's fees motion may be
appropriate, but charging opposing counsel for time spent in exercising appropriate billing
judgment is not as this Court cannot imagine counsel charging its own client for such
routine billing work.  *See* [*id.* at 140 (multiple undated entries)]; *Case*, 157 F.3d at 1250.
Likewise, setting up audio/visual for trial is appropriate, but packing for trial is not.  *See*
[*id.* at 134 (3/26/25 entry)].    And similarly to Mr. Bryan, DH attorneys and

17

paraprofessionals should not be billing for travel time when individuals are solely engaged in transit or arranging for such travel.  *See supra* at 13; [Doc. 335-2 at 123 (2/26/25 entry), 133 (3/25/25 entry), 134 (3/26/25 entries), 137 (3/31/25 entries)].

***Engagement with Media****.*  As discussed above, this Court will not permit recovery of hours claimed for counsel's engagement with the media.  This includes, but is not limited to, Mr. Garvey's time entry as discussed above, *see supra*, or his later review of a press release.  [Doc. 335-2 at 140 (undated entry 45766)].  Mr. Harpring's publishing of a press release similarly is not compensable.  [*id.* at 39 (3/3/21 entry)].

***Administrative Work****.*  The County Defendants argue that all 197.7 hours of DH's administrative legal assistants, Ms. Nelson and Ms. Morales, should be excluded because such work should be absorbed into attorney overhead.  [Doc. 342 at 7].  This Court respectfully declines to make such a blanket ruling.  The Tenth Circuit has recognized that "under the rubric of 42 U.S.C. § 1988 'attorney's fees,'" the fees for attorneys, law clerks, and legal assistants are all determined in the same fashion:  multiplying reasonable hours by reasonable rates to reach a lodestar amount.  *Case,* 157 F.3d at 1249.  Indeed, it makes little sense to disallow compensation for attorneys from performing administrative tasks, and then penalize attorneys for using legal assistants with a lower rate than paralegals to do such tasks.

But even the number of hours claimed by DH for administrative work adjusted to remove the 93 hours discussed above appears excessive.  *See supra* note 7.  Beyond the sheer number of hours by the paralegals and legal assistants—amounting to approximately 911.7 hours, [Doc. 335-2 at 21]—some of such work is not appropriately charged to this matter, or is otherwise unnecessary and/or duplicative.  Like BT Law, DH

has numerous entries dedicated to creating and preparing the Estate, and dealing with probate issues including time entries from Mr. Dormer and Ms. Emch.  *See, e.g.*, [Doc. 335-2 at 38 (2/9/21, 2/10/21, 2/22/21 entries)].  In another instance, Ms. Emch claims time for updating the address for the representative of the Estate.  [*Id.* (2/9/21 entry)].  The Court further finds that the multiple entries claiming time for bookkeeping purposes are not compensable as attorney's fees because they are not for legal purposes, and these are the type of charges that would typically be subsumed into law firm overhead in the Denver market.  *See, e.g.*, [*id.* at 39 (3/8/21 entry); 40 (3/22/21 entry); 41 (3/26/21); 43 (4/22/21 entry)].  For the same reason, time spent reminding experts to submit invoices is similarly not compensable.  *See e.g.*, [*id.* at 75 (4/4/22 entry)].

It is also unclear to the Court why multiple paralegals/legal assistants were observing each day of trial.  *See, e.g.* [*id.* at 137 (3/31/25 entries), 138 (4/1/25 entries)].  And while certain administrative work is compensable pursuant to § 1988, entries attributed to packing and unpacking for trial are simply not.  *See, e.g.* [Doc. 335-2 at 134 (3/26/25 entry), 139 (4/9/25 entry)].  In that same vein, hours billed by any timekeeper— attorney or otherwise—simply for "waiting" for a verdict, or "debriefing" from a completed trial, is not reasonable.  *See* [*id.* at 139 (4/9/25 entries)].  Indeed, the Court neither requires nor requests counsel to be at the courthouse during deliberations and counsel was not required to return until the verdict because the jury did not have any questions.  *See* [Doc. 323].  This Court is hard pressed to imagine that counsel would charge Ms. Lieberenz, as the representative of the Estate, approximately 30 hours on a single day of "waiting," totaling thousands of dollars, and deem it to be "reasonable billing judgment."

Accordingly, these hours are not appropriately recovered from the County Defendants pursuant to § 1988.  *Ramos*, 713 F.2d at 553.

**Firm Work**.  It is also not proper to charge opposing counsel for work for the Firm to clear its own conflicts arising representing two individuals who may have had divergent interests, such as Ms. Lieberenz and Ms. Radigan.  *See* [Doc. 335-2 at 75 (4/6/22 entry, 47/22 entry), 76 (4/7/22 entries)].  Similarly, to the extent that some timekeepers were engaged to participate in team practice sessions because the trial team valued feedback that could not be adequately provided by the trial team because of their "close connection with Ms. Lieberenz," *see, e.g.*, [Doc. 335-2 at 9 ¶ 33], i.e., Mr. Harpring, Ms. Mauser, Ms. Alvarez, Mr. Garber, and Ms. Morales, this work is duplicative of the work of the jury consultants, and/or is simply a luxury that should have been excluded pursuant to reasonable billing judgment.

Based on these considerations, this Court finds that it is appropriate for the Court to reduce the amount of reasonable hours for the remaining DH lawyers by 25% and DH administrative staff by 50% as follows:

| Timekeeper | Compensable Hours |
|---|---|
| Sean Dormer | 853.2 |
| K.C. Harpring | 0 |
| Amy Rogers | 239.78 |
| Tim Garvey | 150.53 |
| Greg Bentley | 12.75 |
| Jessica Mauser | 0 |
| Blaire Bayliss | 23.25 |
| Erik Moya | 4.8 |
| Brittany Freeman | 163.4 |
| Marcie Emch | 114.3[8] |
| Donivan Tarpley | 1.1 |
| Julie Altenhofen | 27.75 |

---

[8] This calculation uses 228.6 hours as its base, derived from 321.6–93.  *See supra* note 7.

| Nancy Alvarez | 0 |
|---|---|
| David Garber | 0 |
| Ella Nelson | 96.9 |
| Carla Morales | 0 |

### 3.    MJC

The Estate seeks MJC attorney's fees for its appeal.  [Doc. 335-4 at ¶ 5].  In her Declaration, Ms. Rao broadly claims that "[a]ll of the hours included in the[] totals were related to and necessary for this appeal."  [*Id.* at ¶ 18].  But "an attorney's *ipse dixit*, standing alone, is insufficient to demonstrate that the requested rates are reasonable." *Actalent, Inc. v. Evergreen Rsch. US, LLC*, No. 24-cv-02839-REB-CYC, 2025 WL 2418531, at *3 (D. Colo. June 20, 2025).  And the Estate fails to provide sufficient information for this Court to determine how many of the hours are dedicated to the issues raised by the County Defendants' appeal of this Court's denial of qualified immunity as to Defendant Wilson versus those raised through the Estate's cross-appeal, which as discussed above, was not well-taken.  Ms. Rao's Declaration does not address it, and although the Declaration refers to an "Exhibit 1" reflecting time entries, [Doc. 335-4 at ¶ 16], this Court could not find such an exhibit.  A party seeking fees for hours worked must submit "meticulous, contemporaneous time records" showing "how those hours were allotted to specific tasks."  *United Phosphorus, Ltd. v. Midland Fumigant, Inc.*, 205 F.3d 1219, 1233 (10th Cir. 2000) (quotation omitted).

As discussed in detail above, this Court finds that fees associated with Plaintiff's cross-appeal is not compensable.  *See supra* at 14–16.  In addition, even half the total number of 436.47 hours, i.e., approximately 218 hours, for an interlocutory appeal on a singular, discrete issue on the denial of qualified immunity is on the high side of

reasonable hours for an interlocutory appeal that this Court could find—particularly in light of the fact that the trial attorneys are also charging fees for the interlocutory appeal. *Cf. Kan. Jud. Watch v. Stout*, No. 06-cv-4056-JAR, 2012 WL 1033634, at *5 (D. Kan. Mar. 27, 2012) (finding that the 59 hours claimed for work on the interlocutory appeal was reasonable in light of a reduction of 77.1 hours based on appropriate billing judgment); *Flitton v. Primary Residential Mortg., Inc.*, No. 2:03-cv-00481-DAK, 2009 WL 1357206, at *5 (D. Utah May 7, 2009), *aff'd,* 614 F.3d 1173 (10th Cir. 2010) (observing that the plaintiff sought fees for 424.10 hours <u>after</u> a full trial in Title VII case).  And unlike her work with Mr. Bryan in *Lance v. Morris* in which the court found that 232.79 hours was reasonable*, this case was not "dead in the water," when she was brought in for the appeal; rather, the Tenth Circuit was reviewing this Court's denial of qualified immunity.  *Cf.* [Doc. 335-1 at 56–57].

It is well-settled that a district court is justified in reducing the reasonable number of hours when the attorney's time records fail to document adequately how he or she utilized the time.  *See Case*, 157 F.3d at 1250.  Although Ms. Rao filed a Supplemental Declaration in support of Plaintiff's Reply, it does not appear she included any timekeeper entries.  *See* [Doc.343-4].  Instead of simply declining to award attorney's fees for MJC's role in the interlocutory appeal given the lack of any specific time entries,[9] this Court reduces the amount of reasonable hours by 75%, to account for the unsuccessful cross-

---

[9] The Court notes that the allocation of these hours may not reflect the distribution of work between the various attorneys for the affirmative appeal versus the cross appeal.  But because this Court was not provided any specific entries, a more precise allocation was not possible and thus, the Court uses its discretion to do rough justice.  *See Fox*, 563 U.S. at 838.

appeal and the straightforward nature of responding to the affirmative appeal, for a total number of reasonable hours for the MJC attorneys as follows:

| Timekeeper | Compensable Hours |
|---|---|
| Megha Ram | 37 |
| Ben Gunning | 61.26 |
| George Mills | 10.85 |

The Court does not find a basis for reducing the number of hours for MJC's paralegal, Emily Clark, and finds that the 6.31 hours claimed for her work is reasonable.

### B.    Reasonable Hourly Rates

The Court next turns to the reasonableness of the hourly rates claimed by counsel. The relevant standard requires the Court to "consider[] the 'prevailing market rate' in the community in order to determine what constitutes a reasonable rate for attorneys." *Preitauer v. Am. Fam. Mut. Ins. Co., S.I.*, 741 F. Supp. 3d 934, 942 (D. Colo. 2024) (quoting *Lippoldt v. Cole*, 468 F.3d 1204, 1224 (10th Cir. 2006)).  Generally, to justify a fee award, the party seeking fees must produce "satisfactory evidence—in addition to the attorney's own affidavits—that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation."  *Blum v. Stenson*, 465 U.S. 886, 895 n.11 (1984).

### 1.    BT Law

BT Law claims an hourly rate of $650 per hour for Mr. Bryan.  [Doc. 335-1 at ¶ 31]. Mr. Bryan obtained his law license in September 2002 in Oklahoma, and March 2018 in Colorado.  [*Id.* at ¶ 1].  His practice focuses upon civil rights litigation, with a subspecialty in jail and prison litigation, and he provides many examples of similar cases he has litigated in his career both on the defensive and affirmative side.  [*Id.* at ¶¶ 1–6, 8–9, 14].

Mr. Bryan submits the Declaration of Darold Killmer ("Mr. Killmer") to support his request for a rate of $650 per hour. [Doc. 335-1 at 172–76]. Mr. Killmer references his own Firm's rates, as well as a number of cases where Colorado courts relied upon his expert opinion in determining a reasonable rate. *See* [Doc. 335-1 at 173–74 ¶¶ 7, 9–10]. Mr. Killmer opines that based on his research and expertise in the area, a range of hourly rates for experience litigation counsel in civil rights disputes such as this one is between $400 and $750 per hour. [*Id.* at ¶ 16]. He indicates that the increases in his own hourly rate represent increases of 2–3% a year. [*Id.* at ¶10]. The Court notes that both Mr. Bryan and Mr. Killmer have been practicing since 2002—approximately 23 years.

Most recently, in September 2023, the United States District Court for the Northern District of Oklahoma determined that Mr. Bryan's reasonable rate was $425 per hour. *See* [Doc. 335-1 at 55]. Assuming that a 2.5% increase is compounded annually from 2023 to 2024, with an increase effective January 1 of each year, Mr. Bryan's reasonable rate would be approximately $458 per hour for Oklahoma. Wolters Kluwer ELM Solutions publishes an annual Real Rate Report. [Doc. 355-1]. For Denver, Colorado, the Real Rate Report reflects the median rate for a litigation partner in 2022 as $495 per hour. [*Id*. at 3]. Compounding that median rate by 2.5% per year, median hourly rate for a Denver partner would be approximately $546. The Real Rate Report also reflects a three-year trend for average hourly rates of $451 in 2020, $512 in 2021, and $553 in 2022—i.e., an approximately 13.5% increase between 2020 and 2021, and another 8% increase between 2021 and 2022. [*Id.*].

According to the National Law Journal's ("NLJ") survey for 2019 billing rates, the average hourly billing rate for a Colorado partner in 2019 was $456. *See* [Doc. 355-2 at

5].   Compounding the NLJ median rate by 2.5% per year since 2019, the average Colorado hourly rate would be approximately $542.  Finally, when the Colorado Bar Association last published its Economics of Law Practice Survey ("CBA Economic Survey") in 2017, the median hourly rate for an attorney with 20–29 years of experience in a law firm with 2–4 individuals was between $250–$275 per hour.  [Doc. 355-3 at 4]. Compounding those rates for the intervening nine years, the average hourly rate would be between approximately $312–$343 per hour.

And while this Court is not bound by the findings of other district courts, *see Camreta v. Greene*, 563 U.S. 692, 709 n.7 (2011), this Court finds it appropriate to consider other district courts' determinations of reasonable rates as relevant to establishing the prevailing market rate, *see Guides*, 295 F.3d at 1079 (holding that a district court may use other relevant factors, including its own knowledge, to establish the reasonable rate); *see also, e.g.*, *Valdez v. Macdonald*, 66 F.4th 796, 838 (10th Cir. 2023) (affirming rates of $595 and $575 per hour for two partners; $375 per hour for four associates; $100 per hour for one law clerk; $200 per hour for three senior paralegals; and $100 per hour for two paralegals).

Given these data points, this Court concludes that a reasonable rate for Mr. Bryan is $550 per hour.  Applying this reasonable rate to the reasonable hours of 795 hours as determined by the Court, the lodestar amount for BT Law is **$437,250**.

      **2.**    **DH**

For its part, DH seeks rates for its attorneys and paraprofessionals as follows:

| Timekeeper | Hourly Rate |
| --- | --- |
| Sean Dormer | $600 |
| Amy Rogers | $450 |
| Tim Garvey | $500 |

| Greg Bentley | $500 |
|---|---|
| Blaire Bayliss | $375 |
| Erik Moya | $375 |
| Brittany Freeman | $180 |
| Marcie Emch | $200 |
| Donivan Tarpley | $175 |
| Julie Altenhofen | $180 |
| Ella Nelson | $100 |

In support of DH's request, the Estate provides an Order from the Bounty County District Court, in which the court determined that $600 per hour was a reasonable hourly rate for Mr. Dormer with respect to a discovery dispute, and $180 per hour was a reasonable hourly rate for Ms. Freeman.  [Doc. 335-2 at 29–32].  The Estate has also submitted the Declaration of Michael Harris ("Mr. Harris") to support its request with respect to DH attorneys.  S*ee* [Doc. 335-3].  Defendants challenge these rates, because of Mr. Dormer and his team's "limited experience in civil rights litigation."  [Doc. 342 at 6]. This Court respectfully agrees in part.

It is well-settled that a moving party "must provide evidence of the prevailing market rate for similar services," charged by lawyers with *comparable skill* and *experience*, *Lippoldt*, 468 F.3d at 1224 (citation omitted).  Mr. Harris makes clear that his experience is limited to personal injury work.  [Doc. 335-3 at ¶ 1].  While the Tenth Circuit has made clear that the work need not be identical and may simply be analogous, *Valdez*, 66 F.4th at 840, here, DH specifically engaged Mr. Bryan as a "subject matter expert for this area of law," and Mr. Dormer conceded that he "did not feel competent to address all of the novel, high-risk issues in this case."  [Doc. 335-2 at ¶ 38].

This Court accounts for all the data set forth above in determining Mr. Bryan's reasonable hourly rate, and notes that Mr. Dormer has approximately 12.5 years of experience.  [*Id.* at ¶ 1].  The CBA Economic Survey has consistently demonstrated that

hourly rates generally increase with more relevant experience; in 2017, the difference between average hourly rates for attorneys with 20–29 years of experience and 10–19 years of experience was 10%. [Doc. 355-3 at 4]. Consistent with the analysis above, this Court finds that an appropriate hourly rate for Mr. Dormer is $500 per hour.[10]

As for the DH associates, this Court notes that as of 2025, Ms. Rogers had 10 years' experience, [Doc. 335-2 at ¶ 18]; Mr. Garvey has 15 years' experience, [*id.* at ¶ 23]; Mr. Bentley has 15 years' experience, [*id.* at ¶ 29]; and Mx. Bayliss and Mr. Moya each had five years' experience, [*id.* at ¶ 34]. The CBA Survey would include Ms. Rogers, Mr. Garvey, and Mr. Bentley all within the same band of experience, i.e., 10–19 years. [Doc. 355-3 at 4]. For litigation associates in 2022, the Real Rate Report reports a median rate of $345 per hour, with a 75th percentile hourly rate of $415. [Doc. 355-1 at 3]. The average hourly rate for a litigation associate in 2022 was $348. [*Id.*]. The NLJ Survey reported an average hourly billing rate for associates was $292, with a 75th percentile hourly rate of $310, and a 90th percentile hourly rate of $315. [Doc. 355-2 at 5]. Applying a 2.5% compound rate to these figures, the average hourly rate for associates would fall between $347–$384. In recognition that associates within this market generally command a lower billable rate than partners given the responsibilities and risks attendant to partnership, but that Mr. Garvey and Mr. Bentley have significantly more experience than an "average" associate, this Court finds that a reasonable blended hourly rate for them is $425, and for Ms. Rogers is $400. With respect to Mx. Bayliss and Mr. Mora, this Court finds that an hourly rate of $350 is consistent with market rates.

---

[10] Similar to the Boulder County district court, this Court finds that accounting for DH's ability to secure a higher hourly rate from its contingency work is not relevant to determining a reasonable hourly rate within the lodestar calculation. [Doc. 335-2 at 31].

With respect to the hourly rates claimed by the paraprofessionals, this Court finds that they are well within the reasonable rates as set by courts in this District. *See, e.g.*, *Let's Go Aero, Inc. v. Forcome Co.*, No. 23-cv-00045-RMR, 2024 WL 4068758, at *4 (D. Colo. Sept. 5, 2024) ($150 and $180 per hour for paralegals and $75 for administrative assistants); *Valdez v. Motyka*, No. 15-cv-00109-WJM-STV, 2022 WL 1092182, at *3 (D. Colo. Apr. 12, 2022) ($100–$200 per hour for paralegals), *aff'd in part, rev'd in part on other grounds sub nom.*, *Valdez v. Macdonald*, 66 F.4th 796 (10th Cir. 2023); and $180 per hour, *Edwards v. Edwards*, No. 20-cv-02843-CMA-SKC, 2021 WL 130690, at *2 (D. Colo. Jan. 14, 2021) ($180 per hour for a paralegal).

Accordingly, taking the reasonable hours and multiplying it by the reasonable hourly rate for each timekeeper, the Court concludes that the lodestar amount for DH is as follows:

| Timekeeper | Compensable Hours | Hourly Rate | Total |
|---|---|---|---|
| Sean Dormer | 853.2 | $500 | $426,600.00 |
| Amy Rogers | 239.78 | $400 | $95,912.00 |
| Tim Garvey | 150.53 | $425 | $63,975.25 |
| Greg Bentley | 12.75 | $425 | $5,418.75 |
| Blaire Bayliss | 23.25 | $350 | $8,137.50 |
| Erik Moya | 4.8 | $350 | $1,680.00 |
| Brittany Freeman | 163.4 | $180 | $29,412.00 |
| Marcie Emch | 114.3[11] | $200 | $22,860.00 |
| Donivan Tarpley | 1.1 | $175 | $192.50 |
| Julie Altenhofen | 27.75 | $180 | $4,995.00 |
| Ella Nelson | 96.9 | $100 | $9,690.00 |
| | | **Total** | **$668,873.00** |

---

[11] This calculation uses 228.6 hours as its base, derived from 321.6 hours—93 hours. *See supra* note 7.

28

### 3.    MJC

MJC seeks an hourly rate of $500 for Ms. Ram; $300 for Mr. Gunning, $300 for Mr. Mills, as well as $250 per hour for Ms. Clark, the paralegal. [Doc. 335-4 at 8]. Ms. Ram graduated from law school in 2018, giving her five years of experience, including one year of a federal clerkship, by 2023—the timeframe of the appeal. [*Id.* at ¶ 19]. Mr. Gunning graduated from law school in 2020, giving him three years of experience, including two years of federal clerkships, by 2023. [*Id.* at ¶ 22]. Mr. Mills graduated law school in May 2021, giving him two years of experience by 2023. [*Id.* at ¶ 24]. Based on the data set forth above, this Court finds that a reasonable hourly rate for Ms. Ram is $350 and for Messrs. Gunning and Mills is $300. Accordingly, taking the reasonable hours and multiplying it by the reasonable hourly rate for each timekeeper, the Court concludes that the lodestar amount for MJC is as follows:

| Timekeeper | Compensable Hours | Hourly Rate | Total |
|---|---|---|---|
| Megha Ram | 37 | $350 | $12,950.00 |
| Ben Gunning | 61.26 | $300 | $18,378.00 |
| George Mills | 10.85 | $300 | $3,255.00 |
| | | Total | $34,583.00 |

### C.    Jury Consultants

The Estate claims 40.14 hours, at a hourly rate of $575 per hour rendered by attorney and jury consultant Jessica Brylo ("Ms. Brylo"), and her colleague Jennifer LaRue ("Ms. LaRue") for a total of $33,030.50. [Doc. 335 at 10; Doc. 335-2 at 18 ¶¶ 53, 63]. Mr. Dormer describes their work as follows:

> Ms. Brylo coordinated two focus groups and a "big data" survey of approximately 400 members of the relevant jury pool to help with case framing, communication strategy, and settlement advice to our client. Ms. LaRue helped us perform background checks on prospective jurors,

in direct communication with me, during jury selection. She also helped
me evaluate and advise my client on her own testimony.

[Doc. 335-2 at 12 ¶ 45].  In support of its request, Plaintiff has submitted invoices to the

Court the curriculum vitae of Ms. Brylo and Ms. LaRue, *see* [*id.* at 24–28, 143–49], and

Mr. Harris's expert opinion.

Courts have observed that recovery of litigation consulting fees under § 1988 may

be appropriate in cases where the claims are not straightforward.[12]  *See, e.g.*, *Phillips v.*

*Duane Morris, LLP*, No. 13-cv-01105-REB-MJW, 2014 WL 7051722, at *4 (D. Colo. Dec.

12, 2014).  The County Defendants do not challenge the recovery of such expenses as

part of attorney's fee award under § 1988.  *See* [Doc. 342 at 7–8].  The Court notes that

trial in this case was required because there was a genuine issue of material fact as to

whether Defendants Wilson and Macias acted with deliberate indifference, and the jury's

determination of those facts was dependent, in part, upon the jury's assessment of

witness credibility.  *See* [Doc. 207].  Indeed, the split verdict at trial, i.e., a finding of liability

as to Defendant Wilson and a finding of non-liability as to Defendant Macias, further

underscores that the facts did not present a straightforward case.

---

[12] As observed by Plaintiff, there is some ambiguity whether litigation consultant fees
should be categorized as "attorney's fees" or "expenses incidental to the award of
attorneys' fees," where such expenses must be reasonably warranted by the case.  [Doc.
335-2 at 22 n.7].  This Court finds that the cost of litigation consultants is more
appropriately categorized as an expense incidental to the award of attorney's fees, only
recoverable under § 1988 when a prevailing party carries it burden to prove that such
expenses are "inseparably intertwined as equally vital components of the costs of
litigation" and not "normally observed as part of law firm overhead."  *Brown*, 227 F.3d at
1297 (quoting *Dowdell v. City of Apopka,* 698 F.2d 1181, 1190 (11th Cir.1983)).  But such
fees, even when warranted, must be reasonable.  *Id.* at 1297.

Nor do the County Defendants challenge any certain work performed by the jury consultants.   But the County Defendants contend that their hourly rates are not reasonably based in civil rights litigation or grounded within the Denver market.  [Doc. 342 at 7].  They further argue that Plaintiff has failed to provide an adequate basis for the Court to conclude that the consultants have any specialized knowledge in civil rights cases, and their fees should be reduced by 25%.  [*Id.*].

In *Auraria Student Hous. at the Regency, LLC v. Campus Vill. Apartments, LLC*, the plaintiff sought $41,925.82 in expenses paid to a litigation consultant for work on a pre-trial focus group and as a jury consultant.  2016 WL 8458776, at *7.  According to invoice, the consultants billed 120 hours at an hourly rate of $200.  *See Auraria Student Hous.*, No. 10-cv-2516-WJM-KLM, [ECF No. 302-7].  That court ultimately reduced the expense by 50% based on the party's lack of sufficient detail.  *Auraria Student Hous*, 2016 WL 8458776, at *8.

Here, the entries by the jury consultants do not suffer from the same type of infirmities.  But insofar as Ms. Brylo consulted on drafts of voir dire or the verdict form, such expense is not reasonably warranted in a case staffed with multiple attorneys who are also drafting and reviewing the proposed voir dire and verdict form.

Plaintiff's expert, Mr. Harris, indicates that rates for jury consultants are "perhaps among the most varying rates within our field of personal injury practice."  [Doc. 335-3 at ¶ 16(f)].  He indicates that he personally has retained such experts between $250 and $800 per hour.  [*Id.*].  He states that Ms. Brylo is "known to the undersigned and has been regarded for quite some time as having a national reputation for her work in assisting in achieving successful trial results."  [*Id.*].  But he points to no other evidence—such as

surveys regarding the costs of jury consultants or court cases where these or similar consultants have been paid—to support his conclusion that the requested $575 per hour is within the Denver market rate.  *See generally* [Doc. 335-3].

This Court could not independently find any rate associated with Ms. Brylo or Ms. LaRue, nor could it find many cases in which a court in this District granted jury consultant fees.  But to the extent that Ms. Brylo is "organizing case files" and "finding names for screener," those administrative tasks at a full rate of $575 are not appropriately billed, just as they are not appropriately billed by an attorney.[13]  And while this Court finds that the conduct of big data surveys and focus groups are not within the ordinary skills of an attorney and may command a premium, background checks on prospective jurors during jury selection do not.

Accordingly, the Court finds that reducing the jury consultant fees by 25% is appropriate to account for the excludable entries and a reduced fee for services that should not command a premium fee, resulting in a reasonable expense of **$24,772.88**. Aggregating all reasonable fees and expenses, the total lodestar amount is **$1,165,478.95**.

### D.    Enhancement or Reduction to Lodestar Calculation

Finally, the Court considers Plaintiff's request for a 1.6x enhancement multiplier. The Tenth Circuit recognizes after the calculation of the lodestar, a court may "adjust the lodestar upward or downward to account for the particularities of the suit and its outcome." *Zinna v. Congrove*, 680 F.3d 1236, 1242 (10th Cir. 2012) (quotation omitted).  The Supreme Court has recognized that enhancements only apply in rare and exceptional

---

[13] The total amount of the excludable entries amounts to approximately $4,657.50.

circumstances.   *See Perdue*, 559 U.S. at 554.   In addition, there must be "specific evidence that the lodestar fee would not have been adequate to attract competent counsel."  *Id.* (internal quotations omitted).

### 1.    Enhancement

Based on the record before it, this Court cannot conclude that the lodestar amount does not adequately account for the performance of Plaintiff's counsel.  Plaintiff suggests that an enhancement is appropriate because the "litigation spanned more than four years, including about a year and a half on interlocutory appeal," and "to encourage competent counsel to accept meritorious cases despite the significant work required."  [Doc. 335 at 8].

***Length of Litigation**.*  In this case, Defendant Wilson appealed this Court's Order granting in part and denying in part the County Defendants' Motion for Partial Summary Judgment, challenging the Court's denial of qualified immunity.  [Doc. 207; Doc. 208]. Plaintiff cross-appealed that same Order granting qualified immunity as to Defendants Wells and Shields, as well as an Order denying sanctions [Doc. 200; Doc. 216].[14]   The Parties then all agreed to administrative closure of the case pending appeal to the Tenth Circuit.  [Doc. 212].  Given that "qualified immunity establishes immunity from suit rather than a mere defense to liability," this Court's denial of a claim of qualified immunity was immediately appealable under 28 U.S.C. § 1291, *Callahan v. Unified Gov't of Wyandotte Cnty.*, 806 F.3d 1022, 1026 (10th Cir. 2015) (quotation omitted), and this Court does not fault Defendant Wilson for exercising his ability to appeal, *cf. Perdue*, 559 U.S. at 556

---

[14] Ultimately, it appears that Plaintiff only pursued her cross-appeal as to the application of qualified immunity to Defendants Wells and Shields, and the Tenth Circuit dismissed that cross-appeal for lack of jurisdiction.  *See* [Doc. 225].

(recognizing that an enhancement may be appropriate where there are unanticipated delays, particularly ones unjustifiably caused by defense). And once the Tenth Circuit issued its Mandate returning the case to this Court on July 5, 2024, [Doc. 228], this Court convened the Parties within three weeks to set an 8-day jury trial, [Doc. 233]. While courts in this District always strive to bring cases to trial in an expeditious manner, the reality is that given the District of Colorado has the sixth-highest weighted civil case load per judge,[15] and on average, it takes 39 months from inception of a civil case to trial.[16] Even with the 16-month delay due to the interlocutory appeal, this case was tried within 48 months of its inception. *Cf. Stella v. Davis Cnty.*, No. 1:18-cv-00002-JNP, 2023 WL 5334427, at *12 (D. Utah Aug. 18, 2023) (applying an enhancement based, in part, on a five-year delay). There is also no evidence that counsel bore the expenses of this action during this case, and in any case, the Clerk of Court has already assessed costs and expenses against the County Defendants. *See* [Doc. 345]. Accordingly, given the particular circumstances in this case, this Court does not find that the length of the case is exceptionally protracted to warrant an enhancement.

***Competent Counsel.*** Nor is this Court persuaded that there is a need to encourage competent counsel to accept meritorious cases despite requirement of significant work is adequate justification for an enhancement. Plaintiff cites no authority to support that proposition, *see* [Doc. 335 at 8], and it is a misstatement of the standard set forth by the Supreme Court that requires "specific evidence that the lodestar fee would

---

[15] N. Reid Neureiter, 2024: The Year in Review, U.S. District Court, District of Colorado, at 9, https://www.cod.uscourts.gov/Portals/0/Documents/DistrictStats/District_Facts_Figures_ 2024.pdf (last visited Mar. 31, 2025).

[16] *Id.* at 27.

not have been adequate to attract competent counsel," *Perdue*, 559 U.S. at 554 (quotation omitted).  There is simply not adequate evidence to suggest the lodestar fee would not be adequate to attract competent counsel to justify such a multiplier.  There is no testimony from Ms. Lieberenz indicating that she had difficulty finding competent counsel, and the record reflects that only three months elapsed from Mr. Maes's untimely death on or about November 17, 2019, to the intake of this case by Dormer Harpring in mid-February 2020.  *Compare* [Doc. 1 at ¶ 1], *with* [Doc. 335-2 at 33].  And as the *Ramos* court observed, "[b]ecause civil rights cases now comprise a large part of all federal trial and appellate litigation, a significant portion of the bar is regularly participating in civil rights litigation; thus, no real stigma remains associated with these cases."  *Ramos*, 713 F.2d at 557–58.

In addition, Counsel's own statements regarding the complexity of this case or the risks involved are insufficient, particularly because "novelty and complexity of a case generally [should] not be used to justify an enhancement because these factors presumably are fully reflected in the number of billable hours by counsel."  *Perdue*, 559 U.S. at 553 (cleaned up).  Nor is this Court persuaded by the Declarations of either Mr. Killmer, who does not address the appropriateness of an enhancement at all, [Doc. 335-1 at 172–76], or Mr. Harris, who concedes that he is "not a specialist in civil rights," and does not address how the lodestar fee would not be adequate to attract competent counsel, *see* [Doc. 335-3].  This Court is also not persuaded that an enhancement to the lodestar is justified due to the rates that may be achieved through contingency fee cases.  And while Mr. Dormer represents "[s]uccessful, in-demand law firms that are hired by sophisticated clients now charge above $2,000," [Doc. 335-1 at ¶ 54 & n.4], this fee is not

for corporate restructuring, and Mr. Dormer identifies no case—and this Court did not independently find any—where *a court* (let alone a *Colorado* one) has found a hourly rate of anywhere near $2,000 per hour as reasonable in awarding attorney's fees.

Finally, as the Tenth Circuit observed in *Ramos*, "the greater the number of attorneys involved on a side, the less likely it is that an extraordinary performance bonus is appropriate." *See Ramos*, 713 F.2d at 557. Here, there were 12 attorneys working on a case involving one client. *Cf. supra* at 16–17 (discussing staffing practices).

There is no question that civil rights are critical to a fair and just society, and civil rights litigation is an important tool for individuals to vindicate those rights when violated. *Cf.* [Doc. 335 at 3]. And this Court in no way minimizes the jury's verdict or the efforts undertaken by Plaintiff's counsel to secure that verdict. But based on the record before it, the Court respectfully concludes that a multiplier on an attorney's fee award is not appropriate. The Court has an obligation "to be fair to the taxpayers who will fund the attorney's fee award," *Veasey v. Abbott*, No. 2:13-cv-00193, 2020 WL 9888360, at *19 (S.D. Tex. May 27, 2020), *aff'd,* 13 F.4th 362 (5th Cir. 2021), even if it is indirectly through insurance premiums. And the Court recognizes that unwarranted enhancement may be counterproductive "because state and local governments have limited budgets, money that is used to pay attorney's fees is money that cannot be used for programs that provide vital public services." *Perdue*, 559 U.S. at 559.

### 2. Reduction

The Court next considers whether a reduction to the lodestar amount is appropriate. The County Defendants argue that a 50% reduction is appropriate due to Plaintiff's "limited success" in the case. [Doc. 342 at 12–16]. To support that argument,

the County Defendants point to the following:  (1) Plaintiff only prevailed on two out of eleven original claims; (2) Plaintiff's recovery was only 5.33% of its demand, [*id*. at 15]; and (3) Plaintiff's unsuccessful claims did not share a common core of facts to the successful ones, *see* [*id.* at 14–15].  On Reply, Plaintiff argues that the County Defendants fail to provide any evidence to support their request for reduction of the lodestar, [Doc. 343 at 2–3], and that the outcome of this case was exceptional, as it was the largest and only plaintiff's verdict in a jail suicide case in Colorado in two decades, [*id.* at 10].

The Supreme Court has made clear that "the extent of a plaintiff's success is a crucial factor in determining the proper amount of an award of attorney's fees under 42 U.S.C. § 1988." *Hensley*, 461 U.S. at 440.  But an assessment of success is not simply tallying up the winning claims versus the non-winning claims.   Instead, this Court considers the overall complexion of the case.  The core of this action is whether some or all of the Defendants who encountered Mr. Maes on his way to and at the Saguache County Jail on November 16, 2019 were deliberately indifferent to a substantial risk of suicide.  The jury answered this question "yes," and awarded $4,000,000.  [Doc. 329]. Regardless of whether this is the largest and only in-custody suicide verdict in Colorado in 22 years, [Doc.343 at 10], it is clear that the verdict was out of the ordinary in the District of Colorado.  Based on the totality of the circumstances, this Court finds that a reduction of the lodestar is not warranted, because the Court has accounted for the success of Plaintiff through its analysis of reasonable hours.

That is not to say that counsel's exercise of billing judgment did not cause concern and consternation on the part of the Court, resulting in this forty-page opinion.  The sheer amount of time and effort that this Court expended in reviewing the Parties' papers,

examining the requested fees and expenses, and drafting this Order, was itself troubling. In reviewing the instant Motion, as with other requests for attorney's fees, this Court was not bound by the arguments of the opposing party, but rather is guided by the principle that:

> Section 1988 serves an important public purpose by making it possible for persons without means to bring suit to vindicate their rights.  But unjustified enhancements that serve only to enrich attorneys are not consistent with the statute's aim.

*Perdue*, 559 U.S. at 559.  This Court encourages counsel to heed the principles regarding billing judgment set forth in this Order as they move forward in other cases.

### D.    Prejudgment Interest

It is well-settled that an award of prejudgment interest is not recoverable as a matter of right but lies within the sound discretion of the district court.  *See White v. Chafin*, 862 F.3d 1065, 1067 (10th Cir. 2017) (citing *Zuchel v. City & Cnty. of Denver*, 997 F.2d 730, 746 (10th Cir. 1993)).  To determine whether to award prejudgment interest, the Tenth Circuit applies a two-step test considering:  (1) whether such an award would compensate the injured party; and (2) if so, whether the equities would preclude an award. *Id.* at 1068.  Plaintiff recognizes that the weight of authority in this District—and indeed, within the Tenth Circuit—holds that prejudgment interest should not be applied to noneconomic damages.  [Doc. 335 at 11 (citing *Clawson v. Mountain Coal Co., L.L.C.,* No. 01-cv-02199-MSK-MEH, 2007 WL 201253 (D. Colo. Jan. 24, 2007); *White v. Wycoff*, No. 13-cv-01761-CMA-MJW, 2016 WL 9632932 (D. Colo. July 7, 2016))]; *see also* [Doc. 335-1 at 71–73].   This Court is unpersuaded by Plaintiff's arguments that these determinations rest on "unsound interpretation of the underlying legal concepts,"  [*id.* at 12–14], or that the County Defendants' argument "misconstrues the law."  [Doc. 343 at

38

11–12].  Even if this Court were to ignore the *Clawson* and *White* decisions—which it is not inclined to do—the court in *Echon v. Sackett* analyzes the issue exhaustively under the two-step framework contemplated by *Zuchel*.  *See* No. 14-cv-03420-PAB-NYW, 2019 WL 8275344, at *9–10 (D. Colo. Feb. 12, 2019) (collecting cases), *aff'd sub nom.*, *Villanueva Echon v. Sackett*, 809 F. App'x 468 (10th Cir. 2020).  This Court need not repeat the analysis here, and observes that despite the County Defendant's citation of *Echon*, [Doc. 342 at 22], Plaintiff fails entirely to respond to it on Reply, *see* [Doc. 343 at 11–12].  The Court further declines Plaintiff's invitation to speculate that the jury's $4 million award somehow reflects some type of compensatory damage calculation tied to the "four days Mr. Maes had left to live."  [Doc. 335 at 15].

Instead, this Court concurs with the weight of authority and concludes that prejudgment interest on the noneconomic damages awarded by the jury in this case is not warranted because, as Justice Blackmun observed:

> Arguably, damages for pain and suffering are themselves not truly compensatory.  Certainly, such awards are of a different character.  They are inherently noneconomic and are established through the subjective discretion of the jury.  Prejudgment interest on these speculative awards does not make up for the lost use of money and cannot be considered compensatory in any realistic sense.

*Monessen Sw. Ry. Co. v. Morgan*, 486 U.S. 330, 348 n.5 (1988) (Blackmun, J., concurring in part and dissenting in part) (internal citations omitted); *see also Coates v. Bd. of Cnty. Comm'rs for Cnty. of Adams*, No. 20-cv-01936-STV, 2025 WL 2061915, at *3 (D. Colo. July 23, 2025) (collecting cases); *Stella v. Davis Cnty.*, No. 1:18-cv-00002-JNP, 2023 WL 5334189, at *2 (D. Utah Aug. 18, 2023) (collecting cases).

Accordingly, Plaintiff's request for prejudgment interest is respectfully **DENIED**.

39

## II.     Motion for Review of Costs

Plaintiff next seeks a review of the costs claimed by Defendant Macias.  [Doc. 346].

Rule 54(d) allows a prevailing party to recover its costs.  Fed. R. Civ. P. 54(d)(1).  Once a

clerk taxes costs, a party has seven days to file a motion for review with the Court.  *Id.*

"[T]he taxing of costs rests in the sound judicial discretion of the trial court."  *Gobbo Farms*

*& Orchards v. Poole Chem. Co.*, 81 F.3d 122, 124 (10th Cir. 1996).  Here, Defendant

Macias bears the burden to establish the amount of compensable costs and expenses.

*See Kulasa v. Wyndham Vacation Rentals N. Am., LLC*, No. 19-cv-00561-NRN, 2020 WL

7640869, at *2 (D. Colo. Dec. 23, 2020) (citing *Mares v. Credit Bureau of Raton*, 801 F.2d

1197, 1208 (10th Cir. 1986)).

Recoverable costs are enumerated by 28 U.S.C. § 1920, which has been

interpreted to include demonstrative models.  *See, e.g., Wade v. Union Pac. R.R.*, No.

12-cv-01772-RM-CBS, 2014 WL 1909666, at *4 (D. Colo. May 13, 2014).  Here, Plaintiff

suggests that Defendant Macias did not establish that the costs of a model subject jail

were actually incurred by him, rather than the County Defendants.  [Doc. 346 at 4].

Plaintiff further contends that imposing costs in the context of civil rights litigation may

impose a chilling effect, arguing that the "Estate made a strategic decision to pursue

Defendant Macias because the facts were so egregious the case presented a good

vehicle for setting circuit-wide precedent.  Defendant Macias thwarted that opportunity by

never requesting qualified immunity . . . ."  [*Id.* at 6].

The Court has reviewed the invoice from Elite Trial Consultants and notes that it is

billed to the law firm representing Defendant Macias.  *See* [Doc. 334-3].  The Court is not

40

persuaded that the location for the storage of the model overrides the clear evidence that counsel for Defendant Macias incurred such costs.

Nor is this Court persuaded that Defendant Macias is not entitled to costs as the prevailing party simply because the Estate included him in an attempt to establish circuit-wide case law. First, the jury decided that Defendant Macias did not, in fact, violate Mr. Maes's Eighth Amendment constitutional rights. [Doc. 329]. Second, it is entirely unclear that the inclusion of Defendant Macias was necessary to establish the parameters of deliberate indifference in the context of a jail suicide, particularly given the fact that Plaintiff argued, and this Court agreed, that such right was already clearly established. As noted in this Court's ruling on the County Defendants' Motion for Partial Summary Judgment, it was clearly established that as of November 2019, prison officials are deliberately indifferent if they fail to take reasonable steps to protect a pretrial detainee or an inmate from suicide when they have subjective knowledge that person is a substantial suicide risk. [Doc. 207 at 27]. This principle was affirmed by the Tenth Circuit on interlocutory appeal. *See Lieberenz v. Wilson*, No. 23-1055, 2024 WL 2952150, at *7 (10th Cir. June 12, 2024) ("Our precedent on November 16, 2019, clearly established that Captain Wilson's failure to take any steps to assist Mr. Maes despite his awareness of the risk of Mr. Maes's death constituted deliberate indifference to his serious medical need."). Third, there was no guarantee that, had such right not been already clearly established, this Court or the Tenth Circuit would have proceeded to establish such a constitutional right in the context of this case. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009) ("[D]istrict courts and the courts of appeals should be permitted to exercise their sound

discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.").

The Estate provides no authority that suggests Defendant Macias should be deprived costs due to a unilateral, strategic decision on its part, and this Court respectfully declines to do so. Accordingly, Plaintiff's Motion for Review of Costs is respectfully **DENIED**.

**CONCLUSION**

For the foregoing reasons, **IT IS ORDERED** that:

(1)    Plaintiff's Motion for Attorneys' Fees and Prejudgment Interest [Doc. 335] is **GRANTED in part** and **DENIED in part**;

(2)    Attorney's fees in the amount of **$1,165,478.95** are **AWARDED** to Plaintiff Sarah Lieberenz, as personal representative of the Estate of Jackson Maes, and against Defendant Kenneth Wilson, in his individual and supervisory capacity, and Defendant Dan Warwick, in his official capacity, with no prejudgment interest; and

(3)    Plaintiff's Motion for Review of Clerk's Taxation of Macias' Bill of Costs [Doc. 346] is **DENIED**.

DATED:  March 31, 2026                               BY THE COURT:

_____
Nina Y. Wang
United States District Court

42
